

Unseale
4/15/03



dg

FILED

03 APR -8  PM 3: 17

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) INDICTMENT |
| Plaintiff, | ) |
| | ) Criminal No. |
| v. | ) 3: 03 CR 739 |
| JAMES L. WHEELER,<br>    a/k/a "FRANK," | ) VIOLATIONS: |
| PATRICK J. PUTTICK,<br>    a/k/a "PUDD," | ) |
| ROBERT W. KEELER, | ) 18 U.S.C. § 2 |
| GARY T. HOHN,<br>    a/k/a "RAMBO," | ) 18 U.S.C. § 894<br>) 18 U.S.C. § 924(o) |
| GLEN D. CARLISLE,<br>    a/k/a 'HOT ROD," | ) 18 U.S.C. § 1962(c)<br>) 18 U.S.C. § 1962(d) |
| DAVID J. HANNUM,<br>    a/k/a "D.J.," | ) 18 U.S.C. § 1963<br>) 18 U.S.C. § 2312 |
| JASON G. FOWLER,<br>    a/k/a "7TH STREET," | ) 18 U.S.C. § 2313<br>) 21 U.S.C. § 841(a)(1) |
| ALLEN C. LAWSON,<br>    a/k/a "PSYCHO" | ) 21 U.S.C. § 843(b)<br>) 21 U.S.C. § 846 |
| JACK E. LEE,<br>    a/ka "DR. LEE," | ) |
| JOHN P. WALKER,<br>    a/k/a "J.W.," | ) |
| GREGORY A. DRIVER, | ) JUDGE DAVID A. KATZ |
| DAVID F. MAYS, | ) |
| THOMAS B. CAIN,<br>    a/k/a "CHAMELEON," | ) |
| DANNY N. GARLAND,<br>    a/k/a "TUBBY GLIDE," | ) |
| DANNY K. HEDGES, | ) |
| DARRELL L. BAKER,<br>    a/k/a "D.B.," | ) |
| JOHN L. BLACKMAN,<br>    a/k/a "LEADHEAD," | ) |
| MICHAEL L. BOWLING, | ) |



1



|                                                      |     |
|------------------------------------------------------|-----|
| a/k/a "SLEAZY,"                                       | )   |
| WILLIAM L. BRAGG,                                    | )   |
| a/k/a "CISCO,"                                        | )   |
| RICHARD F. BRODERICK,                                | )   |
| a/k/a "LEECH" "MONEY MAN,"                            | )   |
| KENNETH L. BUCHER,                                   | )   |
| a/k/a "HOOK,"                                         | )   |
| LYNN A. CARLISLE,                                    | )   |
| REX A. DEITZ,                                         | )   |
| LLOYD E. HECKMAN,                                    | )   |
| a/k/a "DOUBLE L,"                                     | )   |
| DARRELL W. HORTON,                                   | )   |
| JEFFREY A. HUMBLE,                                   | )   |
| a/k/a "JIFFY JEFF,"                                   | )   |
| EARL F. LOGSDON,                                     | )   |
| a/k/a "SKEETER,"                                      | )   |
| DOMINIC R. MANGINE, SR.,                             | )   |
| a/k/a "DOM,"                                          | )   |
| JAMIE M. REICHELDERFER,                              | )   |
| a/k/a "DERF,'                                         | )   |
| MICHAEL J. ROBERTS,                                  | )   |
| BRIAN J. SEXTON,                                     | )   |
| RICHARD L. SPENCE,                                   | )   |
| MANCE R. STEPHENS,                                   | )   |
| a/k/a "TOOL,"                                         | )   |
| RONALD P. TAYLOR, JR.,                               | )   |
| a/k/a "R.T.,"                                         | )   |
| KEVIN A. WALES,                                      | )   |
| JOHNNY D. WARMAN,                                    | )   |
| STEVEN E. WARMAN,                                    | )   |
| a/k/a "TURTLE," and,                                  | )   |
| WILLIAM E. SYLVIA,                                   | )   |
|                                                      | )   |
|                                                      | )   |
| Defendants.                                          | )   |

## Table of Contents

| I.   | RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS CHARGES | 3   |
|------|--------------------------------------------------------|-----|
| II.  | NARCOTICS CONSPIRACY CHARGE                            | 38  |
| III. | FIREARMS CONSPIRACY CHARGE                             | 77  |
| IV.  | POSSESSION WITH INTENT TO DISTRIBUTE CHARGES          | 88  |
| V.   | UNLAWFUL USE OF A COMMUNICATION FACILITY CHARGES      | 90  |
| VI.  | EXTORTIONATE CREDIT TRANSACTION CHARGES               | 99  |
| VII. | STOLEN PROPERTY CHARGES                               | 100 |

## COUNT 1

## RICO 18 U.S.C. Section 1962(c)

### Introduction

1.       At all times material to this Indictment:

a.       The Outlaws Motorcycle Club (hereinafter referred to as "the OMC") was an international organization consisting of national, regional and local units.  The most local unit was the chapter.  Within the United States, the OMC was divided regionally and by color-coded names.  The OMC "Green" region consisted of five chapters, located in five cities, in four states: Indianapolis, Indiana; Fort Wayne, Indiana; Dayton, Ohio; Louisville, Kentucky; and Oklahoma City, Oklahoma.  National units were located in the United States, Canada, Germany, Belgium and Australia.

b.       The OMC "Green" chapters were supervised by a regional president or "boss."

c.       The OMC was supervised on a national and international level by an international president, also known as the "International Spokesman," to whom the regional presidents reported.

d.       Each OMC chapter had officers, consisting of a president, vice president, treasurer and enforcer.

e.       The OMC maintained national By-Laws, or rules, by which the members were required to abide.  If OMC rules were violated, members were subject to assault, fine and/or expulsion from the OMC.

f.       The OMC operated and maintained an Internet website, www.outlawsmc.com, which the OMC used to communicate with OMC members and associates around the world.

g.       The enforcer for each chapter was required to participate in and conduct acts of violence as directed by the president of the local chapter.

3

h.      The enforcer for each OMC region was required to participate in and conduct acts of violence, as directed by the regional president.

i.      The OMC maintained national, regional and chapter treasuries. Membership in the OMC required that members pay dues to the local chapter, which would, in turn, forward a portion of dues collected from members to both the regional and national organizations of the OMC.  Members were "patched" as a formal method of identifying themselves and their level of participation in the enterprise.

j.      Local or chapter meetings were called "church."  Only fully-patched members of the OMC were allowed to attend "church."

k.      Regional presidents met, on a regular basis, with chapter presidents from their respective OMC regions to discuss OMC business.  The International Spokesman regularly met with the regional presidents to discuss OMC business.

l.      There were three stages of membership in the OMC: hangers-on or associates, probates or pledges, and full patch wearing members.

m.      Probates or pledges were required to submit to orders and/or directives from full patch wearing members, including being physically assaulted  by patch members.

n.      The vestments of membership in the OMC, referred to as "colors," included leather vests with "rockers" denoting chapter and club membership information, which surrounded the "patch" or emblem, which was a skull and crossed pistons known as "Charlie."

o.      The OMC maintained rules regarding the wearing of particular OMC-related tattoos.  After one year as a full patched member of the OMC, a member could obtain an OMC-related tattoo.  After five years as a full patched member of the OMC, the members could wear a "back patch" tattoo (which was a skull and cross pistons (Charlie) across the member's back).

4

p.  The OMC required return of all vestments of membership when an individual was no longer an active member.  The OMC could also require that members and other persons outdate or color-over tattoos which served as indicia of OMC membership.

q.  Women were regarded as the personal property of the OMC, and were given vestments reading "Property of Outlaws," which was worn on a leather vest.

r.  Wives, girlfriends and female associates of OMC members were referred to as "old ladies" and were required to provide financial support for OMC members through various activities, including prostitution.

s.  Membership in the OMC was limited to white males who owned American made-motorcycles equipped with engines 1,000 cc. or larger.

t.  All OMC members were required to go on "runs", as directed by the OMC leadership; that is, to travel to various OMC-related events held throughout the United States. Those events were generally either regional or national in scope.

u.  The Indianapolis, Indiana Chapter of the OMC (hereinafter "the Indianapolis Chapter") was regarded as OMC "world headquarters."

v.  The Toledo, Ohio chapter of the OMC was inactive, but was the site of OMC bosses' meetings.

w.  OMC members were required to submit to a Computer Voice Stress Analyzer examination (hereinafter referred to as a CVSA), sometimes on multiple occasions, in an effort to determine if the member was cooperating with law enforcement or other rival motorcycle clubs.

### The Enterprise

2.  At all times material to this Indictment, in the Northern District of Ohio, Western Division, and elsewhere, JAMES L. WHEELER, PATRICK J. PUTTICK, ROBERT WILLIAM KEELER, GARY T. HOHN, GLEN D. CARLISLE, JASON G. FOWLER, ALLEN C. LAWSON, JACK E. LEE, JOHN P. WALKER, GREGORY A. DRIVER, DAVID F. MAYS,

DANNY N. GARLAND, and DANNY K. HEDGES, the defendants herein, and others known and unknown to the Grand Jury, were members of and associated with the "Outlaw Motorcycle Club (OMC)," an enterprise as defined by Title 18, United States Code, Section 1961(4), i.e., a group of individuals associated in fact, although not a legal entity, which engaged in and the activities of which affected interstate and foreign commerce.  Members and associates of the enterprise engaged in acts of murder, attempted murder, controlled substances distribution, interstate and foreign travel in aid of racketeering, interstate transportation of stolen property, robbery, arson, attempted arson, and tampering with witnesses.  This enterprise included the defendants listed above, other members of the OMC known and unknown, and the corporations, associations and other legal entities created by the defendants.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

<strong><u>The Purpose of the OMC Enterprise</u></strong>

3.      The purpose of the OMC enterprise was to enrich the OMC and OMC members and to protect OMC territory in the following ways: a) the enterprise members distributed quantities of controlled substances to each other and otherwise dealt in large quantities of controlled substances, b) the OMC enterprise used violence to protect and expand its territorial influence and drug trafficking networks, c) the OMC sold stolen motorcycles and stolen motorcycle parts, and d) the OMC enterprise required its members to pay monthly dues and fines for infractions; dues and fines were shared with the national and international hierarchy.

<strong><u>Means and Methods of the OMC Enterprise</u></strong>

4.      Means and methods by which the defendants, and others known and unknown to the Grand Jury, conducted and participated in the conduct of the affairs of the OMC Enterprise included the following:

a.    Acts of murder, in violation of Section 2903.02 of the Ohio Revised Code, and Title 35, Article 42, Chapter 1, Section 1, Indiana Code.  These acts involving murder included murders to intimidate persons having contact and association with the OMC.

b.    Acts involving the interstate transportation of stolen motor vehicles in violation of Title 18, United States Code, Section 2312, and the sale and receipt of stolen motor vehicles in violation of Title 18, United States Code, Section 2313.

c.    Acts involving the felonious distribution of controlled substances and dangerous drugs, including cocaine, marijuana, methamphetamine, LSD (lysergic acid diethylamide), ecstasy (methylenedioxymethamphetamine), and valium (diazepam), in violation of Title 21, United States Code, Sections 841(a)(1) and 846, as well as acts of using communication facilities to commit or facilitate the commission of controlled substances offenses in violation of Title 21, United States Code, Section 843(b).

d.    The enterprise members possessed, transported, received, transferred, and used firearms, machineguns, silencers, explosives, explosive devices, and other deadly weapons, including, but not limited to, knives and flashlights, and used violence to promote and conduct the affairs of the enterprise.

e.    The enterprise members transferred, sold, and disposed of firearms to persons the enterprise members knew and had reasonable cause to believe were convicted felons, that is, persons who had been convicted of crimes punishable by imprisonment for a term exceeding one year.

f.    The enterprise members committed acts intended to intimidate owners, managers, employees and customers of businesses which OMC members frequented.

g.    The enterprise members asserted that particular businesses and geographic locations belonged to the OMC.

7

h.      The enterprise members asserted that the territory comprising the cities with OMC chapters within the "Green" region was OMC territory and no other motorcycle clubs or organizations could operate or display "colors" without OMC consent.

i.      The enterprise members committed acts of violence, intimidation, and threats against members and associates of other motorcycle clubs including, but not limited to, the Hells Angels, Iron Horsemen and Sons of Silence.

j.      The enterprise members caused members of the OMC, who did not have felony convictions or other individuals without felony convictions, to purchase and possess firearms for use by all of the enterprise members.

k.      The enterprise members possessed, used, and threatened to use explosive devices to promote and conduct the affairs of the enterprise.

l.      The enterprise members stole motorcycles and sold or dismantled them for parts to be utilized by the enterprise.

m.      The enterprise members took motorcycles and motorcycle parts from former members and associates for OMC use.

n.      The enterprise caused members to visit and observe judicial proceedings involving other members of the OMC and report information back to the enterprise to keep the enterprise informed of law enforcement efforts and methods of investigation, and to identify witnesses testifying against OMC members.

o.      The enterprise members sent letters to OMC members and associates requesting assistance in preventing witnesses from testifying against OMC members and associates or providing information to law enforcement officers.

p.      The enterprise acquired and possessed law enforcement intelligence information regarding the OMC and other motorcycle clubs, as well as their members and associates.

8

q.     The enterprise members used United States mail, private and commercial carriers, and wire communications to promote and conduct OMC affairs.

r.     The enterprise members misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purpose of acts done for the enterprise.

## Roles of the Defendants

5.     In furtherance of the enterprise's purpose, the defendants performed in the following roles:

a.     JAMES L. WHEELER was the international president of the OMC, a position which is also known as "International Spokesman."

b.     PATRICK J. PUTTICK was the "Green" region regional "boss."

c.     ROBERT W. KEELER was the Fort Wayne, Indiana OMC chapter president.

d.     GARY T. HOHN was a former Dayton, Ohio OMC chapter president.

e.     GLEN D. CARLISLE was a Dayton, Ohio OMC member.

f.     JASON G. FOWLER was a Louisville, Kentucky OMC chapter member.

g.     ALLEN C. LAWSON was a former Dayton, Ohio chapter member, who transferred to the Toledo, Ohio chapter.

h.     JACK E. LEE administered Computer Voice Stress Analyzer (CVSA) examinations for the OMC at the direction of JAMES L. WHEELER and was paid for these tests.

i.     JOHN P. WALKER was the former Indianapolis, Indiana OMC chapter president and "Green" region vice-president.

j.     GREGORY A. DRIVER was the Indianapolis, Indiana OMC chapter vice-president.

k.     DAVID F. MAYS was the former national OMC enforcer.

l.    DANNY N. GARLAND was a former Indianapolis, Indiana OMC chapter member, was a former Green region enforcer and was a Louisville, Kentucky OMC chapter member.

m.    DANNY K. HEDGES was a former Fort Wayne, Indiana chapter enforcer.

## The Violation

6.    From in or about 1988, the exact date being unknown to the Grand Jury, until the date of the Indictment, in the Northern District of Ohio, Western Division, and elsewhere,

JAMES L. WHEELER,
PATRICK J. PUTTICK,
ROBERT WILLIAM KEELER,
GARY T. HOHN,
GLEN D. CARLISLE,
JASON G. FOWLER,
ALLEN C. LAWSON,
JACK E. LEE,
JOHN P. WALKER,
GREGORY A. DRIVER,
DAVID F. MAYS,
DANNY N. GARLAND, and
DANNY K. HEDGES,

the defendants herein, and others known and unknown to the grand jury, being persons employed by and associated with the OMC enterprise, did knowingly and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of Title 18, United States Code, Section 1961(1) and (5).

## The Pattern of Racketeering Activity

7.    The pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and (5), consisted of the following acts:

10

## Racketeering Act 1

The defendants named below committed the following acts, any one of which alone constitutes Racketeering Act 1:

1(A).  Beginning in or about 1990, through the date of this Indictment, in the Northern District of Ohio and elsewhere, JAMES L. WHEELER, PATRICK J. PUTTICK, ROBERT W. KEELER, GARY T. HOHN, GLEN D. CARLISLE, JASON G. FOWLER, ALLEN C. LAWSON, JACK E. LEE, JOHN P. WALKER, GREGORY A. DRIVER, DAVID F. MAYS, DANNY N. GARLAND, DANNY K. HEDGES, and others known and unknown, did combine, conspire, confederate and agree with each other to distribute and possess with intent to distribute five or more kilograms of a mixture or substance containing a detectable amount of cocaine, and 50 grams or more of methamphetamine or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, Schedule II controlled substances; 10 or more grams of a mixture or substance containing a detectable amount of LSD (lysergic acid diethylamide), 1000 kilograms or more of a mixture or substance containing a detectable amount of marijuana, and ecstasy (methylenedioxymethamphetamine), Schedule I controlled substances; and valium (diazepam), a Schedule IV controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, as alleged in Count Three of this Indictment, which is incorporated and realleged as if fully rewritten herein.

1(B).  On or about August 30, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, as set forth in Count 11, which is incorporated and realleged by reference herein, in violation of Title 21, United States Code, Section 843(b).

1(C).  On or about October 22, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the

11

Controlled Substances Act, as set forth in Count 12, which is incorporated and realleged by reference herein, in violation of Title 21, United States Code, Section 843(b).

1(D).  On or about October 29, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, as set forth in Count 13, which is incorporated and realleged by reference herein, in violation of Title 21, United States Code, Section 843(b).

1(E).  On or about November 30, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, as set forth in Count 16, which is incorporated and realleged by reference herein, in violation of Title 21, United States Code, Section 843(b).

1(F).  On or about December 2, 2001, in the Northern District of Ohio, Western Division, PATRICK J. PUTTICK did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, as set forth in Count 17, which is incorporated and realleged by reference herein, in violation of Title 21, United States Code, Section 843(b).

1(G).  On or about December 3, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, as set forth in Count 18, which is incorporated and realleged by reference herein, in violation of Title 21, United States Code, Section 843(b).

1(H).  On or about December 6, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the

Controlled Substances Act, as set forth in Count 19, which is incorporated and realleged by reference herein, in violation of Title 21, United States Code, Section 843(b).

## Racketeering Act 2

On or about June 20, 1998, in the Northern District of Ohio, Western Division, GARY T. HOHN did knowingly and intentionally distribute, and possess with intent to distribute, 100 unit doses of LSD (lysergic acid diethylamide), a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) (see Count 5, which is incorporated and realleged as if fully rewritten herein).

## Racketeering Act 3

On or about March 19, 1999, in the Northern District of Ohio, Western Division, ALLEN C. LAWSON did knowingly and intentionally distribute and possess with intent to distribute, approximately two pounds of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) (see Count 8, which is incorporated and realleged as if fully rewritten herein).

## Racketeering Act 4

On or about March 19, 1999, in the Northern District of Ohio, Western Division, ALLEN C. LAWSON did knowingly and intentionally distribute, and possess with intent to distribute, approximately 928 unit doses of valium (diazepam), a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## Racketeering Act 5

On or about September 7, 2001, in the Northern District of Indiana, DANNY K. HEDGES did knowingly and intentionally possess with intent to distribute approximately three ounces of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act 6

The defendant committed the following acts, any one of which alone constitutes Racketeering Act 6:

6(A).  On or about November 28, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, as set forth in Count 14, which is incorporated and realleged by reference herein, in violation of Title 21, United States Code, Section 843(b).

6(B).  On or about November 29, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, in violation of Title 21, United States Code, Section 843(b), as set forth in Count 15, which is incorporated and realleged by reference herein.

6(C).  On or about November 29, 2001, in the Northern District of Indiana, ROBERT W. KEELER did knowingly and intentionally possess with intent to distribute approximately 46.7 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act 7

The defendant committed the following acts, either of which alone constitutes Racketeering Act 7:

7(A).  On or about January 22, 2002, in the Northern District of Indiana, DANNY K. HEDGES did knowingly and intentionally possess with intent to distribute approximately 450 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

7(B).  On or about January 22, 2002, in the Northern District of Indiana, DANNY K. HEDGES did knowingly and intentionally possess with intent to distribute approximately 1.5

14

grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act 8

The defendant committed the following acts, either of which alone constitutes Racketeering Act 8:

8(A).  On or about February 26, 2002, in the Northern District of Ohio, Western Division, ROBERT W. KEELER did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, in violation of Title 21, United States Code, Section 843(b), as set forth in Count 22, which is incorporated and realleged by reference herein.

8(B).  On or about February 26, 2002, in the Northern District of Ohio, Western Division, ROBERT W. KEELER did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, in violation of Title 21, United States Code, Section 843(b), as set forth in Count 23, which is incorporated and realleged by reference herein.

Racketeering Act 9

On or about May 22, 2002, in the Northern District of Ohio, Western Division, ROBERT W. KEELER did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, in violation of Title 21, United States Code, Section 843(b), as set forth in Count 29, which is incorporated and realleged by reference herein.

Racketeering Act 10

In February 2001, in the Southern District of Ohio and the Northern District of Indiana, JAMES L. WHEELER and PATRICK J. PUTTICK did knowingly travel in interstate commerce from Indianapolis, Indiana and Dayton, Ohio, respectively, to Cancun, Mexico, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment,

15

or carrying on, of an unlawful activity, to wit, a business enterprise involving distribution and possession with intent to distribute controlled substances in violation of Title 21, United States Code, Section 846, and thereafter did perform and attempted to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment or carrying on said unlawful activity, in violation of Title 18, United States Code, Sections 1952 and 2.

Racketeering Act 11

On or about September 5, 2001, in the Northern District of Indiana, Northern District of Ohio, and elsewhere, JAMES L. WHEELER did knowingly travel in interstate commerce from Fort Wayne, Indiana, to northeast Ohio, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, or carrying on, of an unlawful activity, to wit, a business enterprise involving distribution and possession with intent to distribute controlled substances in violation of Title 21, United States Code, Section 846, and thereafter did perform and attempted to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment or carrying on said unlawful activity, in violation of Title 18, United States Code, Sections 1952 and 2.

Racketeering Act 12

On or about December 29, 2001, in the Northern District of Indiana, Northern District of Ohio, and elsewhere, JAMES L. WHEELER and GREGORY A. DRIVER did knowingly travel in interstate commerce from the State of Indiana, to Toledo, Ohio, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, or carrying on, of an unlawful activity, to wit, a business enterprise involving distribution and possession with intent to distribute controlled substances in violation of Title 21, United States Code, Section 846, and thereafter did perform and attempted to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment or carrying on said unlawful activity, in violation of Title 18, United States Code, Sections 1952 and 2.

<u>Racketeering Act 13</u>

In or about February 2000, in the Northern District of Indiana, JAMES L. WHEELER and JACK E. LEE, defendants herein, did knowingly intimidate and attempt to intimidate a person known to the Grand Jury by performing on that person a "voice stress analyzer" to determine whether that person was providing information to law enforcement authorities, with the intent to hinder, delay and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of a federal offense, in violation of Title 18, United States Code, Section 1512(b)(3).

<u>Racketeering Act 14</u>

On or about August 29, 2001, in the Northern District of Indiana, JAMES L. WHEELER, ROBERT W. KEELER, JOHN P. WALKER, and JACK E. LEE, defendants herein, did knowingly intimidate and attempt to intimidate a person known to the Grand Jury by performing on that person a "voice stress analyzer" to determine whether that person was providing information to law enforcement authorities, with the intent to hinder, delay and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of a federal offense, in violation of Title 18, United States Code, Section 1512(b)(3).

<u>Racketeering Act 15</u>

On or about May 28, 2002, in the Northern District of Indiana, JAMES L. WHEELER, ROBERT W. KEELER, and JACK E. LEE, defendants herein, did knowingly intimidate and attempt to intimidate persons known to the Grand Jury by performing on those persons a "voice stress analyzer" to determine whether those persons were providing information to law enforcement authorities, with the intent to hinder, delay and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of a federal offense, in violation of Title 18, United States Code, Section 1512(b)(3).

Racketeering Act 16

The defendants committed the following acts, either of which alone constitutes

Racketeering Act 16:

16(A). On or about August 7, 2002, in the Northern District of Indiana, ROBERT W.

KEELER and JACK E. LEE, defendants herein, did knowingly intimidate and attempt to

intimidate Bruce Wendell by performing on him a "voice stress analyzer" to determine whether

he was providing information to law enforcement authorities, with the intent to hinder, delay and

prevent the communication to a law enforcement officer of the United States of information

relating to the commission and possible commission of a federal offense, in violation of Title 18,

United States Code, Section 1512(b)(3).

16(B). On or about August 7, 2002, in the Northern District of Indiana, ROBERT W.

KEELER and JACK E. LEE, defendants herein, did knowingly intimidate and attempt to

intimidate Tony Lupica by performing on him a "voice stress analyzer" to determine whether he

was providing information to law enforcement authorities, with the intent to hinder, delay and

prevent the communication to a law enforcement officer of the United States of information

relating to the commission and possible commission of a federal offense, in violation of Title 18,

United States Code, Section 1512(b)(3).

Racketeering Act 17

On or about April 6, 1999, in the Northern District of Ohio, Western Division, and

elsewhere, GLEN D. CARLISLE, defendant herein, did receive, possess, conceal, store, barter,

sell and dispose of a stolen motor vehicle, that is, a 1998 Harley Davidson motorcycle frame

bearing vehicle identification number 1HD1BML15WY052081, which motor vehicle had

crossed a State boundary after being stolen, said motor vehicle having been stolen in the State of

Indiana and subsequently brought into the State of Ohio, knowing the same to have been stolen,

in violation of Title 18, United States Code, Section 2313.

### Racketeering Act 18

On or about May 14, 1999, in the Northern District of Ohio, Western Division, and elsewhere, GLEN D. CARLISLE and DANNY N. GARLAND, defendants herein, did unlawfully transport and cause to be transported in interstate commerce, from the State of Indiana to the State of Ohio, a motor vehicle, to wit, a motorcycle bearing vehicle identification number 1HD1GEL13PY309621, a 1993 Harley Davidson Dyna Wide Glide, knowing that the motorcycle had been taken by fraud, in violation of Title 18, United States Code, Section 2314.

### Racketeering Act 19

The defendant committed the following acts, either of which alone constitutes Racketeering Act 19:

19(A).  On or about February 20, 1998, in the Northern District of Ohio, Western Division, GARY T. HOHN, defendant herein, did knowingly participate in the use of extortionate means, within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect an extension of credit, within the meaning of Title 18, U.S.C. Section 891(5), in violation of Title 18, United States Code, Section 894.

19(B).  On or about February 21, 1998, in the Northern District of Ohio, Western Division, GARY T. HOHN, defendant herein, did knowingly participate in the use of extortionate means, within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect an extension of credit, within the meaning of Title 18, U.S.C. Section 891(5), in violation of Title 18, United States Code, Section 894.

### Racketeering Act 20

On or about June 19, 1998, in the Northern District of Ohio, Western Division, GARY T. HOHN, defendant herein, did knowingly participate in the use of extortionate means, within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect an extension of credit, within the meaning of Title 18, U.S.C. Section 891(5), in violation of Title 18, United States Code, Section 894.

19

### Racketeering Act 21

On or about September 27, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly participate in the use of extortionate means, within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect an extension of credit, within the meaning of Title 18, U.S.C. Section 891(5), in violation of Title 18, United States Code, Section 894.

### Racketeering Act 22

On or about June 27, 2002, in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly participate in the use of extortionate means, within the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect an extension of credit, within the meaning of Title 18, U.S.C. Section 891(5), in violation of Title 18, United States Code, Section 894.

### Racketeering Act 23

On or about September 18, 1993, in Marion County, Southern District of Indiana, DAVID F. MAYS, while aiding and abetting others, did knowingly and intentionally attempt to kill another human being, to wit: David A. Farley, at the clubhouse of the Iron Horsemen in Anderson, Indiana, in violation of Indiana Code Sections 35-41-5-1 and 35-42-1-1(1).

### Racketeering Act 24

On or about December 3, 1997, in Marion County, Southern District of Indiana, DAVID F. MAYS did knowingly and intentionally kill another human being, to wit: Shannon Turner, in violation of Indiana Code Section 35-42-1-1(1).

### Racketeering Act 25

On or about February 24, 2001, in Montgomery County, Southern District of Ohio, GLEN D. CARLISLE and ALLEN C. LAWSON, while aiding and abetting each other, did purposely cause the death of Eric Laverne Coulter at Spanky's Dollhouse, 2213 Wagoner Ford Road, Dayton, Ohio, in violation of Ohio Revised Code Section 2903.02.

20

Racketeering Act 26

The defendant committed the following acts, any one of which alone constitutes

Racketeering Act 26:

26(A). On or about December 5, 2001, in Washington County, Southern District of

Indiana, JASON G. FOWLER, while aiding and abetting another, did kill another human being,

to wit: Charles Hurst, at 499 South Robbs Lane, Pekin, Indiana, while committing and

attempting to commit robbery, in violation of Indiana Code Section 35-42-1-1(2).

26(B). On or about December 5, 2001, in Washington County, Southern District of

Indiana, JASON G. FOWLER, while aiding and abetting another, did knowingly and

intentionally take property, to wit: a 9mm KBI semi-automatic pistol, from another person, to

wit: Charles L. Hurst, by using and threatening the use of force on Charles L. Hurst, at 499 South

Robbs Lane, Pekin, Indiana, said robbery resulting in serious bodily injury, to wit: the death of

Charles L. Hurst, in violation of Indiana Code Section 35-42-5-1(1).

26(C). On or about December 5, 2001, in the Southern District of Indiana, JASON G.

FOWLER, defendant herein, did knowingly participate in the use of extortionate means, within

the meaning of Title 18, United States Code, Section 891(7), to collect and attempt to collect an

extension of credit, within the meaning of Title 18, U.S.C. Section 891(5), in violation of Title

18, United States Code, Section 894.

Racketeering Act 27

Between September 1994 and October 1994, in Marion County, Southern District of

Indiana, DAVID F. MAYS, did knowingly and intentionally attempt to damage, by fire and

explosive, property of any person, to wit: the clubhouse of the Son's of Silence Motorcycle Club,

3310 West Michigan Street, Indianapolis, Indiana, under circumstances that endanger human life,

in violation of Indiana Code Sections 35-41-5-1 and 35-43-1-1(2).

Racketeering Act 28

On or about October 14, 1994, in Marion County, Southern District of Indiana, DAVID

F. MAYS, did knowingly and intentionally damage, by fire and explosive, property of any

21

person, to wit: the clubhouse of the Son's of Silence Motorcycle Club, 3310 West Michigan Street, Indianapolis, Indiana, under circumstances that endanger human life, in violation of Indiana Code Section 35-43-1-1(2).

All in violation of Title 18, United States Code, Section 1962(c).

## COUNT 2

## RICO Conspiracy (18 U.S.C. Section 1962(d))

The Grand Jury further charges:

1.      Paragraphs 1, 2, 3, 4, 5, and 7 of Count I, which set forth general allegations, and allegations about the Outlaws Motorcycle Club (OMC) enterprise, its purposes, its manner and means, the roles of the defendants and the pattern of racketeering activity, are incorporated herein by reference.

### The Racketeering Conspiracy

2.      From in or about 1988, the exact date being unknown to the grand jury, in the Northern District of Ohio, Western Division and elsewhere,

> JAMES L. WHEELER,
> PATRICK J. PUTTICK,
> ROBERT W. KEELER,
> GARY T. HOHN,
> GLEN D. CARLISLE,
> DAVID J. HANNUM,
> JASON G. FOWLER,
> ALLEN C. LAWSON,
> JACK E. LEE,
> JOHN P. WALKER,
> GREGORY A. DRIVER,
> DAVID F. MAYS,
> THOMAS B. CAIN,
> DANNY N. GARLAND, and
> DANNY K. HEDGES,

the defendants herein, and others known and unknown to the grand jury, being persons employed by and associated with the OMC enterprise, which enterprise engaged in and the activities of which affected interstate commerce, did knowingly and unlawfully combine, conspire, confederate and agree with each other and with other persons known and unknown to the grand

22

jury, to violate Title 18, United States Code, Section 1962(c), that is to conduct and participate, directly and indirectly, in the conduct of the affairs of the OMC enterprise through a pattern of racketeering activity within the meaning of Title 18, United States Code, Sections 1961(1) and (5), which pattern is set forth more fully in racketeering acts 1 - 28 in paragraph 7 of Count I.

       3.      It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the OMC enterprise.

### Overt Acts

In furtherance of the conspiracy and to effect the objects thereof, the defendants and others performed the following overt acts in the Northern District of Ohio and elsewhere:

### Overt Act 1

In or about 1997, during an OMC "Bosses Meeting", in Indianapolis, Indiana, JAMES L. WHEELER advised other OMC regional presidents that the former OMC International President had left instructions with WHEELER that he (WHEELER) would take the leadership role of the OMC, while the former OMC International President was a fugitive.

### Overt Act 2

On or about December 5, 1997, JAMES L. WHEELER possessed a briefcase containing hand written notes from an OMC regional bosses meeting in Dayton, Ohio.

### Overt Act 3

In or about September, 1998, JAMES L. WHEELER attended a "Bosses" meeting in Oklahoma.  At this meeting, representatives of the OMC, Hells Angels Motorcycle Club, and the Bandidos Motorcycle Club reached an agreement on the conditions of a truce, and formed a coalition to collectively defend themselves against federal law enforcement.

### Overt Act 4

On or about September 5, 1998, JAMES L. WHEELER, GARY T. HOHN and other OMC members attended an OMC national meeting in Dayton, Ohio.  Also present were OMC members from Great Britain.

### Overt Act 5

On or about March 18, 1999, GARY T. HOHN, ALLEN C. LAWSON, GLEN D.

CARLISLE, PATRICK J. PUTTICK, and others, discussed the fact that the OMC Warren, Ohio

Chapter had obtained photographs and names of six persons believed to be government

informants. This conversation occurred at a weekly "church meeting" at the OMC Dayton

clubhouse in Dayton, Ohio.

### Overt Act 6

On or about April 22, 1999, a confidential informant and a person known to the Grand

Jury were summoned to the OMC Dayton clubhouse in Dayton, Ohio, and were reprimanded for

not following directions given to them by PATRICK J. PUTTICK on April 19, 1999, regarding

the proper protocol for riding with other OMC motorcycle riders.

### Overt Act 7

On or about June 3, 1999, GARY T. HOHN advised the members of the OMC Dayton,

Ohio Chapter that the OMC Dayton Chapter was buying a computer to track sales of Outlaw t-

shirts and other merchandise, which was to be purchased with PATRICK J. PUTTICK'S credit

card.

### Overt Act 8

On or about July 2, 1999, at a weekly church meeting held at the OMC Dayton clubhouse

in Dayton, Ohio, GARY T. HOHN, GLEN D. CARLISLE, and others, discussed the former

OMC International President, who was charged in a federal indictment returned in Florida.

HOHN stated that the OMC had enough money in a secret defense fund to pay for the legal

defense of the former OMC International President. HOHN further stated at present, the secret

fund contained $7,000.00, but that if the fund was depleted, each member would have to pay

$500.00 to the defense fund. HOHN also stated the West Penn OMC Chapter was hosting the

National Ride, and instructed the Dayton OMC members to travel clean with no drugs, and with

weapons broken down because Pennsylvania State Police would stop OMC members.

### Overt Act 9

On or about September 11, 1999, JAMES L. WHEELER stated that OMC members who were selling the controlled substance "ecstasy" at a recent motorcycle rodeo would be fined or have their patches "pulled" because selling "ecstasy" was forbidden by the OMC.

### Overt Act 10

On or about September 25, 1999, a person known to the Grand Jury told a confidential informant at the OMC West Penn Chapter that he (the person) had received an anonymous telephone call stating that the informant was a "snitch." The person subsequently searched the informant's clothing for monitoring devices.

### Overt Act 11

On or about September 30, 1999, while at the OMC Dayton clubhouse in Dayton, Ohio, PATRICK J. PUTTICK stated that a member of the OMC North Carolina Chapter was cooperating with law enforcement and as such, all OMC members were ordered to cease all communication with the OMC North Carolina member.

### Overt Act 12

On or about January 5, 2000, GARY T. HOHN advised a confidential informant that JAMES L. WHEELER expressed his desire that all OMC chapters be like the Dayton Gangsters.

### Overt Act 13

On or about January 20, 2000, the OMC Dayton Chapter conducted a vote to determine if the club should pull the patch of one of its members who repeatedly failed to answer their pages.

### Overt Act 14

On or about January 31, 2000, JAMES L. WHEELER informed GARY T. HOHN, PATRICK J. PUTTICK and others during a bosses meeting at the OMC Dayton clubhouse in Dayton, Ohio, that the former OMC International President would need $500,000.00 for legal fees and that all OMC members would have to pay $500.00 each to the defense fund.

WHEELER further stated that all the money from the OMC Dayton Super Bowl Party was to go to the defense fund to cover the OMC Dayton Chapter's share.

Overt Act 15

On or about February 17, 2000, while at a church meeting at the OMC Dayton clubhouse in Dayton, Ohio, GARY T. HOHN informed members that an unknown motorcycle club with about 4,000 members was being "patched over" to the OMC England.

Overt Act 16

In or about February 2001, the OMC held an International Meeting in Cancun, Mexico, which was led by JAMES L. WHEELER and attended by PATRICK J. PUTTICK, among others. WHEELER requested a vote of regional bosses to decide if the OMC should amend its by-laws which prohibited the sale of heroin and ecstasy by OMC members. Following a vote by the regional bosses, the by-laws were amended to allow the worldwide sale of heroin and ecstasy by OMC members.

Overt Act 17

On or about June 11, 2001, GARY T. HOHN instructed a person known to the Grand Jury to sign a document acknowledging his dismissal from the OMC. The document, which was to be notarized, stated that the dismissed member was no longer allowed to discuss OMC activities.

Overt Act 18

On or about July 18, 2001, a person known to the Grand Jury and several OMC members discussed traveling to Europe, on a trip to be financed by the OMC, to organize the OMC Europe Chapter.

Overt Act 19

On or about August 10, 2001, JAMES L. WHEELER traveled to Fort Wayne, Indiana to officially announce the formation of a new prospective OMC chapter. In explaining what he expected from the club, WHEELER said it was hard to make money the "old way" and, as such,

26

the OMC does not make as much money as it used to.  At the same meeting, DANNY K.

HEDGES and another person were approved as prospective members.

Overt Act 20

On or about August 23, 2001, JAMES L. WHEELER traveled to Fort Wayne, Indiana,

where he instructed the newly formed OMC Fort Wayne Chapter on what he expected and how

the OMC works as an organization.  WHEELER explained how the position of treasurer was

important for the club, and to expect close scrutiny of the treasurer's position from federal law

enforcement.

Overt Act 21

On or about August 27, 2001, during a telephone conversation, ROBERT W. KEELER

informed a person known to the Grand Jury that, per instructions from JOHN P. WALKER, the

person known to the Grand Jury must take a lie detector test, to establish the person's loyalty to

the OMC.  KEELER further instructed the person known to the Grand Jury to contact JACK E.

LEE for the test.

Overt Act 22

On or about August 29, 2001, while attempting to gain full membership into the OMC, a

person known to the Grand Jury was required to submit to a computer voice stress analyzer

(CVSA) administered by JACK E. LEE.  During the CVSA, the person known to the Grand Jury

was asked if the person had ever been contacted by government agents, if the person was

employed by government agents, and if the person either was cooperating with government

agents or was himself a government agent.

Overt Act 23

On or about September 4, 2001, JAMES L. WHEELER encouraged a person known to

the Grand Jury to "step up" as a leader in the OMC.

## Overt Act 24

On or about October 10, 2001, while at a weekly church meeting at the OMC Indianapolis Chapter in Indianapolis, Indiana, JAMES L. WHEELER, JOHN P. WALKER, and ROBERT W. KEELER discussed regulating methamphetamine use and distribution within the OMC. WHEELER stated, "and I brought it up in the fuckin' national level that uh I think this fuckin' shit is is (sic) worse than any Goddam uh heroin or any of this other shit and it oughta be 86'd [banned], said well Jesus Christ we're Outlaws. Ya know, we, if we keep on 86'ing this shit we might as been belong to the clean and sober club." Subsequently, WHEELER stated that "[PATRICK PUTTICK] must have missed that or something, cuz when we got together with all you people after our last [national] meeting he [PUTTICK] was supposed to let every chapter boss go back to his chapter and get a vote from the chapter so we could get an idea of just how much of our nation is behind 86'ing that fuckin' shit or what we have to do." ROBERT KEELER later added, "Yeah because uh I did a couple of lines [of methamphetamine] in Oklahoma." JOHN P. WALKER stated, "Ya know your not allowed to fuckin' do any quantities of it, personal use fuckin' only." WHEELER then added, "We had fuckin' people that went from from (sic) uh bein able to use it for personal use to dealin' it. Hell, I knew it was against the rules but I did it anyway I seen a chance to make some money to smokin' it. Ya know. And the next shot's shootin' it. I mean what the fuck? If we're gonna have to full 86 the Goddam shit or or (sic) we're gonna have to just make one of them things. We're Outlaws and we're gonna do what we wanna do. But I'm tellin ya they're they're (sic) [law enforcement] fuckin' lockin' in on us. And that shit's gonna be our biggest enemy."

## Overt Act 25

On or about October 24, 2001, during a weekly church meeting of the OMC Fort Wayne Chapter in Fort Wayne, Indiana, attended by DANNY K. HEDGES and others, ROBERT W. KEELER stated that discussions had been held during a bosses' meeting the previous week in Louisville, Kentucky, regarding banning methamphetamine use in the OMC. KEELER advised

the members that it was decided, at the meeting, that distributing methamphetamine was still allowed. KEELER further stated he expected to acquire a clubhouse by the end of the month, with each member providing $2,000.00 towards the purchase price.

### Overt Act 26

On or about October 29, 2001, ROBERT W. KEELER discussed, with a person known to the Grand Jury, his (KEELER's) plans to establish a new methamphetamine supplier in Florida. KEELER advised that he needed to contact JAMES L. WHEELER to apprise WHEELER of the situation and explained that the drug distribution operation was a way to bolster the financial stability of the OMC Fort Wayne Chapter.

### Overt Act 27

On or about November 20, 2001, during the weekly church meeting of the OMC Fort Wayne Chapter in Fort Wayne, Indiana, ROBERT W. KEELER discussed JAMES L. WHEELER's displeasure with KEELER's leadership of the OMC Fort Wayne Chapter, and discussed KEELER'S possible replacement.

### Overt Act 28

On or about December 7, 2001, during a weekly church meeting of the OMC Fort Wayne Chapter in Fort Wayne, Indiana, ROBERT W. KEELER advised the OMC membership that JAMES L. WHEELER did not approve the proposed clubhouse, and as such, WHEELER would not allow it to be opened as an OMC clubhouse and display the OMC "Charlie" symbol.

### Overt Act 29

On or about December 8, 2001, PATRICK J. PUTTICK, JOHN P. WALKER and others traveled to the newly opened OMC Fort Wayne Clubhouse in Fort Wayne, Indiana. After approving the site, PUTTICK and WALKER approved the OMC Fort Wayne Clubhouse, which paved the way for the official display of the OMC "Charlie" symbol.

### Overt Act 30

On or about December 13, 2001, while at the weekly church meeting of the OMC Fort Wayne Chapter, in Fort Wayne, Indiana, JAMES L. WHEELER discussed the funeral of an OMC member in Daytona Beach, Florida on December 22, 2001.  WHEELER advised the membership that OMC members were required to attend all OMC funerals.

### Overt Act 31

On or about December 13, 2001, during a church meeting at the OMC Fort Wayne Chapter clubhouse, in Fort Wayne, Indiana, JAMES L. WHEELER discussed the voice stress tests administered by JACK E. LEE.  WHEELER stated that LEE's job is to protect WHEELER, and that LEE maintained a number of contacts in the law enforcement community.

### Overt Act 32

On or about December 21, 2001, JAMES L. WHEELER told a person known to the Grand Jury that he wanted the OMC Fort Wayne, Indiana Chapter to open a bar called "Crossed Pistons Saloon" in Fort Wayne, Indiana.  WHEELER then informed a person known to the Grand Jury, that he (WHEELER) would receive a portion of the bar's proceeds.

### Overt Act 33

On or about December 29, 2001, JAMES L. WHEELER, PATRICK J. PUTTICK and others attended a bosses' meeting at the OMC Toledo Chapter clubhouse in Toledo, Ohio.

### Overt Act 34

On or about December 31, 2001, while at the OMC Fort Wayne Chapter clubhouse in Fort Wayne, Indiana, JAMES L. WHEELER identified himself as the OMC International President, and final decision maker.

### Overt Act 35

On or about March 16, 2002, while at a weekly church meeting at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, ROBERT W. KEELER advised the membership that he was

going to recommend that the OMC Gary, Indiana Chapter and the OMC Toledo, Ohio Chapter be added to the same region as the OMC Fort Wayne, Indiana Chapter.

Overt Act 36

On or about March 26, 2002, ROBERT W. KEELER advised a person known to the Grand Jury that PATRICK J. PUTTICK had authorized the international travel of one member of the OMC Fort Wayne, Indiana Chapter for OMC business and advised that the OMC Region would pay the traveler's expenses.

Overt Act 37

On or about March 30, 2002, during a weekly church meeting of the OMC Fort Wayne Chapter in Fort Wayne, Indiana, ROBERT W. KEELER advised the membership that the Grim Reaper Motorcycle Club (GRMC) had established a clubhouse in OMC territory, without the permission of the OMC Louisville, Kentucky Chapter. KEELER further advised that the OMC planned to address this issue and that all OMC members would be required to travel to Louisville, Kentucky to "kick some ass."

Overt Act 38

On or about April 2, 2002, during a weekly church meeting of the OMC Fort Wayne, Indiana Chapter, ROBERT W. KEELER advised the membership that the OMC would travel to Louisville to take patches from the GRMC in Louisville, Kentucky. KEELER advised he would be taking a firearm in the event of an altercation. KEELER added that JAMES L. WHEELER would also be in Louisville, Kentucky.

Overt Act 39

On or about May 2, 2002, during a weekly church meeting of the OMC Fort Wayne, Indiana Chapter, ROBERT W. KEELER discussed the upcoming regional party to be hosted by the OMC Fort Wayne Chapter. KEELER advised the membership that he made arrangements for prostitutes to attend the party and provide sexual favors to OMC members. Half of the money raised by the prostitutes would be returned to KEELER.

31

### Overt Act 40

On or about May 4, 2002, ROBERT W. KEELER advised a person known to the Grand Jury that the OMC Fort Wayne, Indiana Chapter had made approximately $3,000.00 profit, for hosting a regional party. KEELER further advised that he intended to put the proceeds into the OMC Fort Wayne Chapter treasury, to be used as a down payment for the OMC Fort Wayne clubhouse.

### Overt Act 41

On or about May 9, 2002, during a weekly church meeting of the OMC Fort Wayne, Indiana Chapter, ROBERT W. KEELER advised the membership that he recently had learned at a bosses' meeting that the treaty with the Hells Angels was no longer in affect.

### Overt Act 42

On or about May 28, 2002, several members and associates of the OMC underwent a computer voice stress analyzer test at the residence of JACK E. LEE in Fort Wayne, Indiana. The purpose of the test was to determine if any of the individuals tested were cooperating with law enforcement.

### Overt Act 43

On or about July 18, 2002, during a weekly church meeting at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, a person known to the Grand Jury and PATRICK J. PUTTICK discussed an upcoming party in Wetzel, Ohio. PUTTICK advised that he would be present to make any "executive decisions" regarding OMC relations with other motorcycle clubs.

### Overt Act 44

On or about July 18, 2002, during a weekly church meeting at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, ROBERT W. KEELER discussed, with the membership, the possibility of shutting down the Escorts Motorcycle Club (EMC) in Fort Wayne, Indiana. KEELER advised that the EMC should be shut down because the EMC wanted to permit persons considered in bad standing, by the OMC, to enter the EMC clubhouse. KEELER discussed

approaching the EMC and demanding that they shut their doors.  KEELER agreed to discuss the matter with regional boss PATRICK J. PUTTICK in the near future.

Overt Act 45

On or about July 24, 2002, a person known to the Grand Jury attempted to place an order for OMC related T-shirts with PATRICK J. PUTTICK.  PUTTICK told the person known to the Grand Jury to write the order down and fax it to the OMC Dayton, Ohio clubhouse.

Overt Act 46

On or about July 25, 2002, during a weekly church meeting at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, OMC members discussed an upcoming annual event in Wetzel, Ohio.  The membership discussed potential problems at the event with other rival motorcycle clubs, including the Iron Coffins Motorcycle Club and the Hells Angels Motorcycle Club.  ROBERT W. KEELER advised the membership that he was under orders to immediately contact the OMC Indianapolis, Indiana Chapter if any members of the Hells Angel Motorcycle Club arrived in Wetzel, Ohio.  If called, OMC Indianapolis members would arrive in Wetzel, Ohio within three hours of notification.

Overt Act 47

On or about August 15, 2002, ROBERT W. KEELER advised a person known to the Grand Jury that another OMC member returned from a visit to OMC Chapters overseas, and brought him (KEELER) several gifts from the OMC Wales Chapter.

All in violation of Title 18, United States Code, Section 1962(d).

**RICO FORFEITURE ALLEGATIONS**

1.    The allegations in Counts 1 and 2 are realleged and incorporated by reference herein.

2.    All property, including but not limited to funds in financial accounts, vehicles, real property, and personal property, which property afforded defendants JAMES L. WHEELER, JOHN P. WALKER, DAVID J. HANNUM, PATRICK J. PUTTICK, THOMAS B. CAIN, DANNY N. GARLAND, and ALLEN C. LAWSON, a source of influence over the enterprise

33

which they established, operated, controlled, and conducted and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, as set forth above in Counts 1 and 2, is property constituting and derived from proceeds which the above-listed defendants obtained, directly and indirectly, from the racketeering activity described above, in violation of Title 18, United States Code, Section 1962, including the following assets:

A.    Assets of JAMES L. WHEELER:

i.    1997 Harley Davidson Motorcycle, Model FLHTC, VIN 1HD1DJL10VY600432, License Number 161867.

ii.    1993 Chevrolet Pick-Up Truck, C3500 PKP Ext. Cab, VIN 1GCHC39F9PE147627, License Number HP2697.

iii.    335 and 337 Jefferson Avenue, Indianapolis, Indiana

Lot Numbered 202 and 203 in Johnson and Hogshire's East Washington Street Addition to the City of Indianapolis, as per plat thereof recorded in Plat Book 8, page 173, in the Office of the Recorder of Marion County, Indiana.

iv.    349 Jefferson Avenue, Indianapolis, Indiana

Lot Numbered 199 in Johnson and Hogshire's East Washington Street Addition to the City of Indianapolis, as per plat thereof, recorded in Plat Book 8, page 173, in the Office of the Recorder of Marion County, Indiana.

v.    2201 & 2203 & 2203 ½ East New York Street, Indianapolis, Indiana

Part of Lot Numbered Two Hundred Ten (210) in Johnson and Hogshire's East Washington Street Addition to the City of Indianapolis, as per plat thereof, recorded in Plat Book 8, page 173 in the Office of the Recorder of Marion County, Indiana, more particularly described as follows: Beginning on the North line of said lot, 91 feet and 6 inches West of the Northeast corner thereof, thence South to a point in the South line 87 feet, 6 inches West of the Southeast corner of said lot, thence West on said South line to the Southwest corner of said lot, thence North on

34

the West line of, said lot, to the Northwest corner thereof; thence East on the North line of, said Lot to the place of beginning.

vi.     2209 and 2211 East New York Street, Indianapolis, Indiana

51 feet north line by 47 feet south line off the east end of lot numbered two hundred ten (210) in Johnson & Hogshire East Washington street addition, an addition to the City of Indianapolis, as per plat recorded in the plat books in the Office of the Recorder of Marion County, Indiana

vii.     2205 and 2207 East New York Street, Indianapolis, Indiana.

PARCEL V - Part of Lot 210 In Johnson and Hogshire's East Washington Street Addition to the City of Indianapolis as per plat thereof recorded in Plat Book 8, Page 173, In the Office of the Recorder of Marion County Indiana, more particularly described as follows: Beginning on the North line of said Lot 51, West of the Northeast corner thereof, thence South to a point in the South line of said Lot, 47 feet West of the Southeast corner of said lot; thence West on the said South line 40 feet and 6 inches thence North to a point In the North line of said Lot, 91 feet and 6 inches West of the Northeast corner thereof; thence East on said North line 40 feet and 8 inches to the place of the beginning.

viii.     345 Jefferson Avenue, Indianapolis, Indiana

Lot 200 in Johnson and Hogshire's East Washington Street Addition to the City of Indianapolis, the Plat of which is recorded in the Plat Book 8, page 173 in the Office of the Recorder of Marion County, Indiana.

ix.     302 and 306 Jefferson, Avenue, Indianapolis, Indiana

Lot numbered 158 in Johnson and Hogshire's East Washington Street Addition to the City of Indianapolis, as per plat thereof recorded in Plat Book 8, page 173, in the office of the Recorder of Marion County, Indiana.

x.     2210 and 2212 East New York Street, Indianapolis, Indiana

The East half of lot number 209 in Johnson and Hogshire's East Washington Street Addition to the City of Indianapolis, as per plat thereof recorded in plat book 8, page 173, in the office of the recorder of Marion County, Indiana.

          xi.     327 and 329 Jefferson Avenue, Indianapolis, Indiana

Lot 204 in Johnson and Hogshire East Washington Addition to the City of Indianapolis, as per plat thereof recorded in Plat Book 8, page 173, in the Office of the Recorder of Marion County, Indiana.

         xii.     2620 West Garden Street, Peoria, Illinois

Lot 104 and 105; City: Peoria, Subdivision: Darst Place Extendeded; Sec/Twn/Rng/Meridian: E2SE4NW4 S18T08NR08E 4P.

         xiii.    331 Jefferson Avenue, Indianapolis, Indiana

Lot Numbered 203 in Johnson & Hogshire's East Washington Street addition to the City of Indianapolis, as per plat thereof recorded in plat Book 8, page 173, in the Office of the Recorder of Marion County, Indiana.

     B.     Assets of JOHN P. WALKER:

         i.     1999 Harley Davidson Motorcycle, Model FLHTCUI, VIN 1HD1FCW17XY619709, License Number 182355.

         ii.     1999 GMC C1500 Suburban, VIN 3GKFK16R7XG505978, License Number 770825L.

         iii.    1994 Chevrolet Truck C1500 Pick-Up Extended Cab, VIN 2GCEK19S9R1147431, License Number NC5551.

         iv.    310 and 312 Jefferson Avenue, Indianapolis, Indiana

Lot 159 In Johnson and Hogshire's East Washington Street Addition to the City of Indianapolis, as per plat thereof recorded in Plat Book 8, Page 173, in the Office of the Recorder of Marion County, Indiana.

         v.     315 and 317 Jefferson Avenue, Indianapolis, Indiana

Lot Numbered 207 in Johnson and Hogshire's East Washington Street Addition to the City of Indianapolis, as per plat thereof recorded in plat Book 8, page 173, in the Office of the Recorder of Marion County, Indiana.

    C.      Assets of DAVID J. HANNUM:

         i.      267 Lansdowne, Dayton, Ohio

Situate in the township of Madison, now known as the City of Trotwood, in the County of Montgomery and State of Ohio, and being a lot numbered ONE HUNDRED FORTY-TWO (142) in Drexel Park Plat as recorded in the plat book "G", page 44 of the Plat records of Montgomery County, Ohio, subject to all restrictions and easements of record on said lot.

    D.      Assets of PATRICK J. PUTTICK:

         i.      2000 Ford Ranger Pick-up Truck Super Cab 2D, VIN 1FTYR14V3YPA39558, License Number PCD6540.

         ii.      1987 Harley Davidson Low-Rider Motorcycle, VIN 1HD1EAL16HY116833, License Number JG4N.

    E.      Assets of THOMAS B. CAIN:

         i.      1986 Harley Davidson Motorcycle Soft-tail, VIN 1HD1BHL16GY011337, License Number 4750K.

         ii.      322 S.E. 46th Street, Oklahoma City, Oklahoma

Situated in the city of Oklahoma City, County of Oklahoma and State of Oklahoma. And known as Lots eleven (11) and twelve (12), Block three (3) in the replat of Block 3 and 5, of Spencer's South Oklahoma City, Oklahoma County, Oklahoma, according to the recorded plat thereof.

    F.      Assets of DANNY N. GARLAND:

         i.      1991 Harley Davidson Motorcycle Soft-tail, Model FXSTC, VIN 1HD1BKL17MY028124, License Number 133117.

         ii.      1612 Pleasant Street, Indianapolis, Indiana

Situated in the City of Indianapolis, County of Marion and State of Indiana. And known as being Lot 271 in E.T.S.K. and A.R. Pletcher's Woodlawn suburb, an addition to the City of Indianapolis. The plat of which is recorded in Plat Book 3, Page 156, in the office of the recorder of Marion County, Indiana. Being the same property conveyed to Everett D. Rice and Christine R. Rice by deed dated January 3, 1992, in the deed drawer 1992, Instrument 977, in the office of the recorder of the County of Marion County, Indiana. Be the same more or less, but subject to all legal highways.

      G.     Assets of ALLEN C. LAWSON:

          i.     1999 Harley Davidson Self-Assembled Motorcycle, VIN 4K7S81354XC005806, License Number 70DBE.

     Pursuant to Title 18, United States Code Section 1963.

## COUNT 3

## NARCOTICS CONSPIRACY CHARGE

The Grand Jury further charges:

     1.     Beginning in or about 1990, through the date of this Indictment, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Western Division, and elsewhere, JAMES L. WHEELER, PATRICK J. PUTTICK, ROBERT W. KEELER, GARY T. HOHN, GLEN D. CARLISLE, DAVID J. HANNUM, JASON G. FOWLER, ALLEN C. LAWSON, JOHN P. WALKER, GREGORY A. DRIVER, THOMAS B. CAIN, DANNY N. GARLAND, DANNY K. HEDGES, DARRELL L. BAKER, JOHN L. BLACKMAN, MICHAEL L. BOWLING, WILLIAM L. BRAGG, RICHARD F. BRODERICK, KENNETH L. BUCHER, REX A. DEITZ, LLOYD E. HECKMAN, DARRELL W. HORTON, JEFFREY A. HUMBLE, EARL F. LOGSDON, DOMINIC R. MANGINE, SR., JAMIE M. REICHELDERFER, MICHAEL J. ROBERTS, BRIAN J. SEXTON, RICHARD L. SPENCE, MANCE R. STEPHENS, RONALD P. TAYLOR, JR., KEVIN A. WALES, JOHNNY D. WARMAN, STEVEN E. WARMAN, and WILLIAM E. SYLVIA, Defendants herein, did

knowingly, intentionally and unlawfully combine, conspire, confederate and agree together and with other persons, both known and unknown to the Grand Jury, to distribute and possess with intent to distribute five or more kilograms of a mixture or substance containing a detectable amount of cocaine, and 50 grams or more of methamphetamine or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, Schedule II controlled substances; 10 or more grams of a mixture or substance containing a detectable amount of LSD (lysergic acid diethylamide), 1000 kilograms or more of a mixture or substance containing a detectable amount of marijuana, and ecstasy (methylenedioxymethamphetamine), Schedule I controlled substances; and valium (diazepam), a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

### Purpose and Object of the Conspiracy

2.     It was the purpose and object of this conspiracy that JAMES L. WHEELER, PATRICK J. PUTTICK, ROBERT W. KEELER, GARY T. HOHN, GLEN D. CARLISLE, DAVID J. HANNUM, JASON G. FOWLER, ALLEN C. LAWSON, JOHN P. WALKER, GREGORY A. DRIVER, THOMAS B. CAIN, DANNY N. GARLAND, DANNY K. HEDGES, DARRELL L. BAKER, JOHN L. BLACKMAN, MICHAEL L. BOWLING, WILLIAM L. BRAGG, RICHARD F. BRODERICK, KENNETH L. BUCHER, REX A. DEITZ, LLOYD E. HECKMAN, DARRELL W. HORTON, JEFFREY A. HUMBLE, EARL F. LOGSDON, DOMINIC R. MANGINE, SR., JAMIE M. REICHELDERFER, MICHAEL J. ROBERTS, BRIAN J. SEXTON, RICHARD L. SPENCE, MANCE R. STEPHENS, RONALD P. TAYLOR, JR., KEVIN A. WALES, JOHNNY D. WARMAN, STEVEN E. WARMAN, and WILLIAM E. SYLVIA would distribute substantial quantities of cocaine (totaling over 400 kilograms), marijuana (totaling over 500 pounds), methamphetamine (totaling over 50 kilograms), valium (diazepam) (totaling over 900,000 unit doses), and (LSD) lysergic acid diethylamide (totaling over 100,000 unit doses) through their membership in and participation in the Outlaws Motorcycle Club (OMC).

**Manner and Means**

3.      The manner and means by which the goals of the conspiracy were met included the following:

a.      JAMES L. WHEELER, as OMC International President distributed over 400 kilograms of cocaine, and over 600,000 unit doses of valium (diazepam) and aided and abetted the distribution of cocaine, marijuana, methamphetamine, valium, LSD (lysergic acid diethylamide), and ecstasy (methylenedioxymethamphetamine), through his control of the OMC and the activities of its members.

b.      PATRICK J. PUTTICK distributed marijuana, and aided and abetted the distribution of cocaine, marijuana, methamphetamine, valium (diazepam), LSD (lysergic acid diethylamide), and ecstasy (methylenedioxymethamphetamine), through his position as OMC Green regional boss.

c.      ROBERT W. KEELER distributed cocaine, marijuana, and methamphetamine, and aided and abetted the distribution of cocaine, marijuana, methamphetamine, valium (diazepam), and LSD (lysergic acid diethylamide), through his position as president of the OMC Fort Wayne chapter.

d.      JOHN P. WALKER distributed cocaine, and aided and abetted the distribution of cocaine, marijuana, methamphetamine, valium (diazepam), and LSD (lysergic acid diethylamide), through his position as president of the OMC Indianapolis chapter.

e.      GARY T. HOHN distributed cocaine, and LSD (lysergic acid diethylamide), and aided and abetted the distribution of cocaine, marijuana, methamphetamine, valium (diazepam), and LSD (lysergic acid diethylamide), through his position as president of the OMC Dayton chapter.

f.      THOMAS B.CAIN distributed methamphetamine, and aided and abetted the distribution of cocaine, marijuana, methamphetamine, valium (diazepam) and LSD

40

(lysergic acid diethylamide), through his position as president of the OMC Oklahoma City chapter.

      g.     DAVID J. HANNUM distributed cocaine, and methamphetamine, and aided and abetted the distribution of cocaine, marijuana, methamphetamine, valium (diazepam), and LSD (lysergic acid diethylamide), through his position as president of the OMC Dayton chapter.

      h.     DANNY K. HEDGES, GARY T. HOHN, GLEN D. CARLISLE, DAVID J. HANNUM, JASON G. FOWLER, ALLEN C. LAWSON, GREGORY A. DRIVER, THOMAS B.CAIN, DANNY N. GARLAND, DARRELL L. BAKER, JOHN L. BLACKMAN, MICHAEL L. BOWLING, WILLIAM L. BRAGG, RICHARD F. BRODERICK, KENNETH L. BUCHER, REX A. DEITZ, LLOYD E. HECKMAN, DARRELL W. HORTON, JEFFREY A. HUMBLE, EARL F. LOGSDON, DOMINIC R. MANGINE, SR., JAMIE M. REICHELDERFER, MICHAEL J. ROBERTS, BRIAN J. SEXTON, RICHARD L. SPENCE, MANCE R. STEPHENS, RONALD P. TAYLOR, JR., KEVIN A. WALES, JOHNNY D. WARMAN, STEVEN E.WARMAN, and WILLIAM E.SYLVIA, distributed substantial quantities of cocaine, marijuana, methamphetamine, valium (diazepam), and LSD (lysergic acid diethylamide).

### Overt Acts

    4.     In furtherance of the conspiracy, and to achieve its objects and purposes, the Defendants undertook the following acts, among others:

    1.     On or about March 20, 1991, REX A. DEITZ possessed approximately 195 grams of cocaine in a 1983 Subaru motor vehicle, in Jefferson County, Kentucky.

    2.     On or about August 23, 1994, JOHN P. WALKER possessed cocaine, marijuana, a Taurus .40 caliber semi-automatic handgun, and $34,985.00, in a 1987 Chevrolet Suburban, owned by WALKER, on Interstate 65 in Tippecanoe County, Indiana.

3.      Between the winter of 1994 and the summer of 1995, JAMES L. WHEELER purchased one kilogram to five kilograms of cocaine, on eight to 12 occasions.  WHEELER paid between $21,000 and $27,000 per kilogram.

4.      Between 1994 and 1998, JOHN P. WALKER sold an ounce of cocaine, on at least 12 occasions, for $1,000.00 to $1,200.00 per ounce.

5.      Between 1994 and 1998, RICHARD F. BRODERICK facilitated the transportation of garbage bags of marijuana, in his recreational vehicle, from the country of Mexico to Indianapolis, Indiana.

6.      In or about 1995, JAMES L. WHEELER and JOHN WALKER facilitated the transportation of approximately three kilograms of cocaine from Indianapolis, Indiana to the Sandusky, Ohio area.

7.      On or about December 30, 1995, WILLIAM E. SYLVIA, while at the OMC Columbus clubhouse in Columbus, Ohio and armed with a 9mm pistol, advised an undercover ATF agent that he (SYLVIA) was moving to Columbus, and would be dealing in ounce quantities of cocaine and methamphetamine.

8.      On or about December 30, 1995, WILLIAM L. BRAGG, while at the OMC Columbus clubhouse in Columbus, Ohio, advised an undercover ATF agent that he (BRAGG) obtained cocaine for $1,000.00 per ounce, and would sell it to the undercover agent for $1,200.00 per ounce.  BRAGG further advised the undercover agent that he (BRAGG) was moving 10 ounces of cocaine per week, in Kentucky.  BRAGG stated that the purchase price was set at $1,200.00 per ounce, as that was the price they paid for doing business with Outlaws.

9.      On or about January 6, 1996, WILLIAM L. BRAGG provided cocaine to guests at the OMC Columbus clubhouse in Columbus, Ohio.

10.     On or about January 6, 1996, while at the OMC Columbus clubhouse in Columbus, Ohio, WILLIAM L. BRAGG advised an undercover ATF agent that the OMC had

access to cocaine and methamphetamine to sell, but that he (BRAGG) had to clear it with his suppliers in Dayton and Indianapolis.

11.     On or about January 7, 1996, WILLIAM E. SYLVIA, while possessing a small caliber revolver and WILLIAM L. BRAGG, while possessing a firearm, negotiated the sale of one pound of marijuana to an undercover ATF agent, at the OMC Columbus clubhouse in Columbus, Ohio.  After agreeing on a price of $1,000.00, BRAGG and SYLVIA advised the undercover agent that they would have to go outside because they did not do business in the clubhouse.  SYLVIA stated that he had another pound and a half of marijuana in Indianapolis that a friend was trying to sell.

12.     On or about January 7, 1996, WILLIAM E. SYLVIA, while possessing a small caliber revolver, sold 488.1 grams of marijuana to an undercover ATF agent, outside of the OMC Columbus clubhouse in Columbus, Ohio.

13.     Between 1995 and 1996, JAMES L. WHEELER and JOHN P. WALKER facilitated the transportation of approximately one kilogram of cocaine from Kankakee, Illinois to Indianapolis, Indiana.

14.     Between 1996 and 1997, DOMINIC R. MANGINE, SR., sold two to three ounces of cocaine in eight ball quantities.

15.     In or about 1997, JAMES L. WHEELER possessed approximately six, eight inch by ten inch size, bricks of cocaine, in the office area of his residence in Indianapolis, Indiana.

16.     In or about 1997, RICHARD F. BRODERICK possessed pound bags of valium tablets, on two occasions.  JAMES L. WHEELER had facilitated the delivery of the valium tablets to BRODERICK.

17.     Between 1997 and 1998, JAMES L. WHEELER and JOHN P. WALKER facilitated the distribution of approximately 560 grams of cocaine through "The Store" in Indianapolis, Indiana.

18.    In or about the summer of 1997, at the OMC Lima clubhouse in Lima, Ohio, DANNY N. GARLAND offered to sell methamphetamine to a confidential informant for $2,300.00.

19.    In or about the summer of 1997, at the OMC Lima clubhouse, in Lima, Ohio, GARY T. HOHN asked a confidential informant to sell cocaine for HOHN.  HOHN advised the informant that he/she would be expected to sell cocaine in one ounce and above quantities at a time.

20.    On or about September 1, 1997, JEFFREY A. HUMBLE possessed a .45 caliber handgun, a .38 caliber handgun, a stolen, Mossberg 12-gauge shotgun, a .22 caliber handgun, a .22 caliber rifle, a 9 mm handgun, and 17 pounds of marijuana at his residence, 45 Cambridge Court, in Anderson, Indiana.

21.    In or about the fall of 1997, in Hardin County, Ohio, JAMES L. WHEELER asked a confidential informant to sell methamphetamine for WHEELER that WHEELER had obtained in Louisville, Kentucky.

22.    In or about October 1997, at the OMC Lima clubhouse, in Lima, Ohio, ALLEN C. LAWSON offered to sell valium tablets to a confidential informant.  LAWSON advised the confidential informant that he (LAWSON) was in a position to supply up to 1000 valium tablets at a time.

23.    On or about December 1, 1997, a person known to the Grand Jury sold ½ ounce of cocaine in Allen County, Ohio.

24.    On or about December 4, 1997, a person known to the Grand Jury sold ¼ ounce of cocaine in Allen County, Ohio.

25.    On or about December 5, 1997, a person known to the Grand Jury sold 3/4 ounce of cocaine in Allen County, Ohio.

26.    On or about December 11, 1997, in Allen County, Ohio, a person known to the Grand Jury received $350.00 from a confidential informant for ¼ ounce of cocaine, which had been fronted on December 5, 1997.

27.    Between 1998 and 1999, RICHARD F. BRODERICK possessed cocaine in a brown jersey glove, in Indianapolis, Indiana, which he caused to be weighed and packaged into ½ gram, gram and eight ball quantities of cocaine.

28.    On or about March 20, 1998, a person known to the Grand Jury collected $200.00 from a confidential informant in Allen County, Ohio.  The person known to the Grand Jury showed the informant several firearms that he/she received from people who owed him/her money from past cocaine deals.

29.    On or about March 21, 1998, a person known to the Grand Jury told a confidential informant that the he/she was planning to plant another crop of marijuana that year.

30.    On or about April 18, 1998, GARY T. HOHN and ALLEN C. LAWSON consumed methamphetamine at the Legends Motorcycle Club clubhouse in Sidney, Ohio.

31.    On or about April 18, 1998, GARY T. HOHN sold methamphetamine at the Legends Motorcycle Club clubhouse in Sidney, Ohio.

32.    On or about April 18, 1998, JAMIE M. REICHELDERFER stated that he purchased thousands of bootleg valium tablets from Canada.

33.    On or about June 20, 1998, GARY T. HOHN sold 100 unit doses of LSD to a confidential informant in Lima, Ohio.

34.    On or about June 20, 1998, GARY T. HOHN advised a confidential informant that he (HOHN) sold 50,000 unit doses of LSD in the last two weeks.

35.    On or about September 16, 1998, GLEN D. CARLISLE and ALLEN C. LAWSON possessed marijuana at the OMC Lima clubhouse in Lima, Ohio.

36.    On or about September 19, 1998, MICHAEL L. BOWLING possessed ¼ ounce of cocaine at the OMC Dayton clubhouse in Dayton, Ohio.

45

37.     On or about September 26, 1998, ALLEN C. LAWSON and a person known to the Grand Jury purchased cocaine at the OMC West Penn clubhouse in Kittaning, Pennsylvania.

38.     On or about September 29, 1998, a person known to the Grand Jury possessed marijuana and a .38 caliber handgun at the OMC Lima clubhouse in Lima, Ohio.

39.     On or about September 30, 1998, a person known to the Grand Jury told a confidential informant that he/she would repay a recent $30,000.00 loan by harvesting 10 pounds of marijuana, which the other person planned to sell for $2,500.00 per pound.

40.     On or about October 20, 1998, at the OMC Knoxville clubhouse in Knoxville, Tennessee, a person known to the Grand Jury stated that he/she made $35,000.00 per year from selling homegrown marijuana.

41.     On or about October 21, 1998, JAMES L. WHEELER sold cocaine at the OMC Knoxville clubhouse in Knoxville, Tennessee.

42.     On or about October 31, 1998, JAMES L. WHEELER sold cocaine to JOHN P. WALKER at the OMC Knoxville clubhouse in Knoxville, Tennessee.

43.     On or about November 28, 1998, MICHAEL L. BOWLING sold cocaine to DANNY N. GARLAND at the OMC Louisville clubhouse in Louisville, Kentucky.

44.     On or about November 28, 1998, ALLEN C. LAWSON sold cocaine at the OMC Louisville clubhouse in Louisville, Kentucky.

45.     On or about December 22, 1998, KENNETH L. BUCHER sold 25.8 grams of cocaine in Allen County, Ohio.  BUCHER stated that he had an additional 40 ounces of cocaine to sell.

46.     On or about December 22, 1998, KENNETH L. BUCHER advised a confidential informant that he (BUCHER) makes $8,000.00 per week selling cocaine.

47.     Between late 1998 and April 2001, JAMES L. WHEELER purchased 50,000 to 100,000 valium tablets, on ten to 12 occasions. WHEELER paid .35 cents per valium tablet. Many of the purchases were made on behalf of RICHARD F. BRODERICK.

48.     Between late 1998 and April 2001, JAMES L. WHEELER purchased one to two kilograms of cocaine at least once per month.  WHEELER paid $22,000 to $27,000 per kilogram of cocaine.  GREGORY A. DRIVER transported the cocaine from the Joliet, Illinois area to WHEELER in Indianapolis, Indiana.

49.     In or about 1999, JAMES L. WHEELER agreed to purchase one kilogram of cocaine for $26,500.  On behalf of WHEELER, JOHN P. WALKER delivered $26,500 to the source of the cocaine for the purchase.

50.     Between 1999 and 2001, at his residence in Indianapolis, Indiana, JAMES L. WHEELER offered to provide valium for distribution at a cost of .45 cents per tablet.

51.     On or about January 8, 1999, KENNETH L. BUCHER sold 23.07 grams of cocaine for $1,000.00 in Allen County, Ohio, which BUCHER delivered in his blue Ford Bronco.

52.     On or about January 31, 1999, JOHN P. WALKER distributed cocaine to other OMC members at the OMC Dayton clubhouse in Dayton, Ohio.

53.     On or about January 31, 1999, STEVEN E. WARMAN distributed ¼ ounce of cocaine to ALLEN C. LAWSON at the OMC Dayton clubhouse in Dayton, Ohio.

54.     On or about February 7, 1999, ALLEN C. LAWSON distributed methamphetamine at the OMC Dayton clubhouse in Dayton, Ohio.

55.     On or about February 7, 1999, MICHAEL L. BOWLING facilitated the distribution of cocaine at the OMC Dayton clubhouse in Dayton, Ohio.

56.     On or about March 4, 1999, ALLEN C. LAWSON sold methamphetamine to OMC members at the OMC Daytona clubhouse in Daytona Beach, Florida.

57.     On or about March 7, 1999, PATRICK J. PUTTICK, and GLEN D. CARLISLE possessed marijuana at the OMC Knoxville clubhouse in Knoxville, Tennessee.

58.     On or about March 11, 1999, GLEN D. CARLISLE told a confidential informant that CARLISLE would provide marijuana to the informant for $650.00 per pound.

59.     On or about March 13, 1999, KEVIN A. WALES possessed ¼ ounce of cocaine at the OMC Dayton clubhouse in Dayton, Ohio.

60.     On or about March 13, 1999, ALLEN C. LAWSON possessed approximately one ounce of marijuana at the OMC Dayton clubhouse in Dayton, Ohio.

61.     On or about March 19, 1999, ALLEN C. LAWSON delivered two pounds of marijuana to a confidential informant in Hardin County, Ohio.  Later that day, the confidential informant and GLEN D. CARLISLE delivered $2,000.00 to LAWSON at LAWSON'S residence, in Middletown, Ohio.

62.     On or about March 19, 1999, ALLEN C. LAWSON fronted 929 valium tablets to a confidential informant at LAWSON'S residence in Middletown, Ohio.  GLEN D. CARLISLE was present during this transaction.  LAWSON also possessed 10 pounds of marijuana and another 5,000 valium tablets at his residence.

63.     On or about March 19, 1999, GLEN D. CARLISLE sold ½ ounce of cocaine for $600.00 to a confidential informant at CARLISLE'S residence, 174 Lansdowne Avenue in Dayton, Ohio.

64.     On or about March 26, 1999, a confidential informant delivered $840.00 to ALLEN C. LAWSON at the OMC Dayton clubhouse in Dayton, Ohio, in payment for 929 valium tablets that LAWSON "fronted" the informant on March 19, 1999.

65.     On or about April 5, 1999, KENNETH L. BUCHER sold approximately 28 grams of cocaine in Lima, Ohio.

66.     On or about April 6, 1999, KENNETH L. BUCHER sold approximately 27.9 grams of cocaine in Lima, Ohio.

67.     On or about April 15, 1999, THOMAS B. CAIN possessed approximately ½ ounce of methamphetamine in Luther, Oklahoma.  CAIN advised a confidential informant that he (CAIN) sells ½ ounce quantities of methamphetamine for $450.00.

68.     On or about May 1, 1999, ALLEN C. LAWSON purchased cocaine at the OMC Louisville clubhouse in Louisville, Kentucky.

69.     On or about May 6, 1999, DAVID J. HANNUM told a confidential informant that he (HANNUM) just received a shipment of cocaine which was of high quality.  HANNUM advised the confidential informant that he (HANNUM) would meet with the informant away from the OMC clubhouse to discuss the sale of the cocaine.

70.     On or about May 17, 1999, GLEN D. CARLISLE possessed one ounce of cocaine at his residence in Dayton, Ohio.  CARLISLE told a confidential informant that CARLISLE obtains the cocaine for $1,050.00 per ounce, and would sell the cocaine to the informant for $1,150.00 per ounce.

71.     On or about May 25, 1999, GLEN D. CARLISLE possessed ½ ounce of cocaine at the OMC Dayton clubhouse in Dayton, Ohio.  CARLISLE told a confidential informant that on March 12, 1999, he (CARLISLE) delivered ½ ounce of cocaine to the Sharks Lounge in Dayton.

72.     On or about May 29, 1999, DANNY N. GARLAND distributed 1/16 ounce of cocaine at the OMC Indianapolis clubhouse in Indianapolis, Indiana.

73.     On or about May 29, 1999, while attending a party at the OMC Indianapolis clubhouse in Indianapolis, Indiana, DAVID J. HANNUM offered to sell one ounce of cocaine to a confidential informant for $1,100.00.

74.     On or about June 6, 1999, GLEN D. CARLISLE possessed one ounce of cocaine, which he broke down into 1/16 ounce packages.  CARLISLE sold one of the packages of cocaine to MICHAEL L. BOWLING.

75.     On or about June 7, 1999, ALLEN C. LAWSON told a confidential informant that LAWSON and LLOYD E. HECKMAN had just delivered methamphetamine to Detroit, Michigan.

49

76.     On or about June 7, 1999, LLOYD E. HECKMAN possessed methamphetamine in Allen County, Ohio.

77.     On or about June 11, 1999, DAVID J. HANNUM sold one ounce of cocaine for $1,000.00 at his residence, 267 Lansdowne, Avenue, Dayton, Ohio.

78.     On or about June 12, 1999, MICHAEL L. BOWLING purchased 1/16 ounce of cocaine from GLEN D. CARLISLE at the OMC Dayton clubhouse in Dayton, Ohio.

79.     On or about June 20, 1999, DAVID J. HANNUM, DANNY N. GARLAND, JOHN P. WALKER, ALLEN C. LAWSON, and GLEN D. CARLISLE possessed and used cocaine at the OMC Dayton clubhouse in Dayton, Ohio.

80.     On or about June 26, 1999, GLEN D. CARLISLE sold 1/8 ounce of cocaine to MICHAEL L. BOWLING at the OMC Dayton clubhouse in Dayton, Ohio.

81.     On or about June 26, 1999, GLEN D. CARLISLE offered to sell ¼ ounce of cocaine to a confidential informant at the OMC Dayton clubhouse in Dayton, Ohio.

82.     On or about July 2, 1999, a person known to the Grand Jury told a confidential informant that he/she was growing 350 marijuana plants.  The person known to the Grand Jury stated that he/she made $50,000.00 from selling marijuana.

83.     On or about July 6, 1999, in Louisville, Kentucky, the president of the OMC Louisville chapter introduced a confidential informant to REX A. DEITZ.  DEITZ advised the informant that he (DEITZ) sells cocaine and crystal methamphetamine.  DEITZ stated that he knew how to cook the methamphetamine and would sell it in 1/8 ounce quantities for $200.00.

84.     On or about July 8, 1999, ALLEN C. LAWSON possessed cocaine at the OMC Warren clubhouse in Warren, Ohio.

85.     On or about July 9, 1999, at the OMC West Penn chapter clubhouse in Kitanning, Pennsylvania, the president of the OMC Louisville, Kentucky chapter advised a confidential informant that no members of the OMC should deal with REX A. DEITZ because DEITZ was going to be indicted for trafficking in cocaine.

50

86.     On or about July 9, 1999, THOMAS B. CAIN offered to sell methamphetamine to a confidential informant.  CAIN stated that he could supply the informant with all the methamphetamine that he/she wanted.  CAIN further stated that the informant would have to travel to Oklahoma to pick up the methamphetamine.

87.     On or about July 15, 1999, RICHARD L. SPENCE possessed 1/16 of an ounce of methamphetamine at the OMC Dayton clubhouse in Dayton, Ohio.

88.     On or about July 25, 1999, DARRELL W. HORTON possessed methamphetamine in Wetzell, Ohio.

89.     On or about July 30, 1999, MICHAEL J. ROBERTS possessed $5,000.00 at the OMC Dayton clubhouse in Dayton, Ohio, which ROBERTS stated that he would use to purchase ½ pound of methamphetamine in Oklahoma.  Upon returning from Oklahoma, ROBERTS offered to sell one to two ounces of methamphetamine to a confidential informant.

90.     On or about August 4, 1999, DAVID J. HANNUM possessed 1/8 ounce of cocaine at the Pottery Shop, 745 Troy Street, Dayton, Ohio.  HANNUM delivered the cocaine to GARY T. HOHN at the OMC Dayton clubhouse in Dayton, Ohio.

91.     On or about August 6, 1999, MANCE R. STEPHENS possessed six, one-gram bags of cocaine at the OMC Indianapolis clubhouse in Indianapolis, Indiana.

92.     On or about August 6, 1999, DARRELL W. HORTON sold methamphetamine to OMC members at the OMC Indianapolis clubhouse in Indianapolis, Indiana.

93.     On or about August 11, 1999, DAVID J. HANNUM obtained 1/8 ounce of cocaine from the basement of the Pottery Shop, 745 Troy Street, Dayton, Ohio, which was later distributed at the OMC Dayton clubhouse in Dayton, Ohio.

94.     On or about August 18, 1999, GLEN D. CARLISLE possessed one ounce of cocaine at his residence, 174 Lansdowne Avenue, Dayton, Ohio.

95.     On or about August 21, 1999, DAVID J. HANNUM purchased cocaine from STEVEN E. WARMAN at Eisenhauers Bar, 780 Troy Street, Dayton, Ohio.

96.    On or about August 21, 1999, DAVID J. HANNUM possessed ½ ounce of cocaine at his residence, 267 Lansdowne Avenue, Dayton, Ohio.

97.    On or about August 27, 1999, during a telephone conversation between THOMAS B. CAIN and a confidential informant, CAIN discussed MICHAEL J. ROBERTS transporting two ounces of methamphetamine and stolen motorcycles to a confidential informant on August 26, 1999.

98.    On or about August 28, 1999, DAVID J. HANNUM possessed 1/8 ounce of cocaine at the OMC Dayton clubhouse in Dayton, Ohio.

99.    On or about August 30, 1999, MICHAEL J. ROBERTS stated that he was stopped at a roadblock in Missouri, and disposed of the methamphetamine that he was transporting.

100.    On or about September 3, 1999, RONALD P. TAYLOR, JR., possessed cocaine, LSD, and methamphetamine at the Easyrider Rodeo in Chillicothe, Ohio.

101.    On or about September 3, 1999, RICHARD L. SPENCE and LLOYD E. HECKMAN possessed methamphetamine at the Easyrider Rodeo in Chillicothe, Ohio.

102.    On or about September 4, 1999, DAVID J. HANNUM, ALLEN C. LAWSON, MICHAEL L. BOWLING, and DARRELL W. HORTON possessed cocaine at the Easyrider Rodeo in Chillicothe, Ohio.

103.    On or about September 4, 1999, DOMINIC R. MANGINE, SR., used cocaine at the Easyrider Rodeo in Chillicothe, Ohio.

104.    On or about September 5, 1999, PATRICK J. PUTTICK purchased a marijuana pipe and screens at the Easyrider Rodeo in Chillicothe, Ohio.

105.    On or about September 9, 1999, MICHAEL J. ROBERTS discussed selling eight ounces of methamphetamine for $4,500.00.

106.    On or about September 9, 1999, DAVID J. HANNUM sold one ounce of methamphetamine for $1,600.00 at HANNUM's residence, 267 Lansdowne Avenue, Dayton, Ohio.

107.     On or about September 16, 1999, DARRELL W. HORTON provided GARY T. HOHN with cocaine at the OMC Indianapolis clubhouse in Indianapolis, Indiana.

108.     On or about September 16, 1999, ALLEN C. LAWSON, JOHN L. BLACKMAN, and a person known to the Grand Jury possessed cocaine at the OMC Indianapolis clubhouse in Indianapolis, Indiana.

109.     On or about September 17, 1999, RONALD P. TAYLOR, JR., possessed cocaine, methamphetamine, LSD, xanax, and ecstasy in Pawhuska, Oklahoma.

110.     On or about September 17, 1999, RONALD P. TAYLOR, JR,. offered to sell methamphetamine to a confidential informant for $1,150.00 per ounce in Pawhuska, Oklahoma.

111.     On or about September 18, 1999, THOMAS B. CAIN and MICHAEL J. ROBERTS provided cocaine and methamphetamine to OMC members in Pawhuska, Oklahoma.

112.     On or about September 20, 1999, MICHAEL J. ROBERTS stated that four ounces of methamphetamine could be purchased from him for $3,500.00, eight ounces for $4,500.00, and 16 ounces for $8,000.00.

113.     On or about September 25, 1999, LLOYD E. HECKMAN possessed ¼ ounce of methamphetamine at the OMC West Penn clubhouse in Kittaning, Pennsylvania.

114.     On or about September 25, 1999, ALLEN C. LAWSON offered to sell ½ ounce of cocaine to a confidential informant at the OMC West Penn clubhouse in Kittaning, Pennsylvania.

115.     On or about October 2, 1999, RONALD P. TAYLOR, JR., and GLEN D. CARLISLE possessed methamphetamine at the American Drag Bike Association Races in Bowling Green, Kentucky.

116.     On or about October 2, 1999, DARRELL W. HORTON possessed cocaine at the American Drag Bike Association Races in Bowling Green, Kentucky.

117.     On or about October 6, 1999, DAVID J. HANNUM offered to sell ¼ ounce of cocaine to a confidential informant at his residence, 267 Lansdowne Avenue, Dayton, Ohio.

118.    On or about October 21, 1999, GARY T. HOHN supplied cocaine to members of the OMC Indianapolis, Indiana chapter.

119.    On or about October 23, 1999, GLEN D. CARLISLE purchased 1/16 ounce of cocaine for $100.00 at the OMC Chicago Southside clubhouse in Chicago, Illinois.

120.    On or about October 27, 1999, DAVID J. HANNUM told a confidential informant that no one was going to sell methamphetamine or cocaine in HANNUM's town without his (HANNUM's) approval.  HANNUM further told the informant that ALLEN C. LAWSON could not sell methamphetamine in Dayton, Ohio without HANNUM profiting from the sales, and if LAWSON did not like it, then HANNUM would shut down LAWSON's sale of cocaine and methamphetamine in Dayton.

121.    On or about October 28, 1999, DAVID J. HANNUM stated that he supplies GARY T. HOHN with cocaine.  HANNUM further stated that he had sold cocaine that day to KEVIN A. WALES and MICHAEL L. BOWLING.

122.    On or about October 29, 1999, MICHAEL L. BOWLING and GLEN D. CARLISLE used 1/8 ounce of cocaine in a vehicle being driven by BOWLING from the OMC Dayton clubhouse in Dayton, Ohio, to the OMC Chattanooga clubhouse in Chattanooga, Tennessee.

123.    On or about October 30, 1999, JEFFREY A. HUMBLE possessed cocaine at the OMC Chattanooga clubhouse in Chattanooga, Tennessee.

124.    On or about October 30, 1999, JEFFREY A. HUMBLE sold 1/16 ounce quantities of cocaine at the OMC Chattanooga clubhouse in Chattanooga, Tennessee.

125.    On or about October 30, 1999, RONALD P. TAYLOR, JR., possessed methamphetamine at the OMC Chattanooga clubhouse in Chattanooga, Tennessee.

126.    On or about October 30, 1999, DARRELL W. HORTON possessed methamphetamine at the OMC Chattanooga clubhouse in Chattanooga, Tennessee.

127.    On or about October 30, 1999, JOHN L. BLACKMAN possessed cocaine at the OMC Chattanooga clubhouse in Chattanooga, Tennessee.

128.    On or about November 7, 1999, DAVID J. HANNUM obtained one ounce of cocaine from the Pottery Shop, 745 Troy Street, Dayton, Ohio.

129.    On or about November 7, 1999, DAVID J. HANNUM distributed cocaine to KEVIN A. WALES at the OMC Dayton clubhouse in Dayton, Ohio.

130.    On or about November 18, 1999, GLEN D. CARLISLE stated that he was supplying MICHAEL L. BOWLING with $300.00 to $400.00 of cocaine per week.  This conversation occurred at DAVID J. HANNUM's residence, 267 Lansdowne Avenue, Dayton, Ohio.

131.    On or about November 23, 1999, DAVID J. HANNUM provided 1/8 ounce of cocaine to OMC members at the OMC Dayton clubhouse in Dayton, Ohio.

132.    On or about November 23, 1999, DAVID J. HANNUM and JOHN L. BLACKMAN provided cocaine to OMC members at the OMC Gary clubhouse in Gary, Indiana.

133.    On or about November 26, 1999, THOMAS B. CAIN stated that MICHAEL J. ROBERTS was attempting to retrieve methamphetamine that ROBERTS had discarded while ROBERTS was being pursued by law enforcement, in August 1999.

134.    On or about November 26, 1999, DAVID J. HANNUM possessed 10 to 12 grams of cocaine at the OMC Dayton clubhouse in Dayton, Ohio, which HANNUM concealed in a film container.

135.    On or about November 27, 1999, JOHN L. BLACKMAN sold cocaine at the OMC Louisville clubhouse in Louisville, Kentucky.  BLACKMAN had obtained this cocaine from DANNY N. GARLAND.

136.    On or about December 2, 1999, DAVID J. HANNUM stated that he was not selling any more cocaine until all the people that owed him money had paid him.  This conversation occurred at the OMC Dayton clubhouse in Dayton, Ohio.

137.    On or about December 4, 1999, during a telephone conversation, THOMAS B. CAIN offered to sell methamphetamine to a confidential informant, if the informant would travel to Oklahoma City, Oklahoma.

138.    On or about December 9, 1999, DAVID J. HANNUM stated that he would obtain cocaine in Florida.

139.    On or about December 11, 1999, DAVID J. HANNUM advised a confidential informant that HANNUM obtained his cocaine from STEVEN E. WARMAN.  HANNUM then offered to sell cocaine to the informant.

140.    On or about December 20, 1999, RONALD P. TAYLOR, JR., agreed to sell two ounces of methamphetamine for $1,200.00 per ounce.

141.    On or about December 21, 1999, MICHAEL J. ROBERTS and another OMC Oklahoma City member stated that they were going to manufacture methamphetamine, and wanted to distribute the drugs in Ohio.

142.    On or about December 21, 1999, RONALD P. TAYLOR, JR., sold 49 grams of methamphetamine to a confidential informant at TAYLOR'S residence,169 Ringold Avenue, Indianapolis, Indiana for $2,400.00.  TAYLOR also possessed LSD, ½ ounce of cocaine, two shotguns and three handguns.

143.    On or about December 21, 1999, at 169 Ringold Ave. Indianapolis, Indiana, RONALD P. TAYLOR, JR., asked a confidential informant to distribute 100 pound quantities of marijuana for TAYLOR.

144.    On or about December 26, 1999, ALLEN C. LAWSON distributed ½ ounce of cocaine at the Dayton OMC clubhouse in Dayton, Ohio.

145.    On or about December 26, 1999, PATRICK J. PUTTICK and ALLEN C. LAWSON possessed ½ ounce of marijuana at the OMC Dayton clubhouse in Dayton, Ohio.

146. On or about December 29, 1999, while en route to an OMC party in Fort Lauderdale, Florida, DAVID J. HANNUM possessed vicadin, xanax, valium and ½ ounce of cocaine.

147. On or about December 30, 1999, DAVID J. HANNUM told a confidential informant that RICHARD L. SPENCE and STEVEN E. WARMAN took over HANNUM'S cocaine sales, but assured the confidential informant that he/she could still come to HANNUM for cocaine.

148. On or about December 30, 1999, DAVID J. HANNUM told a confidential informant the name of his (HANNUM's) source for vicadin and xanax.

149. On or about January 11, 2000, DAVID J. HANNUM and KEVIN A. WALES used 1/8 ounce of cocaine at the OMC Dayton clubhouse in Dayton, Ohio.

150. On or about January 19, 2000, RONALD P. TAYLOR, JR., sold one ounce of methamphetamine to a confidential informant for $1,200.00 at TAYLOR'S residence, 1649 Ringold Ave., Indianapolis, Indiana.

151. On or about January 20, 2000, GLEN D. CARLISLE sold 1/16 ounce of cocaine to DAVID J. HANNUM at the OMC Dayton clubhouse in Dayton, Ohio.

152. On or about January 20, 2000, GLEN D. CARLISLE sold 1/16 ounce of cocaine to MICHAEL L. BOWLING at the OMC Dayton clubhouse in Dayton, Ohio.

153. On or about January 29, 2000, DAVID J. HANNUM obtained two ounces of cocaine from the Pottery Shop, 745 Troy Street, Dayton, Ohio, and delivered the cocaine to GLEN D. CARLISLE at CARLISLE's residence, 174 Lansdowne Ave., Dayton, Ohio.

154. On or about January 29, 2000, at the OMC Dayton clubhouse in Dayton, Ohio, GLEN D. CARLISLE provided a confidential informant with one ounce of cocaine, which was divided into 1/16 ounce packages, and instructed the informant to sell the cocaine for CARLISLE, DAVID J. HANNUM and GARY T. HOHN. CARLISLE told the informant to sell the 1/16 ounce packages of cocaine for $80.00.

57

155.    On or about January 29, 2000, MICHAEL L. BOWLING and JEFFREY A. HUMBLE each purchased 1/8 ounce of cocaine, while KEVIN A. WALES and a person known to the Grand Jury each purchased 1/16 ounce of cocaine from a confidential informant at the OMC Dayton clubhouse in Dayton, Ohio.  The informant, in turn, provided the profits of the cocaine sales, and the remaining nine bags of cocaine, to GLEN D. CARLISLE.

156.    On or about January 29, 2000, ALLEN C. LAWSON possessed approximately 24 grams of cocaine at the OMC Dayton clubhouse in Dayton, Ohio.  LAWSON offered to sell this cocaine to a confidential informant.

157.    On or about February 11, 2000, at Lookers Lounge in Fort Wayne, Indiana, JOHN L. BLACKMAN stated that he was receiving a large shipment of methamphetamine.

158.    On or about February 12, 2000, JOHN L. BLACKMAN obtained methamphetamine from the manager's office of Lookers Lounge in Fort Wayne, Indiana. BLACKMAN stated that he was receiving several ounces of methamphetamine in a couple days, and that he would sell the methamphetamine to a confidential informant for $1,100.00 to $1,150.00 an ounce.

159.    On or about February 21, 2000, JOHN L. BLACKMAN advised a confidential informant that during contacts regarding future purchases of methamphetamine and stolen motorcycles, BLACKMAN would use the word "cocktail" to indicate that BLACKMAN had drugs or stolen motorcycles for sale.

160.    On or about February 23, 2000, at Lookers Lounge in Fort Wayne, Indiana, JOHN L. BLACKMAN stated that he expected to receive ¼ pound of methamphetamine.

161.    On or about February 25, 2000, at the OMC Dayton clubhouse in Dayton, Ohio, ALLEN C. LAWSON told a confidential informant that LAWSON could supply the informant with methamphetamine.

162.    On or about February 28, 2000, at Lookers Lounge in Fort Wayne, Indiana, JOHN L. BLACKMAN advised a confidential informant that the ¼ pound of methamphetamine had not

58

yet been delivered.  BLACKMAN further stated that he was getting a stolen Harley Davidson that the informant could purchase.

163.    On or about March 1, 2000, a person known to the Grand Jury sold 1000 valium tablets for $750.00 in Allen County, Ohio. The person known to the Grand Jury stated that he/she only had 8,000 valium tablets left to sell, but he/she originally had 20,000 valium tablets.

164.    On or about March 8, 2000, JAMES L. WHEELER possessed 1½ ounces of cocaine at the OMC Daytona Beach clubhouse in Daytona Beach, Florida.  WHEELER distributed an unknown amount of this cocaine to DAVID J. HANNUM and GARY T. HOHN.

165.    On or about March 9, 2000, JAMES L. WHEELER and DAVID J. HANNUM supplied various OMC members with cocaine at the OMC Daytona Beach clubhouse in Daytona Beach, Florida. The OMC members used the cocaine in RICHARD F. BRODERICK'S trailer.

166.    On or about March 11, 2000, after an OMC national meeting in Daytona Beach, Florida, THOMAS B. CAIN advised a confidential informant that CAIN now had three methamphetamine suppliers.  CAIN stated that he could supply any amount of methamphetamine requested.

167.    On or about March 21, 2000, GARY T. HOHN possessed a bag of cocaine at the OMC Dayton clubhouse in Dayton, Ohio.  HOHN was using the cocaine.

168.    On or about March 31, 2000, PATRICK J. PUTTICK and ALLEN C. LAWSON used marijuana at the OMC Dayton clubhouse in Dayton, Ohio.

169.    On or about April 27, 2000, a person known to the Grand Jury stated that he/she had approximately 6,000 valium tablets for sale.

170.    Between June 2000 and June 2001, LLOYD E. HECKMAN provided approximately 15 ounces of methamphetamine in Dayton, Ohio to a person known to the Grand Jury.

171.    On or about June 1, 2000, a person known to the Grand Jury sold 1000 valium tablets for $750.00.  During the transaction, the person known to the Grand Jury stated that he

obtains the valium from ALLEN C. LAWSON in Dayton, Ohio, and further stated that he still had approximately 4,000 valium tablets to sell.

172.    On or about June 1, 2000, a person known to the Grand Jury and a confidential informant discussed the terms of a two ounce methamphetamine transaction.  The person known to the Grand Jury stated that the methamphetamine was of very good quality, and that the informant could cut it 50%, thereby making a substantial profit.  The person known to the Grand Jury further stated that the price was $2,000.00 per ounce, with an additional delivery fee.  When the informant told the person known to the Grand Jury that he/she intended to pay about $200.00 for the delivery fee, the person known to the Grand Jury responded that the delivery fee was $500.00.

173.    On or about June 5, 2000, during a telephone conversation, a person known to the Grand Jury advised a confidential informant that he/she brought two ounces of methamphetamine from Dayton, Ohio for the informant.

174.    On or about June 5, 2000, during a telephone conversation, a confidential informant advised a person known to the Grand Jury that the informant only wanted one motorcycle, not two, as they previously discussed.  The word "motorcycle" was used to refer to methamphetamine.

175.    On or about June 6, 2000, a person known to the Grand Jury sold one ounce of methamphetamine to a confidential informant for $2,500.00 in Allen County, Ohio.  During the transaction the person known to the Grand Jury advised the informant that he/she had another ounce for the informant.

176.    On or about July 4, 2000, a person known to the Grand Jury telephoned a confidential informant and asked whether he/she was still "ready for that one thing".  When the informant stated that he/she was ready anytime, the other person responded that he/she would re-contact the informant at a later date.

60

177.    On or about July 18, 2000, a person known to the Grand Jury sold one ounce of methamphetamine to a confidential informant for $2,300.00 in Allen County, Ohio.

178.    On or about July 23, 2000, JAMIE M. REICHELDERFER asked a confidential informant whether the informant had an ounce of methamphetamine. REICHELDERFER stated that he had the same methamphetamine supplier as the informant. REICHELDERFER added that he and an unknown associate purchased one ounce of methamphetamine from that supplier and split the cost.

179.    On or about August 11, 2000, MICHAEL J. ROBERTS possessed ¼ ounce of methamphetamine at the OMC Oklahoma City clubhouse in Oklahoma City, Oklahoma.

180.    On or about August 15, 2000, during a telephone conversation discussing the purchase of one ounce of methamphetamine, a confidential informant used the terms "room length" to refer to the purchase price. In response to the informant's question whether the room would be 23 feet (meaning $2,300.00) or 25 feet (meaning $2,500.00) long, the person known to the Grand Jury stated that it would depend on the size of the carpet that went in it.

181.    On or about August 24, 2000, at the OMC Oklahoma City clubhouse in Oklahoma City, Oklahoma, THOMAS B. CAIN advised a probate that the probate could deal drugs, but that the probate must be responsible about it and not leave anything, such as baggies or papers, lying around the OMC clubhouse.

182.    On or about August 25, 2000, at the OMC Oklahoma City clubhouse in Oklahoma City, Oklahoma, MICHAEL J. ROBERTS instructed a probate on the rules for dealing drugs, which included no drug sales at the OMC clubhouse, and not wearing OMC identifiers when selling drugs. ROBERTS informed the probate that ROBERTS could supply the probate with as much methamphetamine as the probate needed.

183.    On or about August 25, 2000, a person known to the Grand Jury telephoned a confidential informant and advised the informant that the other person had not talked to his

61

supplier of methamphetamine. The other person asked the informant to help him by purchasing valium pills from him.

184.    On or about September 8, 2000, a person known to the Grand Jury informed a confidential informant that since the other person's supply of methamphetamine did not arrive, he/she had to go to another supplier and, therefore, the price for one ounce of methamphetamine was $2,500.00.

185.    On or about September 22, 2000, a person known to the Grand Jury telephoned a confidential informant and asked if he/she was ready to purchase methamphetamine because the other person now had a supply.

186.    On or about October 24, 2000, a person known to the Grand Jury possessed approximately two ounces of methamphetamine in a clear plastic zip lock bag, in Lima, Ohio, which he offered to sell to a confidential informant. When the informant declined the purchase, the other person advised the informant to re-contact him when the informant was ready to make the purchase, as he now had a steady supply and could get all he wanted. The person known to the Grand Jury stated that the purchase price would be $1,800.00 per ounce.

187.    On or about January 25, 2001, ALLEN C. LAWSON possessed approximately 45 grams of cocaine, approximately 142 grams of marijuana, a digital scale, and various OMC vestments, in a Ford Aerostar minivan at milepost marker #155, on interstate 75 in Hancock County, Ohio. DANNY N. GARLAND previously purchased this Ford Aerostar minivan from M D Auto Sales, a business owned by RICHARD F. BRODERICK.

188.    In or about February 2001, while at an OMC world meeting in Cancun, Mexico, "Wop", the Canadian national boss, made a motion to JAMES L. WHEELER, and the OMC bosses that were present, including PATRICK J. PUTTICK, to amend club rules to allow OMC members to sell heroin and ecstasy. Following a vote, the regional bosses amended club rules to permit the sale of heroin and ecstasy by OMC club members.

189.     On or about March 1, 2001, DAVID J. HANNUM possessed 392.67 grams of cocaine at his business, David Jack's Pottery and Ceramics, 745 Troy Street, Dayton, Ohio.

190.     On or about March 1, 2001, DAVID J. HANNUM possessed 2.75 grams of cocaine and 19.26 grams of marijuana at his residence, 267 North Lansdowne Avenue, Dayton, Ohio.

191.     On or about March 1, 2001, PATRICK J. PUTTICK possessed 7.30 grams of marijuana and four orange tablets containing .59 grams of diazepam at his residence, 94 Morgan Street, Dayton, Ohio.

192.     On or about March 1, 2001, STEVEN E. WARMAN possessed 13 firearms, two sets of scales, approximately 3.38 grams of cocaine, and cocaine residue at his residence, 9492 Taylorsville Road, Huber Heights, Ohio.

193.     In or about May 2001, JAMES L. WHEELER purchased a kilogram of cocaine and 50,000 valium tablets in Joliet, Illinois. WHEELER purchased the valium tablets on behalf of RICHARD F. BRODERICK.

194.     On or about August 3, 2001, JAMES L. WHEELER and a person known to the Grand Jury discussed the problems that the other person had with the OMC Dayton chapter. WHEELER stated that DAVID J. HANNUM'S problem with the other person centered on the fact that the other person did not assist HANNUM in HANNUM'S cocaine distribution activities. WHEELER further stated that HANNUM'S cocaine was of such poor quality, it would barely test positive.

195.     On or about August 10, 2001, DOMINIC R. MANGINE, SR., and JOHN P. WALKER offered cocaine to a person known to the Grand Jury at 1009 Kinsmoor, Ft. Wayne, Indiana. WALKER possessed approximately ½ ounce of cocaine in a solid, olive colored vial the size of a pill bottle.

196.     On or about August 10, 2001, DOMINIC R. MANGINE, SR., JOHN P. WALKER, and JEFFREY A. HUMBLE used cocaine at 1009 Kinsmoor, Ft. Wayne, Indiana.

197.     On or about August 23, 2001, after an OMC Fort Wayne chapter church meeting at the residence of ROBERT W. KEELER, 1009 Kinsmoor, Fort Wayne, Indiana, DANNY K. HEDGES told a person known to the Grand Jury that he (HEDGES) was the "man" as far as distributing narcotics was concerned.  HEDGES further stated that the OMC expected a portion of the proceeds from the sale of drugs to be donated back to the OMC chapter, and in return, the OMC would maintain the supply of drugs.

198.     On or about August 23, 2001, during a church meeting of the OMC Fort Wayne chapter at 1009 Kinsmoor, Fort Wayne, Indiana, JAMES L. WHEELER stated, "I started out in this club man, I didn't even know where home was at.  Me and (unintelligible) run all over the fucking country.  You Know?  And the towns where there wasn't no Outlaw chapters, that's where we'd thrive.....Now, those days are pretty well gone now....but....if the laws change and the times changes, if-if you're smart, you learn how to change with them.  The opportunity's still there.  Fucking Mexicans are still out there making a fucking millions, you know they're just seven blocks from the clubhouse they knocked off three hundreds pounds of fucking marijuana, I don't know how many kilos of cocaine, bags of money, guns, I mean they had every fucking thing imaginable there.  They come with a hundred cop cars raid these three house and this restaurant, seven blocks from my house.  Those mother-fuckers had more dope and more money than we've seen in a year.  Where the fuck's my robbers at, where's my god damn gangster outlaws at? You know?"

199.     On or about August 30, 2001, during a telephone conversation between ROBERT W. KEELER and a person known to the Grand Jury, KEELER stated that GREGORY DRIVER was very busy distributing cocaine.  KEELER further stated that many of the problems the OMC Indianapolis chapter was having retaining members was related to the chapter members' heavy use of cocaine.

200.     On or about August 31, 2001, during a party at the OMC Dayton clubhouse in Dayton, Ohio, ROBERT W. KEELER stated that he used cocaine during the event.

64

201.     On or about August 31, 2001, at the OMC Dayton clubhouse in Dayton, Ohio, MICHAEL L. BOWLING ingested cocaine.  DAVID J. HANNUM stated that he had provided BOWLING with a substantial amount of cocaine for personal use, as a deterrent so that BOWLING would not consume too much alcohol.

202.     On or about September 1, 2001, DANNY K. HEDGES offered to sell cocaine to a person known to the Grand Jury for $1,000.00 per ounce.  HEDGES stated that he would sell the cocaine to the other person for $950.00 per ounce, with an additional $50.00 per ounce being charged as a delivery fee to OMC Indianapolis, Indiana member GREGORY A. DRIVER.  HEDGES further stated that DRIVER is HEDGES' cocaine supplier.

203.     On or about September 2, 2001, a person known to the Grand Jury observed JAMES L. WHEELER possess cocaine at an OMC event in Chillicothe, Ohio.

204.     On or about September 4, 2001, DANNY K. HEDGES telephonically contacted a person known to the Grand Jury and asked the other person if he/she was still interested in purchasing "three tools".

205.     On or about September 6, 2001, after a church meeting of the OMC Fort Wayne, GREGORY A. DRIVER told a person known to the Grand Jury that he brought "that stuff", which the other person understood to be cocaine, with him to the meeting.  DRIVER asked the other person if he/she wanted the cocaine that night.

206.     On or about September 7, 2001, in the parking lot of Hall's Restaurant, Bluffton Road, Fort Wayne Indiana, DANNY K. HEDGES sold a person known to the Grand Jury three ounces of cocaine for $3,000.00.

207.     On or about September 15, 2001, during an OMC event at the American Indian Reservation, Pawhuska, Oklahoma, DANNY K. HEDGES and GREGORY A. DRIVER stated that they would be obtaining additional cocaine for the upcoming week.  HEDGES and DRIVER asked a person known to the Grand Jury if the other person would like to purchase any of the cocaine when it became available.

65

208.    On or about September 20, 2001, at 2110 E. Pontiac Ave., Fort Wayne, Indiana, DANNY K. HEDGES stated that he might be in contact with GREGORY A. DRIVER during the upcoming week to obtain additional cocaine.

209.    On or about September 22, 2001, at 2110 E. Pontiac Ave., Fort Wayne, Indiana, DANNY K. HEDGES stated that JOHN L. BLACKMAN had previously served as the coordinator for stealing motorcycles and distributing drugs.  HEDGES further stated that he, BLACKMAN, and another OMC member previously conducted these criminal activities.

210.    On or about September 29, 2001, during an event in Churubusku, Indiana, ROBERT W. KEELER stated that he knew someone who would supply methamphetamine.

211.    On or about September 29, 2001, during an event in Churubusku, Indiana, ROBERT W. KEELER stated that he was making between $600.00 and $1,000.00 per week from selling marijuana.  KEELER further stated that he was selling the marijuana from his residence.

212.    On or about September 29, 2001, during an event in Churubusku, Indiana, DANNY K. HEDGES and GREGORY A. DRIVER used cocaine in ROBERT W. KEELER'S motor home.  KEELER invited a person known to the Grand Jury inside KEELER'S motor home to ingest cocaine.  KEELER stated that he had taken acid, and that he was armed with a handgun throughout the event.

213.    On or about October 4, 2001, during a church meeting of the OMC Fort Wayne chapter, at 2110 E. Pontiac Ave, Fort Wayne, Indiana, ROBERT W. KEELER discussed ways for the chapter to make money, such as by selling methamphetamine or stolen motorcycles.

214.    On or about October 10, 2001, at a church meeting of the OMC Indianapolis in Indianapolis, Indiana, JAMES L. WHEELER advised OMC members that he was considering banning the use of methamphetamine within the ranks of the OMC.

66

215.    On or about October 10, 2001, after a church meeting of the OMC Indianapolis, in Indianapolis, Indiana, ROBERT W. KEELER provided one gram of cocaine to each of the OMC members present, for the members' personal use.

216.    On or about October 15, 2001, in Sheyboygan, Wisconsin, DANNY K. HEDGES told a person known to the Grand Jury that JAMES F. WHEELER and JOHN P. WALKER were requiring HEDGES to obtain cocaine from them.  HEDGES stated that he could obtain better quality cocaine at a better price than what was being offered by the OMC Indianapolis members. HEDGES further stated that GREGORY A. DRIVER, a drug courier for WHEELER and WALKER, makes $100.00 per cocaine delivery.

217.    On or about October 17, 2001, while traveling from Indiana to Wisconsin, DANNY K. HEDGES and a person known to the Grand Jury discussed stolen motorcycles and equipment for specific prices.  HEDGES also discussed the cocaine operation involving JAMES L. WHEELER and JOHN P. WALKER.

218.    On or about October 24, 2001, during a church meeting of the OMC Fort Wayne chapter, in Fort Wayne, Indiana, ROBERT W. KEELER stated that there were discussions during the bosses meeting to ban methamphetamine in the OMC.  KEELER advised the OMC members that it was decided that distributing methamphetamine was still allowed.

219.    On or about October 29, 2001, during a telephone conversation between ROBERT W. KEELER and a person known to the Grand Jury, KEELER stated that he was considering establishing a methamphetamine distribution connection with individuals in Florida. KEELER further stated that he wanted to discuss the matter with JAMES L. WHEELER to apprise him of the situation.  KEELER explained that the drug distribution network was viewed as a way for the individuals involved to make money, and to bolster the financial stability of the OMC Fort Wayne chapter.

220.    On or about November 1, 2001, during a church meeting of the OMC Fort Wayne in Fort Wayne, Indiana, ROBERT W. KEELER advised OMC members that he had contacted a

67

supplier in Florida, who could provide KEELER with kilogram amounts of cocaine and methamphetamine. KEELER told the members that he viewed drug distribution as a mechanism for the OMC Fort Wayne chapter to make money. KEELER stated that he had discussed his possible new drug supplier with JAMES L. WHEELER, and WHEELER was interested in sampling the drugs.

221.    On or about November 6, 2001, at the OMC Indianapolis, Indiana clubhouse in Indianapolis, Indiana, ROBERT W. KEELER purchased $100.00 worth of cocaine from OMC Indianapolis chapter member GREGORY A. DRIVER.

222.    On or about November 15, 2001, during a church meeting of the OMC Fort Wayne in Fort Wayne, Indiana, ROBERT W. KEELER told OMC members that he could obtain cocaine and methamphetamine at any time. KEELER advised the members that the code words "insulated gloves" would be used to refer to the "high test" or methamphetamine, and that the number of ounces requested should be referred to as pairs of gloves. KEELER stated that the price for the methamphetamine was still being negotiated, and that the supplier was not the previous person(s) spoken of from Florida, but he was still working on the connection. KEELER told the members that marijuana could be purchased for $700.00 per pound.

223.    On or about November 23, 2001, at the OMC Louisville, Kentucky clubhouse in Louisville, Kentucky, ROBERT W. KEELER advised a person known to the Grand Jury that EARL LOGSDON either had 12 or 16 pounds of methamphetamine available and would be willing to sell the methamphetamine for about $1,300.00 per ounce. KEELER stated that he was interested in purchasing a quantity of the methamphetamine.

224.    On or about November 25, 2001, at an OMC bosses meeting at the OMC Louisville, Kentucky clubhouse in Louisville, Kentucky, GREGORY A. DRIVER stated that methamphetamine would no longer be allowed on OMC properties in Indianapolis, although the Louisville chapter would continue to conduct business as usual.

68

225.    On or about November 26, 2001, after an OMC Fort Wayne church meeting in Fort Wayne, Indiana, ROBERT W. KEELER told a person known to the Grand Jury that KEELER attempted to contact KEELER'S drug supplier, however, they were not at home.

226.    On or about November 28, 2001, during a telephone conversation, ROBERT W. KEELER told a person known to the Grand Jury that KEELER was ready to conduct a drug transaction, and to "bring your life savings."

227.    On or about November 28, 2001, ROBERT W. KEELER told a person known to the Grand Jury that KEELER was prepared to sell the other person two ounces of methamphetamine.  KEELER advised the other person that the purchase price would be $1,250.00 per ounce of methamphetamine, for a total price of $2,500.00, and that he (KEELER) needed the money up front.  KEELER further stated that DANNY K. HEDGES was involved in the transaction.

228.    On or about November 29, 2001, during a telephone conversation, a person known to the Grand Jury told ROBERT W. KEELER, "I've got my end ready, and hopefully those gloves are ready." KEELER responded, "Ya, I should have that taken care of by the time you get over here."

229.    On or about November 29, 2001, at the OMC Fort Wayne clubhouse, in Fort Wayne, Indiana, ROBERT W. KEELER sold a person known to the Grand Jury two ounces of methamphetamine for $2,500.00.  KEELER stated that the quality of the methamphetamine was better than that possessed by "SKEETER" (EARL F. LOGSDON).

230.    On or about November 30, 2001, at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, DANNY K. HEDGES told a person known to the Grand Jury that HEDGES had access to a kilogram of methamphetamine, which HEDGES would sell to the other person.

231.    On or about December 2, 2001, DANNY K. HEDGES, while wearing his OMC dress shirt, possessed methamphetamine and cocaine in Fort Wayne, Indiana.

69

232.    On or about December 19, 2001, after a church meeting at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, DANNY K. HEDGES and a person known to the Grand Jury discussed methamphetamine, which was referred to as "high test". HEDGES stated that he transferred over much of his drug dealing enterprise to his son, and therefore, HEDGES would not become involved in the transactions unless it was with an OMC member. HEDGES further stated that the price would be negotiated, but HEDGES would add his transaction fee to the purchase price.

233.    On or about December 22, 2001, at the OMC Daytona Beach clubhouse in Daytona Beach, Florida, ROBERT W. KEELER told a person known to the Grand Jury that KEELER met with his methamphetamine source located in Florida, and that KEELER would have methamphetamine delivered to Indiana. KEELER asked the other person if he/she was interested in purchasing two ounces per week from KEELER and his source.

234.    On or about December 29, 2001, while traveling from Indianapolis, Indiana to the OMC Toledo clubhouse in Toledo, Ohio, GREGORY A. DRIVER possessed three to four grams of cocaine, which he distributed to JAMES L. WHEELER and DOMINIC R. MANGINE, SR.

235.    In or about the winter of 2002, JOHNNY D. WARMAN possessed 100 ounces of cocaine in the garage area of his residence,1845 Vull Street, Dayton, Ohio.

236.    On or about January 8, 2002, after cocaine was found at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, ROBERT W. KEELER advised the OMC membership that he was considering banning drugs at the OMC Fort Wayne clubhouse.

237.    On or about January 13, 2002, ROBERT W. KEELER discussed DANNY K. HEDGES having smoked crack cocaine in the basement of a building, which adjoins the OMC Fort Wayne clubhouse, in Fort Wayne, Indiana.

238.    On or about January 22, 2002, at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, DANNY K. HEDGES stated that he had one pound of methamphetamine available to

him, which had been "fronted" to him by his supplier.  HEDGES stated that the quality of the methamphetamine was better than what he had previously received from his supplier.

239.    On or about January 22, 2002, DANNY K. HEDGES provided methamphetamine to a person known to the Grand Jury.

240.    On or about January 24, 2002, at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, DANNY K. HEDGES stated that he had a significant quantity of methamphetamine that he wanted to sell.

241.    On or about January 24, 2002, ROBERT W. KEELER told the OMC Fort Wayne membership that some members were not happy with the illegal drug use in the chapter clubhouse.  KEELER added that a $50.00 fine would be assessed against anyone leaving a "roach" in the clubhouse.

242.    On or about January 24, 2002, DANNY K. HEDGES stated the methamphetamine that he provided to a person known to the Grand Jury, on January 22, 2002, was the "primo shit".

243.    On or about January 24, 2002, during a church meeting of the OMC Fort Wayne in Fort Wayne, Indiana, ROBERT W. KEELER advised that he would no longer permit the open use of cocaine in the OMC Fort Wayne clubhouse, but marijuana could be used in the cooler area of the clubhouse.

244.    On or about January 29, 2002, DANNY K. HEDGES stated that he was currently distributing methamphetamine with DARRELL L. BAKER.  HEDGES added that BAKER currently possessed one pound of methamphetamine for distribution.  HEDGES further stated that HEDGE'S son had taken over distributing cocaine for HEDGES.

245.    On or about January 30, 2002, GREGORY A. DRIVER possessed cocaine and a handgun, while driving his truck in the Saginaw, Michigan area.

246.    On or about January 31, 2002, DANNY K. HEDGES removed $100.00 from the Fort Wayne chapter treasury, which HEDGES stated was needed to complete a drug transaction.

247.    On or about February 3, 2002, EARL F. LOGSDON stated that he would distribute methamphetamine to a person known to the Grand Jury.

248.    On or about February 7, 2002, DANNY K. HEDGES offered to sell methamphetamines and stolen motorcycles to a person known to the Grand Jury.  HEDGES stated he had identified three motorcycles to steal, and had approximately five ounces of very good quality methamphetamine to sell.

249.    On or about February 11, 2002, DANNY K. HEDGES stated that he would sell stolen motorcycles for "350" ($3,500.00), and methamphetamine for "ten fifty" ($1,050.00) per ounce.

250.    On or about February 11, 2002, DANNY K. HEDGES discussed selling methamphetamine with a person known to the Grand Jury.

251.    On or about February 12, 2002, DANNY K. HEDGES discussed selling a stolen motorcycle and one ounce of methamphetamine for $4,000.00.  HEDGES stated that he had other people who were stealing motorcycles for him.

252.    On or about February 13, 2002, EARL F. LOGSDON sold approximately one ounce of methamphetamine at the OMC Louisville clubhouse in Louisville, Kentucky.

253.    On or about February 13, 2002, EARL F. LOGSDON agreed to sell methamphetamine at or in the vicinity of the OMC Louisville clubhouse in Louisville, Kentucky.

254.    On or about February 13, 2002, EARL F. LOGSDON possessed approximately three ounces of methamphetamine, a handgun, and $5,903.00 in the vicinity of the OMC Louisville clubhouse in Louisville, Kentucky.

255.    On or about February 21, 2002, ROBERT W. KEELER discussed an ongoing Florida drug connection, with regular deliveries being made in the Fort Wayne, Indiana area.

256.    On or about February 21, 2002, at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, DANNY K. HEDGES told a person known to the Grand Jury that HEDGES had a stolen 1998 Harley Davidson Road King motorcycle that he may be willing to sell.  HEDGES

72

stated that he intended to change the motorcycle's casings to conceal the vehicle identification number, and alter its frame to conceal the identifiable parts. HEDGES advised the informant that HEDGES would ask $3,500.00 for the motorcycle when he obtained it and that he was able to supply methamphetamines at any time.

257. On or about February 21, 2002, ROBERT W. KEELER and a person known to the Grand Jury discussed the possibility of conducting drug transactions with EARL F. LOGSDON. KEELER stated that contacting LOGSDON for methamphetamine was out of the question, since federal law enforcement officers had broken down the door of the OMC Louisville clubhouse.

258. On or about February 23, 2002, DANNY K. HEDGES stated that HEDGES and DARRELL L. BAKER would be handling methamphetamine distribution, and that the quality would be very good.

259. On or about February 23, 2002, ROBERT W. KEELER discussed the sale of four ounces of methamphetamine for $4,000.00. KEELER stated he would have to check with his suppliers.

260. On or about February 26, 2002, ROBERT W. KEELER, while discussing a methamphetamine deal, stated, "money wise it's just way off. . .they were talking $1,650.00 (per ounce of methamphetamine) delivered."

261. On or about February 27, 2002, ROBERT W. KEELER advised a person known to the Grand Jury that it would not be possible to provide four ounces of methamphetamine for $4,000.00; rather, the price would be $1,650.00 per ounce delivered.

262. On or about February 27, 2002, ROBERT W. KEELER stated, "well I'm not dragging that (methamphetamine) back and forth across the state line."

263. On or about March 8, 2002, DARRELL L. BAKER distributed cocaine to ROBERT W. KEELER and BRIAN J. SEXTON, inside KEELER'S motor home.

264.    On or about March 16, 2002, DARRELL L. BAKER stated that he had methamphetamine for sale for $1,100.00 per ounce, and a stolen 1996 Harley Davidson Road King for sale for $3,500.00.

265.    On or about March 19, 2002, DARRELL L. BAKER discussed the sale of methamphetamine and a stolen motorcycle with a person known to the Grand Jury.

266.    On or about March 23, 2002, at a church meeting at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, ROBERT W. KEELER stated that OMC Louisville, Kentucky member EARL F. LOGSDON had been arrested for the third time, and would probably do jail time for the offense.  KEELER added that LOGSDON had four to five ounces of methamphetamine, some of which was found behind the bar at the OMC Louisville clubhouse.

267.    On or about March 25, 2002, DARRELL L. BAKER discussed selling one ounce of methamphetamine and a stolen motorcycle, which was being stored in the New Haven, Indiana area.

268.    On or about March 26, 2002, DARRELL L. BAKER sold one ounce of methamphetamine for $1,100.00, and a stolen Harley Davidson motorcycle for $3,500.00 in Lima, Ohio.

269.    On or about March 28, 2002, DARRELL L. BAKER stated he wanted to do more "business" with a person known to the Grand Jury.  BAKER added that he was ready to provide another stolen motorcycle and another ounce of methamphetamine for the total price of $2,600.

270.    In or about April 2002, JOHNNY D. WARMAN possessed approximately ½ kilogram of cocaine at his residence, 1845 Vull Street, Dayton, Ohio.

271.    On or about April 2, 2002, DARRELL L. BAKER stated he would deliver the stolen truck and one ounce of methamphetamine the next day for $1,850.00.  BAKER further stated he would have one of his "boys" deliver the vehicle, in the event something went wrong.  BAKER added that his boys were "good" at auto thefts.

272.    On or about April 3, 2002, DARRELL L. BAKER sold one ounce of methamphetamine and a stolen Chevrolet pickup truck to a person known to the Grand Jury, for $2,950.00 in Lima, Ohio.

273.    On or about April 25, 2002, BRIAN J. SEXTON discussed selling methamphetamine with a person known to the Grand Jury.

274.    On or about April 30, 2002, BRIAN J. SEXTON discussed the possible sale of methamphetamine with a person known to the Grand Jury.  SEXTON estimated the price to be $1,200.00 per ounce.

275.    On or about May 3, 2002, PATRICK J. PUTTICK used marijuana at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana.

276.    On or about May 7, 2002, BRIAN J. SEXTON stated that he was waiting for his drug supplier to return to town to conduct further transactions.

277.    On or about May 8, 2002, DANNY N. GARLAND possessed an unknown quantity of cocaine at the OMC Fort Wayne, clubhouse in Fort Wayne, Indiana.

278.    On or about May 22, 2002, ROBERT W. KEELER telephoned a person known to the Grand Jury and advised him/her that KEELER would sell the other person a "shoe" (methamphetamine) for $1,600.00.

279.    On or about May 22, 2002, BRIAN J. SEXTON and ROBERT W. KEELER offered to sell one ounce of methamphetamine to a person known to the Grand Jury for $1,600.00.   KEELER offered the person known to the Grand Jury money from the OMC Fort Wayne Chapter treasury to cover the cost of the methamphetamine.

280.    On or about May 23, 2002, ROBERT W. KEELER and BRIAN J. SEXTON discussed efforts to identify a law enforcement informant, and the sale of one pound of methamphetamine to a person known to the Grand Jury.  SEXTON offered the person known to the Grand Jury money from the OMC Fort Wayne Chapter treasury to cover the cost of the pound of methamphetamine.

281.   On or about May 25, 2002, while at an OMC bosses' meeting, PATRICK J. PUTTICK, RICHARD L. SPENCE and BRIAN J. SEXTON possessed marijuana at the OMC Indianapolis, Indiana clubhouse in Indianapolis, Indiana.

282.   On or about May 30, 2002, BRIAN J. SEXTON stated he would sell cocaine to a person known to the Grand Jury.

283.   On or about May 31, 2002, DANNY K. HEDGES distributed 1/8 ounce of methamphetamine, while at the Kentucky Derby in Louisville, Kentucky.

284.   On or about May 31, 2002, EARL LOGSDON stated that he was the primary supplier of methamphetamine to the OMC in Louisville, Kentucky.

285.   On or about June 3, 2002, BRIAN J. SEXTON stated he would be able to provide two "insulated gloves" (cocaine) to a person known to the Grand Jury.

286.   On or about June 4, 2002, BRIAN J. SEXTON sold two ounces of cocaine to a person known to the Grand Jury for $2,600.00 at SEXTON'S residence, 2110 East Pontiac Street, Fort Wayne, Indiana.

287.   On or about June 7, 2002, JOHNNY D. WARMAN sold 13.4 grams of cocaine at WARMAN'S residence, 1845 Vull Street, Dayton, Ohio.

288.   On or about June 19, 2002, DANNY N. GARLAND possessed  a .40 caliber Glock pistol and $3,780.00 near his residence  in Louisville, Kentucky.

289.   On or about June 26, 2002, JOHNNY D. WARMAN sold approximately one ounce of cocaine at WARMAN'S residence, 1845 Vull Street, Dayton, Ohio.

290.   On or about July 10, 2002, an associate of the OMC Fort Wayne chapter advised a person known to the Grand Jury that he had five pounds of marijuana and needed to speak to ROBERT W. KEELER about it.

291.   On or about September 28, 2002, EARL F. LOGSDON, BRIAN J. SEXTON and THOMAS B. CAIN possessed and used methamphetamine at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana.

76

292.    On or about September 28, 2002, EARL F. LOGSDON, while attending a party at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, offered to sell methamphetamine to a person known to the Grand Jury.

293.    On or about October 18, 2002, EARL F. LOGSDON sold two ounces of methamphetamine for $2,000.00 to a person known to the Grand Jury in Jeffersonville, Indiana.

294.    On or about November 1, 2002, BRIAN J. SEXTON consumed cocaine that he obtained from OMC members while at the OMC Joliet clubhouse in Joliet, Illinois.

295.    On or about November 7, 2002, JASON G. FOWLER facilitated the delivery of approximately 1,484 grams of methamphetamine to his residence, 9805 Lower River Road, Louisville, Kentucky.

All in violation of Title 21, United States Code, Section 846.

## COUNT 4

## FIREARMS CONSPIRACY

The Grand Jury further charges:

1.    Beginning at least as early as 1990, the exact date being unknown to the Grand Jury, and continuing to the date of this Indictment, within the Northern District of Ohio, Western Division, JAMES L. WHEELER, ROBERT W. KEELER, GLEN CARLISLE, JOHN P. WALKER, GARY T. HOHN, MANCE R. STEPHENS, DAVID F. MAYS, THOMAS B. CAIN, WILLIAM L. BRAGG, REX A. DEITZ, JASON G. FOWLER, DANNY N. GARLAND, DANNY K. HEDGES, DARRELL W. HORTON, JEFFREY A. HUMBLE, EARL F. LOGSDON, DOMINIC R. MANGINE, SR., WILLIAM E. SYLVIA and RONALD P. TAYLOR, JR., Defendants herein, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree together, and with each other, and with others known and unknown to the Grand Jury, to use and carry firearms, deadly weapons, dangerous weapons, and devices during and in relation to the commission of the drug trafficking crime charged in Count 3 of this indictment (conspiracy to possess with intent to

77

distribute, and to distribute cocaine, marijuana, methamphetamine, LSD (lysergic acid diethylamide), and valium (diazepam), in violation of Title 21, United States Code, Section 846, and during and in relation to the commission of crimes of violence, to include extortionate credit transactions in violation of Title 18, United States Code, Section 894; and murder, in violation of Ohio Revised Code Section 2903.02, and Indiana Criminal Code Section 35-42-1-1.  All in violation of Title 18, United States Code, Section 924(c).

### Purpose and Object

2.      It was the purpose and object of this conspiracy that the defendants would, on a regular basis, carry and use firearms in connection with their cocaine, marijuana, methamphetamine,  LSD (lysergic acid diethylamide), and valium (diazepam) distribution operation.  These firearms would be used to protect themselves from retaliation by rival motorcycle clubs, to intimidate narcotics dealers and others who interfered with their control of drug dealing, to protect their product from seizure by rival narcotics dealers and law enforcement officers, and to protect Outlaw clubhouses, their members, chapter presidents, and the Outlaws International President, JAMES L. WHEELER.

It was further the purpose and object of this conspiracy that the defendants would, on a regular basis, carry and use firearms in connection with crimes of violence to include extortionate credit transactions and murder.  These firearms would be used as a means to convey threats of violence, to both members and nonmembers of the OMC, in the collection, or attempted collection of an extension of credit, and to punish for the nonrepayment of an extension of credit.

It was further the purpose and object of this conspiracy that the defendants would carry and use firearms in connection with the commission of crimes of violence, to include RICO,- murder, murder and assault.  These firearms would be used against any individual, including members, nonmembers, and female associates (known in the OMC as "property patches") who posed a threat to the OMC or OMC members, or failed to show respect for the OMC or its members.

78

**Manner and Means**

3.      The manner and means by which the goals of the conspiracy were met included the following:

a.      OMC members were required to be armed with a firearm for the protection of the OMC chapter clubhouse, its members, and the chapter president.

b.      At public events, OMC members who had not previously been convicted of felony offenses, carried the firearms, which protected the firearms from being seized by law enforcement and shielded OMC members from criminal charges.

c.      Each chapter appointed a member to act as the chapter enforcer, who had to be a non-felon and who was responsible for transporting firearms to OMC events and runs.

d.      The firearms were used as a means to convey threats to OMC members and nonmembers who were suspected of being snitches or police informants, and to prevent OMC members and nonmembers from becoming snitches or police informants.

e.      Stolen firearms and fully automatic firearms, which are prohibited by law, were bought  and sold in order to finance the objectives of the conspiracy.

**Overt Acts**

4.      In furtherance of the conspiracy and to affect the objectives thereof, the defendants and others performed the following overt acts, among others, in the Northern District of Ohio and elsewhere:

1.      Between 1993 and 1995, JAMES L. WHEELER provided the regional enforcer for the OMC Green Region with various firearms, including semi-automatic handguns and "street sweeper" type shotguns.

2.      On or about September 18, 1993, REX A. DEITZ and another OMC member fired numerous rounds from .12 gauge shotguns into the clubhouse of the Iron Horsemen Motorcycle Club in Anderson, Indiana, from a vehicle being driven by DAVID F. MAYS.  A member of the

79

Iron Horsemen Motorcycle Club who was inside the clubhouse at the time of the shooting was seriously wounded.

3.      On or about June 22, 1994, DAVID F. MAYS assaulted a member of a rival motorcycle club with a firearm in Indianapolis, Indiana.  After beating the victim with the butt of a handgun, MAYS pointed the handgun at the victim, while other unknown individuals cut the victim's shirt and removed it from his person.

4.      On or about August 23, 1994, JOHN P. WALKER possessed a plastic military match holder with 1.92 grams of cocaine, a small amount of marijuana, a loaded Taurus .40 caliber semi-automatic handgun, $34,985.00 in U.S. currency, a pair of hemostats, and rolling papers, in a 1987 Chevrolet Suburban owned by JOHN P. WALKER, on Interstate 65 in Tippecanoe County, Indiana.

5.      In or about September 1994, DAVID F. MAYS and another OMC member attempted to bomb the Sons of Silence Motorcycle Club in Indianapolis, Indiana.  MAYS drove, while the other OMC member placed a pipe bomb near the front door of the Sons of Silence clubhouse.  The other member was unable to ignite the fuse.

6.      On or about September 16, 1994, DAVID F. MAYS and WILLIAM E. SYLVIA fired shots at an interracial couple driving an automobile in the 1100 block of South Harding Street in Indianapolis, Indiana.  Prior to the shooting, SYLVIA shouted a racial epithet at the couple.

7.      On or about October 14, 1994, DAVID F. MAYS, WILLIAM E. SYLVIA and other OMC members bombed the Sons of Silence clubhouse in Indianapolis, Indiana.  SYLVIA drove, as another OMC member placed the bomb near the clubhouse.  MAYS and other OMC members, who occupied another vehicle, acted as surveillance and were in radio contact with SYLVIA.

8.      On or about April 23, 1995, MANCE R. STEPHENS possessed a Smith & Wesson .357 magnum handgun in Indianapolis, Indiana.

9.     On or about December 30, 1995, WILLIAM L. BRAGG, while at the Brothers Motorcycle clubhouse in Columbus, Ohio and armed with a .357 magnum revolver, threatened to shoot a member of a rival motorcycle club if he and the other members of the club did not turn their patches in to BRAGG by January 3, 1996.

10.     On or about December 30, 1995, WILLIAM L. BRAGG gave a half of a box of low velocity .22 caliber rounds of ammunition to an undercover ATF agent. BRAGG told the undercover agent that the rounds were perfect for shooting someone in the back of the head in the restroom while they were urinating. BRAGG explained that the rounds hardly make any noise that could be heard if music was playing; all a person would have to do is approach behind the person and shoot them in the soft spot in the back of the head, and if that did not work, shoot them in the eye.

11.     On or about December 30, 1995, WILLIAM E. SYLVIA, while at the OMC Columbus clubhouse in Columbus, Ohio, and armed with a 9mm pistol, advised an undercover ATF agent that SYLVIA was moving to Columbus, Ohio, and would be dealing in ounce quantities of cocaine and methamphetamine.

12.     On or about January 7, 1996, WILLIAM E. SYLVIA, while possessing a small caliber revolver, and WILLIAM L. BRAGG, while possessing a firearm, negotiated the sale of one pound of marijuana to an undercover ATF agent at the OMC Columbus clubhouse in Columbus, Ohio.

13.     On or about January 7, 1996, WILLIAM E. SYLVIA, while possessing a small caliber revolver, sold 488.1 grams of marijuana to an undercover ATF agent outside of the OMC Columbus clubhouse in Columbus, Ohio.

14.     On or about June 10, 1996, during a disturbance at Hots Night Club, 255 West Morris Street, Indianapolis, Indiana, DAVID F. MAYS possessed a handgun.

15.     On or about November 5, 1996, MANCE R. STEPHENS assaulted an individual with a firearm in Indianapolis, Indiana.

16.     On or about March 14, 1997, DOMINIC R. MANGINE, SR., believing that a person had stolen motorcycle parts belonging to him, kidnapped the person from a residence in Marion County, Indiana.  During the kidnapping, another individual advised the person that the only reason that he had not killed the person was because the person's young daughter had answered the door with the person.  The other individual struck the person with a .45 caliber handgun while MANGINE, SR. struck the person with "some type of stick", before the person was able to escape.  As the person fled the area, the other individual fired a .45 caliber handgun.

17.     On or about September 1, 1997, JEFFREY A. HUMBLE possessed a .45 caliber handgun, a .38 caliber handgun, a stolen, Mossberg 12-gauge shotgun, a .22 caliber handgun, a .22 caliber rifle, a 9 mm handgun, and 17 pounds of marijuana at his residence, 45 Cambridge Court, in Anderson, Indiana.

18.     On or about January 28, 1998, DAVID F. MAYS shot an individual with a handgun at the B&B Tavern in Indianapolis, Indiana after the individual made comments to MAYS about his affiliation with the OMC.

19.     On or about April 15, 1998, JAMES L. WHEELER, DANNY N. GARLAND and three other OMC members occupied a recreational vehicle on U.S. Route 250 in Erie County, Ohio, that contained a Colt .45 caliber handgun and a Ruger .357 magnum handgun.

20.     On or about August 22, 1998, DAVID F. MAYS, while possessing a handgun, created a disturbance at B&B Tavern, 2409 East English Avenue, Indianapolis, Indiana.

21.     On or about September 26, 1998, DARRELL W. HORTON shot himself in the hip while attempting to pull a handgun on a Rally's restaurant employee, during an argument with the employee in Indianapolis, Indiana.

22.     On or about September 29, 1998, a person known to the Grand Jury possessed marijuana and a .38 caliber handgun at the OMC Lima chapter clubhouse in Lima, Ohio.

23.     On or about May 14, 1999, GLEN D. CARLISLE, while armed with a handgun, possessed a stolen Harley Davidson motorcycle in Dayton, Ohio.

24.     On or about August 11, 1999, MANCE R. STEPHENS was shot by DANNY N. GARLAND in Indianapolis, Indiana.  After the shooting, STEPHENS filed a false report with the Indianapolis Police Department stating that an unknown black male had shot him.

25.     On or about September 11, 1999, JAMES L. WHEELER advised a confidential informant that the shooting involving MANCE R. STEPHENS and DANNY N. GARLAND occurred at the residence of an OMC member, and that both STEPHENS and GARLAND were fined by the OMC for their involvement in the shooting.

26.     On or about September 25, 1999, a person known to the Grand Jury told a confidential informant that if the informant did not kill the person who had made the telephone call identifying the informant as a snitch, the other person would kill the caller by shooting him in each eye with a .25 caliber pistol.

27.     On or about October 2, 1999, DARRELL W. HORTON possessed cocaine and two handguns in Bowling Green, Kentucky.

28.     On or about October 7, 1999, MANCE R. STEPHENS possessed a loaded firearm and a stolen motorcycle at the 1000 block of South Churchman Avenue in Indianapolis, Indiana.

29.     On or about December 20, 1999, while at his residence, RONALD P. TAYLOR, JR., offered to sell methamphetamine to a confidential informant, and possessed two handguns, two shotguns, and a rifle.

30.     On or about December 21, 1999, RONALD P. TAYLOR, JR., sold approximately 49 grams of methamphetamine to a confidential informant at his residence while possessing three handguns and two shotguns.

31.     On or about February 29, 2000, GLEN D. CARLISLE sold a fully automatic SKS rifle which was a "machinegun" and a 30 round, banana style magazine to a confidential informant for $300.00 in Dayton, Ohio.

32.     On or about August 15, 2000, during an altercation between DARRELL W. HORTON'S wife and an employee at the Las Vegas Lounge in Indianapolis, Indiana, DARRELL

W. HORTON displayed a handgun and threatened to kill a witness to the altercation if the witness got involved in the dispute. An individual present with DARRELL W. HORTON said, "don't be fucking with the Outlaws." HORTON threatened to kill the Las Vegas Lounge employee if she called the police.

33.     On or about September 9, 2000, DARRELL HORTON possessed a Smith & Wesson semi-automatic handgun, numerous articles of clothing bearing Outlaw insignia and a knife at his residence, 7302 East 48th Street, Indianapolis, Indiana.

34.     On or about September 16, 2000, while at an OMC event in Pawhuska, Oklahoma, DANNY N. GARLAND drew a handgun, pointed it at the head of a probate, and said "bang".

35.     On or about October 6, 2000, at the OMC Oklahoma City clubhouse in Oklahoma City, Oklahoma, THOMAS B. CAIN and another OMC Oklahoma City chapter member confronted a probate about the probate's relationship with law enforcement. CAIN displayed a handgun to the probate, while the other member pointed a handgun at the probate, and threatened to kill the probate and the probate's family if the probate was a "snitch."

36.     On or about February 24, 2001, GLEN D. CARLISLE shot and fatally wounded Eric Colter, Jr., with a handgun at Spanky's Doll House, 2213 Wagoner Ford Road in Dayton, Ohio.

37.     On or about March 1, 2001, three firearms were present at the OMC Dayton clubhouse in Dayton, Ohio.

38.     On or about March 1, 2001, GARY T. HOHN possessed two firearms at his residence, 179 Lansdowne Ave., Dayton, Ohio.

39.     On or about July 29, 2001, ROBERT W. KEELER stated that he had $40,000.00 worth of guns in a safe at his residence in Fort Wayne, Indiana.

40.     On or about August 23, 2001, ROBERT W. KEELER possessed a handgun in Fort Wayne, Indiana.

41.     On or about September 17, 2001, ROBERT W. KEELER showed a person known to the Grand Jury the contents of a safe located at KEELER'S residence, 1009 Kinsmoor, Ft. Wayne, Indiana. The safe contained approximately 15 firearms, including a Colt semi-automatic handgun, a .44 caliber handgun, and several other semi-automatic handguns, as well as revolvers.

42.     On or about September 20, 2001, ROBERT W. KEELER was armed with a black handgun during a church meeting at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana.

43.     On or about September 22, 2001, during a church meeting of the OMC Fort Wayne chapter at 2110 E. Pontiac Ave., Fort Wayne, Indiana, DANNY K. HEDGES was named the OMC Fort Wayne chapter enforcer.

44.     On or about September 29, 2001, during an event in Churubusku, Indiana, DANNY K. HEDGES and GREGORY A. DRIVER used cocaine in ROBERT W. KEELER'S motor home. KEELER invited a person known to the Grand Jury inside KEELER'S motor home to ingest cocaine. KEELER further stated that he was armed with a handgun throughout the event.

45.     On or about October 18, 2001, ROBERT W. KEELER possessed a revolver at an OMC Fort Wayne chapter church meeting.

46.     On or about November 6, 2001, ROBERT W. KEELER and DANNY K. HEDGES possessed firearms at the OMC Indianapolis, Indiana chapter clubhouse.

47.     On or about November 15, 2001, ROBERT W. KEELER possessed a handgun while at an OMC Fort Wayne church meeting in Fort Wayne, Indiana.

48.     On or about December 5, 2001, at 499 South Robbs Lane, Pekin, Indiana, JASON G. FOWLER and another individual attempted to collect a debt from Charles L. Hurst. FOWLER tied Hurst to a chair, while the other person held a .45 cal. pistol to Hurst and took Hurst's 9mm handgun. Hurst was fatally shot in the face with a .45 cal. semi-automatic pistol.

49.     On or about December 13, 2001, in Shepherdsville, Kentucky, JASON G. FOWLER was the passenger in a motor vehicle operated by another OMC member, in which the

85

following items were located: a loaded .45 caliber handgun, a 9mm handgun, two magazines, a film case with an off-white powder, zip lock baggies with a hard off-white substance, baggies with eight packages of a hard off-white substance, and a glass vile with residue and scales.

50.     On or about February 13, 2002, EARL F. LOGSDON possessed approximately three ounces of methamphetamine, a handgun, and $5,903.00 in the vicinity of the OMC Louisville clubhouse in Louisville, Kentucky.

51.     On or about February 27, 2002, in Fort Wayne, Indiana, ROBERT W. KEELER showed a person known to the Grand Jury a rifle KEELER had received in exchange for a Thompson sub-machine gun.

52.     On or about April 2, 2002, ROBERT W. KEELER stated that he would bring a firearm with him to the upcoming event in Louisville, Kentucky in case of an altercation with a rival motorcycle club.

53.     On or about April 17, 2002, at a church meeting at the OMC Fort Wayne chapter in Fort Wayne, Indiana, ROBERT W. KEELER discussed a recent robbery at the Fort Wayne clubhouse. KEELER declared that they should leave the clubhouse door open, so that they could shoot the robbers the next time.

54.     On or about April 19, 2002, ROBERT W. KEELER possessed a semi-automatic handgun in Fort Wayne, Indiana.

55.     On or about April 25, 2002, at an OMC Fort Wayne chapter church meeting, ROBERT W. KEELER sold a .45 caliber rifle with a 30 round magazine to a new probationary member. KEELER claimed the weapon was worth $1,000.00, but sold the rifle for several hundred dollars.

56.     On or about April 25, 2002, DANNY K. HEDGES, along with others, barged through the front door of 1625 Sherman Blvd., Fort Wayne, Indiana, pointing guns at the occupants. One of the men stated, "Watch it boy, the Outlaws are in town."

57.     On or about May 2, 2002, DANNY K. HEDGES stated that he was responsible for the invasion of a home in Fort Wayne, Indiana which was the subject of an article in a Fort Wayne newspaper.  HEDGES stated that the invasion occurred because the residents were "fucking" with HEDGE'S boys.  HEDGES added that he went back a second time, lined up the occupants on their knees, and threatened them by placing a handgun to each of their heads.

58.     On or about May 23, 2002, during an OMC Fort Wayne church meeting in Fort Wayne, Indiana, ROBERT W. KEELER advised OMC members that they should carry pistols, as all peace treaties with other motorcycle clubs were now over.

59.     On or about May 25, 2002, while attending a regional OMC party, ROBERT W. KEELER possessed a firearm at the OMC Indianapolis clubhouse in Indianapolis, Indiana.

60.     On or about June 19, 2002, DANNY N. GARLAND possessed methamphetamine, a .40 caliber Glock pistol and $3,780.00 in Louisville, Kentucky.

61.     On or about June 19, 2002, DANNY N. GARLAND possessed methamphetamine, pills, scales, a bulletproof vest, pistols, long guns, $20,000.00, Outlaw memorabilia and a sign stating, "Tubby Glide" at his residence, 8406 Arnoldtown Rd., Louisville, Kentucky.

62.     On or about July 10, 2002, ROBERT W. KEELER ordered that members of the OMC Fort Wayne chapter who stand guard duty outside the clubhouse must hold a gun permit and be armed with a gun, while OMC members standing guard duty inside the clubhouse must be armed with a gun.

63.     On or about July 25, 2002, ROBERT W. KEELER stated that his girlfriend will carry his gun in her underwear, rather than him carrying the weapon on his person, when he travels to Ohio for an upcoming OMC event.

64.     On or about August 2, 2002, JASON G. FOWLER concealed a loaded .38 cal. revolver on his person while operating a motorcycle in West Kittaning, Pennsylvania.

65.     On or about September 12, 2002, while at a church meeting at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, ROBERT W. KEELER instructed OMC members to attend an upcoming event in Bunker Hill, Indiana, as a show of force to the Hells Angels Motorcycle Club, who would also be present.  KEELER advised the members that JAMES L. WHEELER was in charge of the event, and that WHEELER wanted OMC members with gun permits to be present.  KEELER stated that he would not be attending the event, but would stand guard at the OMC Fort Wayne clubhouse armed with a machinegun.

66.     On or about October 24, 2002, during a church meeting at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, ROBERT W. KEELER ordered a probationary member to locate and assault a person in Fort Wayne, Indiana.  KEELER and the probationary member were both armed with handguns during the church meeting.

67.     On or about November 7, 2002, during a church meeting at the OMC Fort Wayne clubhouse in Fort Wayne, Indiana, ROBERT W. KEELER advised OMC members to be prepared, at an hours notice, to respond and intimidate individuals in Fort Wayne, Indiana. KEELER was armed with a handgun during the meeting.

68.     On or about November 7, 2002, JASON G. FOWLER possessed a silencer for a firearm and approximately $14,000.00 in U.S. currency at his residence, 9805 Lower River Road, Louisville, Kentucky.

All in violation of Title 18, United States Code, Section 924(o).

## COUNT 5

The Grand Jury further charges:

On or about June 20, 1998, in the Northern District of Ohio, Western Division, GARY T. HOHN, defendant herein, did knowingly and intentionally distribute and possess with intent to distribute 100 unit doses of lysergic acid diethylamide (LSD), a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT 6

The Grand Jury further charges:

On or about December 22, 1998, in the Northern District of Ohio, Western Division, KENNETH L. BUCHER, defendant herein, did knowingly and intentionally distribute and possess with intent to distribute approximately 25.8 grams of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT 7

The Grand Jury further charges:

On or about January 8, 1999, in the Northern District of Ohio, Western Division, KENNETH L. BUCHER, defendant herein, did knowingly and intentionally distribute and possess with intent to distribute approximately 23.07 grams of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT 8

The Grand Jury further charges:

On or about March 19, 1999, in the Northern District of Ohio, Western Division, ALLEN C. LAWSON, defendant herein, did knowingly and intentionally distribute and possess with intent to distribute approximately two pounds of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT 9

The Grand Jury further charges:

On or about March 26, 2002, in the Northern District of Ohio, Western Division, DARRELL L. BAKER, defendant herein, did knowingly and intentionally distribute and possess with intent to distribute approximately 27.1 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT 10

The Grand Jury further charges:

On or about April 3, 2002, in the Northern District of Ohio, Western Division, DARRELL L. BAKER, defendant herein, did knowingly and intentionally distribute and possess with intent to distribute approximately 26.1 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT 11

The Grand Jury further charges:

On or about August 30, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 12

The Grand Jury further charges:

On or about October 22, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 13

The Grand Jury further charges:

On or about October 29, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 14

The Grand Jury further charges:

On or about November 28, 2001 in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 15

The Grand Jury further charges:

On or about November 29, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code

(conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 16

The Grand Jury further charges:

On or about November 30, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 17

The Grand Jury further charges:

On or about December 2, 2001, in the Northern District of Ohio, Western Division, PATRICK J. PUTTICK, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 18

The Grand Jury further charges:

On or about December 3, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 19

The Grand Jury further charges:

On or about December 6, 2001, in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 20

The Grand Jury further charges:

On or about February 11, 2002, in the Northern District of Ohio, Western Division, DANNY K. HEDGES, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code

93

(conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 21

The Grand Jury further charges:

On or about February 12, 2002, in the Northern District of Ohio, Western Division, DANNY K. HEDGES, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 22

The Grand Jury further charges:

On or about February 26, 2002, at approximately 1:30 p.m., in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

94

## COUNT 23

The Grand Jury further charges:

On or about February 26, 2002, in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 24

The Grand Jury further charges:

On or about March 20, 2002, in the Northern District of Ohio, Western Division, DARRELL L. BAKER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 25

The Grand Jury further charges:

On or about March 28, 2002, in the Northern District of Ohio, Western Division, DARRELL L. BAKER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code

95

(conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 26

The Grand Jury further charges:

On or about April 3, 2002, in the Northern District of Ohio, Western Division, DARRELL L. BAKER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 27

The Grand Jury further charges:

On or about April 30, 2002, in the Northern District of Ohio, Western Division, BRIAN J. SEXTON, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing or facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 28

The Grand Jury further charges:

On or about May 7, 2002, in the Northern District of Ohio, Western Division, BRIAN J. SEXTON, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 29

The Grand Jury further charges:

On or about May 22, 2002, in the Northern District of Ohio, Western Division, ROBERT W. KEELER, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 30

The Grand Jury further charges:

On or about June 3, 2002, in the Northern District of Ohio, Western Division, BRIAN J. SEXTON, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to

97

distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 31

The Grand Jury further charges:

On or about August 28, 2002, in the Northern District of Ohio, Western Division, BRIAN J. SEXTON, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 32

The Grand Jury further charges:

On or about September 3, 2002, in the Northern District of Ohio, Western Division, BRIAN J. SEXTON, defendant herein, did knowingly and intentionally use a communication facility, to wit, a telephone, in causing and facilitating the commission of acts constituting a felony under the Controlled Substances Act, Title 21, Section 846, United States Code (conspiracy to distribute and possess with intent to distribute controlled substances), as alleged in Count 3 of this Indictment, which is incorporated by reference herein.

All in violation of Title 21, United States Code, Section 843(b), and Title 18, United States Code, Section 2.

## COUNT 33

The Grand Jury further charges:

On or about February 20, 1998, in the Northern District of Ohio, Western Division, KEVIN A. WALES, JAMIE M. REICHELDERFER, and GARY T. HOHN, defendants herein, did knowingly participate in the use of extortionate means, within the meaning of Title 18, United States Code, Section 891(7), to collect and to attempt to collect an extension of credit within the meaning of Title 18, United States Code, Section 891(5), in violation of Title 18, United States Code, Section 894.

## COUNT 34

The Grand Jury further charges:

On or about February 21, 1998, in the Northern District of Ohio, Western Division, KEVIN A. WALES, JAMIE M. REICHELDERFER, and GARY T. HOHN, defendants herein, did knowingly participate in the use of extortionate means, within the meaning of Title 18, United States Code, Section 891(7), to collect and to attempt to collect an extension of credit within the meaning of Title 18, United States Code, Section 891(5), in violation of Title 18, United States Code, Section 894.

## COUNT 35

The Grand Jury further charges:

On or about June 19, 1998, in the Northern District of Ohio, Western Division, GARY T. HOHN, defendant herein, did knowingly participate in the use of extortionate means, within the meaning of Title 18, United States Code, Section 891(7), to collect and to attempt to collect an extension of credit within the meaning of Title 18, United States Code, Section 891(5), in violation of Title 18, United States Code, Section 894.

99

## COUNT 36

The Grand Jury further charges:

On or about July 20, 1998, in the Northern District of Ohio, Western Division, GARY T. HOHN, defendant herein, did knowingly participate in the use of extortionate means, within the meaning of Title 18, United States Code, Section 891(7), to collect and to attempt to collect an extension of credit within the meaning of Title 18, United States Code, Section 891(5), in violation of Title 18, United States Code, Section 894.

## COUNT 37

The Grand Jury further charges:

On or about May 14, 1999, in the Northern District of Ohio, Western Division, GLEN D. CARLISLE, defendant herein, did transport in interstate commerce, from the State of Indiana to the State of Ohio, a motor vehicle, that is, a 1993 Harley Davidson motorcycle, vehicle identification number 1HD1GEL13PY309621, knowing the same to be stolen, in violation of Title 18, United States Code, Section 2312.

## COUNT 38

The Grand Jury further charges:

On or about June 9, 1999, in the Northern District of Ohio, Western Division, GLEN D. CARLISLE and LYNN A. CARLISLE, defendants herein, did receive, possess, conceal, store, barter, sell and dispose of a stolen motor vehicle, that is, a 1993 Harley Davidson motorcycle, which vehicle had crossed a State boundary after being stolen, to wit, said vehicle being stolen in the State of Indiana, and subsequently brought into the State of Ohio, knowing the same to have been stolen, in violation of Title 18, United States Code, Section 2313 and Title 18, United States Code, Section 2.

## COUNT 39

The Grand Jury further charges:

On or about March 26, 2002, in the Northern District of Ohio, Western Division, DARRELL L. BAKER, defendant herein, did transport in interstate commerce, from the State of Indiana to the State of Ohio, a motor vehicle, that is, a Harley Davidson Motorcycle, vehicle identification number 1HDFBR13VY617748, knowing the same to be stolen, in violation of Title 18, United States Code, Section 2312.

## COUNT 40

The Grand Jury further charges:

On or about April 3, 2002, in the Northern District of Ohio, Western Division, DARRELL L. BAKER, defendant herein, did transport in interstate commerce, from the State of Indiana to the State of Ohio, a motor vehicle, that is, a Chevrolet pickup truck, vehicle identification number 1GCGK24U3YE244905, knowing the same to be stolen, in violation of Title 18, United States Code, Section 2312.

A True Bill

_Barry S. Milliron_
Foreperson

_Gregory A. White_
GREGORY A. WHITE
United States Attorney

101

## COUNT 39

The Grand Jury further charges:

On or about March 26, 2002, in the Northern District of Ohio, Western Division, DARRELL L. BAKER, defendant herein, did transport in interstate commerce, from the State of Indiana to the State of Ohio, a motor vehicle, that is, a Harley Davidson Motorcycle, vehicle identification number 1HDFBR13VY617748, knowing the same to be stolen, in violation of Title 18, United States Code, Section 2312.

## COUNT 40

The Grand Jury further charges:

On or about April 3, 2002, in the Northern District of Ohio, Western Division, DARRELL L. BAKER, defendant herein, did transport in interstate commerce, from the State of Indiana to the State of Ohio, a motor vehicle, that is, a Chevrolet pickup truck, vehicle identification number 1GCGK24U3YE244905, knowing the same to be stolen, in violation of Title 18, United States Code, Section 2312.

A True Bill

_____
Foreperson

_____
GREGORY A. WHITE
United States Attorney

101