**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

UNITED STATES OF AMERICA,    :    CASE NO.  3:03-CR-739
    :
    Plaintiff,    :
    :    JUDGE JAMES G. CARR
    vs.    :
    :    **SUPPLEMENT TO MOTION FOR**
JAMES LEE WHEELER,    :    **SENTENCING REDUCTION UNDER**
    :    **18 U.S.C. § 3582(c)(1)(A)(i) FOR**
    Defendant.    :    **COMPASSIONATE RELEASE DUE TO**
    :    **COVID-19 CIRCUMSTANCES**

The defendant, James Wheeler, by and through counsel, respectfully moves this Court, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), for an order reducing his sentence and placing him on home confinement based on the extraordinary and compelling circumstances that have presented through the COVID-19 pandemic as well as the impact on Mr. Wheeler by his continued incarceration.

    Respectfully submitted,

    STEPHEN C. NEWMAN
    Federal Public Defender
    Ohio Bar: 0051928

    */s/ Jeffrey B. Lazarus*
    JEFFREY B. LAZARUS
    Assistant Federal Public Defender
    Ohio Bar: 0079525
    1660 West Second Street, Suite #750
    Cleveland, OH 44113
    (216)522-4856  Fax:(216)522-4321
    E-mail: jeffrey_lazarus@fd.org

    Attorney for James Wheeler

## MEMORANDUM IN SUPPORT

### I.      Introduction and Procedural History

On April 8, 2003, the grand jury returned an indictment charging James Wheeler and 37 other co-defendants with offenses related to racketeering (RICO) violations, a drug conspiracy, and firearms offenses. Dkt. 1, PageID 1-102. Specifically, James Wheeler was charged with four counts, specifically in Count 1, racketeering, in violation of 18 U.S.C. § 1962(c); Count 2, RICO conspiracy, in violation of 18 U.S.C. § 1962(d); Count 3, drug trafficking conspiracy, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and Count 4, conspiracy to carry or use firearms in relation to drug trafficking or crimes of violence, in violation of 18 U.S.C. § 924(o). The case was assigned to the Honorable David Katz.

During the pendency of the case, the government filed an enhancement information pursuant to 21 U.S.C. § 851, claiming his two Indiana convictions, from 1972, for felony drug possession were each prior felony drug convictions, which increased Mr. Wheeler's statutory penalties. Dkt. 916, Information, PageID 301-05. Mr. Wheeler exercised his right to trial.

Prior to trial, during trial, and after trial, a main point of contention by Mr. Wheeler was the fact that he had been charged and convicted of RICO violations in the Middle District of Florida in 2002. In that case, on January 30, 2004, Mr. Wheeler received a sentence from the Florida federal court for 199 months. PSR at ¶ 103. In the instant case, he filed various motions to dismiss the instant charges due to Double Jeopardy violations. Dkt. 973, Motion to Dismiss; Dkt. 1101, Amended Motion to Dismiss; Dkt. 1110, Supplement to Motion. These motions were ultimately denied by the Court. Dkt. 1482, PageID 2721-28.

The jury found Mr. Wheeler guilty on Counts 1, 2 and 3; a Special Verdict form indicated the drug quantities to be 5 kilograms or more of cocaine and 100 kilograms but less than 1000

kilograms of marijuana. Dkt. 1161, Verdict, PageID 1806-07. Mr. Wheeler was found not guilty of Count 4. Dkt. 1161, PageID 1806.

The sentencing hearing was held on December 20, 2004. The sentencing transcript is not accessible on the court's online docket (ECF), and therefore defense counsel attaches it as Exhibit A. In accordance with the presentence report's findings, the district court found that, under the sentencing guidelines, Mr. Wheeler was a total offense level 36, Criminal History Category II, which corresponded to a guideline range of 210 to 262 months. Ex. A, p. 12. The government, however, made objections to the presentence report's calculations. Specifically, the government sought for Mr. Wheeler to be deemed a career offender based on: 1) the 1972 Indiana drug possession conviction, and 2) the Florida federal RICO conviction. Ex. A, p. 6. With the career offender designation, the government sought for Mr. Wheeler's sentencing guideline range to be 360 months to life, at total offense level 41, Criminal History Category VI. Ex. A, p. 6. The Court agreed with the government's conclusion that he was a career offender based on these two convictions, and concluded his guideline range was 360 months to life. Ex. A, p. 19.

The government also claimed that under the § 851 notice, Mr. Wheeler was subject to a mandatory statutory life sentence. Ex. A, p. 13. The Court seemed to agree, initially indicating "because the enhancements and notifications with regard to prior criminal activity were afforded to the defendant under Section 851 of Title 21, it would therefore appear that a sentencing of life is mandatory." Ex. A, p. 20. The Court then indicated:

> I also believe that it is clear to this judge that even if Mr. Wheeler were a guideline of 36 and a criminal history of two, this Court would sentence Mr. Wheeler to 262 months on Counts 1 and 3 to be served consecutively, and 20 years consecutively on Count 2. That's a total of in excess of 63 years.

Ex. A, p. 20.

3

Defense counsel, in arguing for a favorable sentence, asked the Court to "consider some of the health problems [Mr. Wheeler] has experienced more recently at his current age of 62 years." Ex. A, p. 21. The district court, detailed the facts surrounding the offense and that Mr. Wheeler was a good husband and father, but found no reason to downward depart from the guideline range. Ex. A, pp. 27-29. The district court imposed a sentence of life imprisonment on Count 1 and Count 3, which was to run consecutively to a sentence of 20 years on Count 2. Dkt. 1684, PageID 3240.

On August 1, 2008, the Sixth Circuit reversed Mr. Wheeler's convictions on Count 1 and Count 2, finding "the indictment for the substantive RICO and RICO conspiracy offenses violated the Double Jeopardy clause because of an earlier prosecution." Dkt. 1973, PageID 3890, *see also United States v. Wheeler*, 535 F.3d 446 (6th Cir. 2008). The Sixth Circuit affirmed the life sentence on Count 3. *Id.* Upon remand, on June 19, 2009, Judge Katz reimposed the life sentence on Count 3; Judge Katz found Mr. Wheeler's appearance was not required in reimposing the life sentence. Dkt. 2070, PageID 4333.

In the years since that time Mr. Wheeler has filed several motions to seek relief from his life sentence. He filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255. Dkt. 2132. In this petition, he challenged his life sentence and the validity of the § 851 filing resulting in his life sentence. Dkt. 2132, PageID 6691-96. In their response, the government indicated that Mr. Wheeler was not given a mandatory life sentence but was given a life sentence under the guidelines. Dkt. 2153, PageID 6950-51. The district court agreed, finding that Mr. Wheeler's only § 851 enhancement was his 1972 Indiana conviction for possession of drugs. Dkt. 2155, PageID 2155.

In 2014, Mr. Wheeler filed a motion for relief under one of the retroactive sentencing guidelines amendments. Dkt. 2223. While Mr. Wheeler had demonstrated U.S.S.G. Amendment

782 would have reduced his total offense level by two, from 41 to 39, his range still remained 360 months to life, and therefore the Court denied his motion. Dkt. 2227.

On March 26, 2020, Mr. Wheeler filed a pro se motion requesting this Court grant him a compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). Dkt. 2278. In this motion, Mr. Wheeler provides several exhibits, including his medical records from the institution, his rehabilitative efforts, and his requests to the Warden. Dkt. 2278, PageID 7320-39. These will be discussed in greater detail *infra*. The government has filed a response. Dkt. 2279. On April 14, 2020, this Court appointed the undersigned to file a position paper regarding Mr. Wheeler's motion. Mr. Wheeler now supplements his pro se motion, clarifying some points and addressing why he is both eligible for, and deserving of, a compassionate release under 18 U.S.C. § 3582(c)(1)(A).

## II.    Mr. Wheeler's Request for Compassionate Release and the COVID-19 Pandemic

Mr. Wheeler requests a compassionate release due to the circumstances surrounding COVID-19. The COVID-19 outbreak represents an additional and immediate health concern facing the Bureau of Prisons as a whole, and further places Mr. Wheeler at high-risk for danger. The BOP facility where Mr. Wheeler is currently incarcerated, FCI Terre Haute, is on total lockdown due to the pandemic and quarantine procedures.

Over the last six weeks, the number of positive COVID-19 cases in the Bureau of Prisons has grown at an alarming rate. As of April 27, 2020, there have been 1,376 total cases of COVID-19 in BOP facilities (1,046 inmates and 330 staff members) and a total of 28 inmate deaths.[1] The "curve" is not flattening in the BOP; in fact the opposite is taking place.

---

[1] *https://www.bop.gov/coronavirus/* (updating daily)



In fact, the table below compares the number of cases of COVID-19 in the BOP as compared to the rest of the United States, as compared by days since first infection reported.[2]

| Day of Known COVID-19 Case | BOP Date | BOP Infections | U.S. Date | U.S. Infections |
|---|---|---|---|---|
| Day 1 | 3/20/2020 | 2 | 1/22/2020 | 1 |
| Day 2 | 3/21/2020 | 3 | 1/23/2020 | 1 |
| Day 4 | 3/23/2020 | 6 | 1/25/2020 | 2 |
| Day 5 | 3/24/2020 | 9 | 1/26/2020 | 5 |
| Day 7 | 3/26/2020 | 18 | 1/28/2020 | 5 |
| Day 8 | 3/27/2020 | 27 | 1/29/2020 | 5 |
| Day 10 | 3/29/2020 | 38 | 1/31/2020 | 7 |
| Day 11 | 3/30/2020 | 52 | 2/1/2020 | 8 |
| Day 12 | 3/31/2020 | 59 | 2/2/2020 | 8 |
| Day 13 | 4/1/2020 | 94 | 2/3/2020 | 11 |
| Day 14 | 4/2/2020 | 114 | 2/4/2020 | 11 |
| Day 15 | 4/3/2020 | 141 | 2/5/2020 | 11 |
| Day 16 | 4/4/2020 | 174 | 2/6/2020 | 11 |
| Day 17 | 4/5/2020 | 197 | 2/7/2020 | 11 |
| Day 18 | 4/6/2020 | 259 | 2/8/2020 | 11 |
| Day 19 | 4/7/2020 | 313 | 2/9/2020 | 11 |
| Day 20 | 4/8/2020 | 377 | 2/10/2020 | 11 |
| Day 21 | 4/9/2020 | 408 | 2/11/2020 | 12 |
| Day 22 | 4/10/2020 | 481 | 2/12/2020 | 12 |

---

[2] *https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html*

| Day 23 | 4/11/2020 | 520 | 2/13/2020 | 13 |
|--------|-----------|-----|-----------|----|
| Day 24 | 4/12/2020 | 541 | 2/14/2020 | 13 |
| Day 25 | 4/13/2020 | 589 | 2/15/2020 | 13 |
| Day 26 | 4/14/2020 | 694 | 2/16/2020 | 13 |
| Day 27 | 4/15/2020 | 731 | 2/17/2020 | 13 |
| Day 28 | 4/16/2020 | 752 | 2/18/2020 | 13 |
| Day 29 | 4/17/2020 | 761 | 2/19/2020 | 13 |
| Day 30 | 4/18/2020 | 784 | 2/20/2020 | 13 |
| Day 31 | 4/19/2020 | 804 | 2/21/2020 | 15 |
| Day 32 | 4/20/2020 | 816 | 2/22/2020 | 15 |
| Day 33 | 4/21/2020 | 863 | 2/23/2020 | 15 |
| Day 34 | 4/22/2020 | 908 | 2/24/2020 | 15 |
| Day 35 | 4/23/2020 | 977 | 2/25/2020 | 15 |
| Day 36 | 4/24/2020 | 985 | 2/26/2020 | 15 |
| Day 37 | 4/25/2020 | 1047 | 2/27/2020 | 16 |
| Day 38 | 4/26/2020 | 1118 | 2/28/2020 | 16 |
| Day 39 | 4/27/2020 | 1376 | 2/29/2020 | 24 |

The rates of rising COVID-19 infections in the BOP are significantly higher than the rest of the United States population.



As of right now, FCI Terre Haute, does not have any reported positive cases of COVID-19, but given the testing deficiencies, it cannot be said that there are no infected inmates. Several institutions have quickly been overrun with infections due to the BOP's inability to adequately

address the necessary interventions. On May 3, 2020, it was reported that BOP facilities in West Virginia (FCI Gilmer and FCC Hazelton) which had previously reported no positive cases of COVID-19, were designated to accept inmates from other institutions, and within days, there were reported positive cases amongst the inmates.[3] This story demonstrates the chaos, uncertainty, and tumultuous circumstances facing the Bureau of Prisons as a whole.

In fact, within the Northern District of Ohio, one specific prison, FCI Elkton, has been in the spotlight over the past month due to the effects of COVID-19. On March 31, 2020, two inmates at FCI Elkton tested positive for COVID-19.[4] That same day, due to the nationwide impact of COVID-19, the Bureau of Prisons issued a mandatory 14-day lockdown for all inmates in all BOP facilities.[5] The following day, a third inmate had tested positive and 80 inmates were showing symptoms of COVID-19.[6] The following day, April 2, 2020, an FCI Elkton inmate died of COVID-19.[7] On April 3, a second inmate died from the same virus.[8] A few days later, a third inmate died, and the Governor sent in the Ohio National Guard to assist the prison staff.[9] On April

---

[3] *https://www.timeswv.com/covid-19/there-were-no-cases-of-covid-19-in-west-virginia-federal-prisons-four-days-after/article_4d6d4ff6-8cdb-11ea-b700-b34865726b5b.html*

[4] *https://www.cleveland.com/court-justice/2020/03/federal-prison-in-ohio-where-jimmy-dimora-is-doing-time-reports-coronavirus-cases-among-inmates.html*

[5] *https://www.npr.org/sections/coronavirus-live-updates/2020/03/31/824917318/prisoners-across-country-will-be-confined-for-14-days-to-cut-coronavirus-spread*

[6] *https://www.wkyc.com/article/news/investigations/3-elkton-inmates-test-positive-for-covid-19-another-80-are-showing-symptoms/95-e24580c2-dd59-4c0a-9334-1aa061b4abbe*

[7] *https://www.cleveland19.com/2020/04/02/year-old-inmate-dies-while-federal-custody-ohio/*

[8] *https://www.wkbn.com/news/coronavirus/federal-prison-in-columbiana-county-reports-another-inmate-death-this-one-from-covid-19/*

[9] *https://radio.wosu.org/post/coronavirus-ohio-national-guard-sent-elkton-federal-prison-medical-mission#stream/0*

14, 2020, a fourth inmates died from COVID-19 symptoms[10], and the following day a fifth inmate died after testing positive for COVID-19.[11] On April 16, 2020, a sixth inmate died from COVID-19.[12] On April 27, 2020, a seventh inmate died.[13]

Much like several of the inmates at FCI Elkton who have died from COVID-19, Mr. Wheeler presents a number of health issues that place him at high risk. He is currently 77 years old, which the CDC recognizes places him as a severely high risk.[14] In fact, the CDC reports that in the United States, 8 out of 10 deaths from COVID-19 are people over age 65. Mr. Wheeler's pro se motion includes his medical records, but for the sake of clarity, he reattaches those records with the instant motion as Exhibit B. As detailed by Exhibit B, p. 4, Mr. Wheeler suffers from heart issues and is being treated for an aortic aneurysm, and also suffers from a heart murmur. People like Mr. Wheeler who have a pre-existing heart condition are particularly susceptible to fatal problems if they contract COVID-19 because the virus has an abnormal large impact on the heart.[15]

Furthermore, the prison is treating Mr. Wheeler for diabetes, and is receiving prescriptions for metformin. Ex. B, pp. 2, 4. Diabetes is a condition that places people at high-risk for COVID-

---

[10] *https://www.cleveland.com/metro/2020/04/fourth-inmate-dies-at-sole-federal-prison-in-ohio-as-coronavirus-spreads-among-inmates-staff.html*

[11] *https://www.cleveland.com/metro/2020/04/fifth-inmate-dies-of-coronavirus-at-elkton-federal-prison-in-ohio.html*

[12] *https://www.news5cleveland.com/news/continuing-coverage/coronavirus/6th-inmate-at-elkton-federal-correctional-institution-dies-from-covid-19*

[13] *https://www.nbc4i.com/community/health/coronavirus/columbus-man-is-seventh-inmate-who-dies-of-covid-19-at-elkton-correctional/*

[14] *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html*

[15] *https://www.health.harvard.edu/blog/how-does-cardiovascular-disease-increase-the-risk-of-severe-illness-and-death-from-covid-19-2020040219401*

19.[16] He also suffers from high blood pressure, for which he is prescribed hydrochlorothiazide; this is another risk factor for COVID-19.[17] Ex. B, pp. 2-3. Additionally, Mr. Wheeler is being treated for emphysema, for which he is prescribed several inhalers (cromolyn and albuterol). Ex. B, pp. 1, 3. Respiratory conditions are another ailment that places him at greater risk if he contracts COVID-19.[18] Mr. Wheeler's presentence report details that Mr. Wheeler was in a car accident in 1962, which resulted in surgery, but he still suffers from blood circulation issues and has a history of blood clots.

Mr. Wheeler is currently on a living pod with 50 to 60 people, in tight confined areas, in which two or three inmates are in a single bunking area. The institution is providing inadequate procedures to properly sanitize areas, and has insufficient practices on social distancing or preventing the spread of germs. Given the status of his physical health, and all the prevalent risk factors, his continued incarceration under these conditions places him at great risk.

Over the last few weeks, Mr. Wheeler has developed tremendous anxiety and depression over the fear of contracting COVID-19. Given his past and current health issues, he is gravely afraid of what might happen to him if he contracts COVID-19. He is greatly concerned about the institution's inability to keep him separated from others, but further that if he does get sick, that the institution lacks the ability to properly meet his medical needs. He therefore requests this Court permit him to be released on home confinement. Given these circumstances, Mr. Wheeler requests this Court grant him a compassionate release as permitted by 18 U.S.C. § 3582(c)(1)(A). These

---

[16] *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html*

[17] *https://www.webmd.com/lung/coronavirus-high-blood-pressure#1;*

[18] *https://copdnewstoday.com/2020/03/26/copd-patients-vulnerable-to-severe-covid-19-infections-study-finds/*

circumstances demonstrate extraordinary and compelling circumstances to justify a reduction in his custodial sentence.

### III.     Exceptional Circumstances: COVID-19 Pandemic

As of April 30, 2020, the new strain of coronavirus (COVID-19), has infected over 3,100,000 people globally, leading to 229,972 deaths worldwide.[19] Governor DeWine declared a State of Emergency on March 9, 2020,[20] and on March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[21] Governor DeWine issued a "stay at home" order to prevent further spread of the virus. As of April 30, 2020, there have been 17,285 confirmed cases of the virus in Ohio, 3,533 people have been hospitalized, and 898 have died.[22] The COVID-19 pandemic is "clearly out of the ordinary, uncommon, or rare" as "COVID-19 is twice as contagious as the flu, and 20 times more deadly."[23] The virus is "highly infectious," and can be spread "easily and sustainably" from person-to-person.[24] The virus can live on plastic and steel

---

[19] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (April 21, 2020), *at* *https://nyti.ms/2U4kmud* (updating daily).

[20] *https://ema.ohio.gov/Documents/pdfs/DeWine_Signs_Emergency_Order_Regarding_Coronavirus_Response_0309.pdf*

[21] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* *https://bit.ly/2W8dwpS*.

[22] *https://coronavirus.ohio.gov/wps/portal/gov/covid-19/*

[23] Governor Mike DeWine (@GovMikeDeWine), Twitter (Mar. 14, 2020, 2:19PM), *https://twitter.com/GovMikeDeWine/status/1238892579262992384?s=20*

[24] *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads* (accessed Apr. 3, 2020), *https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html*

surfaces for up to 72 hours[25], and, powered by a single cough or sneeze, can be propelled in a gas cloud that extends up to 27 feet in length.[26]

The CDC has issued guidance that individuals at higher risk of contracting COVID-19 take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[27] The conditions in jails do not allow for an inmate to take the recommended preventive actions and create an ideal environment for the transmission of contagious disease.[28] Inmates cycle in and out of jails from all over, and people who work in the facilities leave and return daily, without effective screening. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[29]

Given these circumstances and high risk of infection in jails and prisons, federal circuit and district courts across the country have released defendants from pretrial detention, due to COVID-19. *See Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (sua sponte releasing detainee from immigration detention "[I]n light of the rapidly escalating public health

---

[25] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENG. J. MED., 2 (2020), available at *https://doi.org/10.1056/NEJMc2004973* (accessed Apr 2, 2020).

[26] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19*, JAMA (2020), *https://jamanetwork.com/journals/jama/fullarticle/2763852* (accessed Apr 2, 2020)

[27] *https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/asthma.html*

[28] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at *https://doi.org/10.1086/521910*

[29] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at https://bit.ly/2W9V6oS.*

crisis"); *United States v. Meekins*, Case No. 1:18-cr-222-APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-sentence release order releasing defendant with three pending assault charges due to extraordinary danger COVID-19 poses to folks in detention); *United States v. Davis*, No. 1:20-CR-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community, and to preserve Sixth Amendment rights in this perilous time); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Hector*, Case No. 2:18-cr-3-002, Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to folks in prison); *United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (post-plea presentence release of defendant whose pretrial release was revoked because "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is necessary for Defendant to prepare his pre-sentence defense"); *United States v. Mclean*, No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, see 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun and drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the

current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic").

Given these circumstances, Mr. Wheeler's concern for his health and safety is real and significant. A sentence reduction is justified and should be granted by this Court. Mr. Wheeler requests this Court grant a reduction under 18 U.S.C. § 3582(c)(1)(A).

## IV.   Legal Standards for Seeking Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)

Prior to 2018, a district court could only receive a motion for sentence reduction under 18 U.S.C. § 3582(c)(1)(A), known as a "compassionate release" upon a motion from the Warden of the prison where the defendant was being held. The First Step Act of 2018 amended 18 U.S.C. § 3582(c)(l)(A) to allow district courts to modify sentences of imprisonment upon motion by the defendant if "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." § 603(b), 132 Stat.5 194, 5239 (codified at 18 U.S.C.§ 3582(c)(l)(A)).

Section 3582(c)(1)(A)(i) authorizes the modification of a sentence of imprisonment if "extraordinary and compelling reasons warrant such reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," as set out in United States Sentencing Guideline § 1B1.13. This Court has discretion to reduce the term of

imprisonment imposed in this case based on § 3582(c)(1)(A)(i), which states in relevant part that the Court "may reduce the term of imprisonment, after consideration of the factors set forth in section 3553(a) to the extent they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction[.]" Pursuant to the requirement of 28 U.S.C. § 994(t), as authorized by 28 U.S.C. § 994(a)(2)(C), the Sentencing Commission promulgated a policy statement that sets out the criteria for a reduction in sentencing, which, as set forth in U.S.S.G. § 1B1.13 includes, in relevant part:

> (1)(A)  extraordinary and compelling reasons warrant the reduction;
>
> (2)  the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3)  the reduction is consistent with this policy statement.

Further, the application note, 1B1.13, Application Note 1(A) provided insight into what constitutes "extraordinary and compelling reasons," which include the defendant's medical condition, and further detailed as:

> (ii)  The defendant is:
>
> (I)  suffering from a serious physical or medical condition,
>
> (II)  suffering from a serious functional or cognitive impairment, or
>
> (III)  experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Following the passage of the First Step Act of 2018, a number of other federal district courts have granted sentence reductions under § 3582(c)(1)(A). *See United States v. Beck*, Case No. 1:13-CR-186, 2019 WL 2716505 (M.D.N.C., June 28, 2017); *United States v. Johns*, Case No. 91-CR-392,

2019 WL 2646663 (D. Ariz., June 27, 2019); *United States v. Cantu-Rivera*, Case No. 4:89-CR-204, Dkt. 492 (S.D.Tx., June 24, 2019) (69-year-old defendant with health issues was granted a reduction of his life sentence to time served, having served 30 years in prison); *United States v. Cantu*, Case No. 1:05-CR-458 (S.D. Tex., June 17, 2019); *United States v. McGraw*, Case No. 2:02-CR-018, 2019 WL 2059488 (S.D.Ind. May 9, 2019) (72-year-old and wheelchair-bound defendant with other health issues was granted a reduction in his life sentence after serving sixteen years); *United States v. Bazemore*, Case No. 3:12-CR-319, Dkt. 203 (N.D.Tx., March 16, 2019); *United States v. Evans*, Case No. 4:15-CR-015, Dkt. 428 (S.D.Tx., March 8, 2019).

COVID-19 is a game-changer, which warrants consideration for a sentence reduction for Mr. Wheeler. Other federal courts have recognized the extraordinary and compelling circumstances that COVID-19 presents in assessing motions for compassionate release. The following is a list of defendants who have received a sentence reduction under the compassionate release statute due to COVID-19 (all of which were issued within the last five weeks):

1) *United States v. Marin*, No. 15-CR-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020);

2) *United States v. Muniz*, Case No. 4:09-CR-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020);

3) *United States v. Campagna*, No. 16-CR-78, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020);

4) *United States v. Powell*, No. No. 1:94-CR-00316 (D.D.C. Mar. 28, 2020);

5) *United States v. Gonzales*, No. 2:18-CR-0232, 2020 WL 1536155 (E.D. Wash. Mar. 31, 2020);

6) *United States v. Wheeler*, No. 3:04-CR-095, Dkt. 91 (N.D. Fla., April 1, 2020);

7) *United States v. Perez*, No 1:17-CR-00513, Dkt. 98 (S.D.N.Y., April 1, 2020);

8)  *United States v. Rodriguez*, No. 2:03-CR-00271, Dkt. 136 (E.D.Pa., April 1, 2020);

9)  *United States v. Garcia*, No. 95-CR-142, (E.D. Wis., March 27, 2020);

10)  *United States v. Foster*, No. 1:14-CR-324, Dkt. 191 (M.D.Pa., April 3, 2020);

11)  *United States v. Zukerman*, No. 1:16-CR-194, Dkt. 116 (S.D.N.Y., April 3, 2020);

12)  *United States v. Esparza*, No. 1:07-CR-294, Dkt. 124 (D. Idaho, April 7, 2020);

13)  *United States v. Plunk*, No. 3:94-CR-036 (D. Alaska, April 9, 2020);

14)  *United States v. Sawicz*, No. 1:08-CR-287, Dkt. 66 (E.D.N.Y., April 10, 2020);

15)  *United States v. Clagett*, No. 2:97-CR-265, Dkt. 238 (W.D.Wash., April 9, 2020);

16)  *United States v. Burrill*, No. 3:17-CR-491, Dkt. 308 (N.D.Cal., April 10, 2020);

17)  *United States v. Stahl*, No. 1:18-CR-694, Dkt. 53 (S.D.N.Y., April 10, 2020);

18)  *United States v. Tran*, No. 8:08-CR-197, Dkt. 405 (C.D.Cal., April 10, 2020);

19)  *United States v. Ben-Yhwh*, No. 1:15-CR-830, Dkt. 206 (D. Hawaii, April 13, 2020).

20)  *United States v. Hope*, Case No. 90-CR-6108, Dkt. 479 (S.D.Fla., April 10, 2020);

21)  *United States v. Hakin*, Case No. 4:05-CR-40025, Dkt. 158 (D. South Dakota, April 6, 2020);

22)  *United States v. Cosgrove*, Case No. 2:15-CR-230, Dkt. 95 (W.D.Wa. April 15, 2020);

23)  *United States v. Samy*, Case No. 16-CR-20610, Dkt. 88 (E.D.Mi., April 16, 2020);

24)  *United States v. Hammond*, Case No. 1:02-CR-294, Dkt. 51 (D.D.C. April 16, 2020);

25)  *United States v. Love*, Case No. 1:14-CR-004, Dkt. 41 (W.D.Mi., April 21, 2020).

## V.  The § 3553(a) Factors Warrant the Reduction Requested

The compassionate release statute permits this Court to reduce a defendant's sentence upon consideration of the § 3553(a) factors, and upon a finding that there are extraordinary and compelling reasons warrant such a reduction. *See* 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13. The COVID-19 pandemic is clearly an extraordinary and compelling reason to consider a reduction. For the past six weeks COVID-19 has affected every part of the globe and affected all facets of normal daily living. Citizens in the community have made changes to their daily routine and to how they physically interact with others. Those who are incarcerated are not able to make such drastic changes to their daily lives; the conditions of prison place limitations on their ability to effectively combat this virus. They cannot practice social distancing, but are contained in crowded living pods, and inmates have little to no control over the way in which their surroundings are cleaned and sterilized. Further, the sanitary conditions are substantially diminished as compared to the average community. This places James Wheeler at a heightened risk for COVID-19 simply by being incarcerated.

The conditions in the Bureau of Prisons are a relevant consideration for this Court under the statutory sentencing factors. As detailed in 18 U.S.C. § 3553(a)(2)(D), the district court must consider "the need for the sentence imposed to provide the defendant with needed education or vocational training, *medical care*, or other correctional treatment in the most effective manner." (Emphasis added).

18

The institutional problems within the Bureau of Prisons are well highlighted in a recent civil suit filed by the American Civil Liberties Union on behalf of a class of federal inmates at FCI Elkton. *See Wilson et. al. v. Williams*, Case No. 4:20-CV-794, Dkt. 1 (N.D.Ohio, April 13, 2020). Included in the complaint to that case were two declarations, by Dr. Meghan Novisky and Dr. Joe Goldenson. *See id.* at Dkt. 1-3, PageID 47-56; Dkt. 1-4, PageID 57-68. These declarations are included as exhibits to the instant motion as Exhibits C and D, respectively. While the ACLU lawsuit, and the accompanying declarations focus on FCI Elkton, the problems highlighted are seen throughout BOP facilities nationwide, and the findings of the experts should apply to Mr. Wheeler's incarceration as well.

These doctors maintain that given the circumstances in the BOP, inmates who are medically-vulnerable need to be removed from the prison. *See* Ex. C, pp. 6-7 ("Significantly reducing the prison population at Elkton as rapidly as possible is the best line of defense to maintain the public health interests of persons incarcerated at Elkton, correctional staff who work at Elkton, and the Ohio community"); Ex. D, p. 9 ("It is my public health recommendation that everyone who is medically-vulnerable to severe symptoms and death from COVID-19 . . . be released from FCI Elkton and FCL Elkton immediately.").

The lead plaintiff in *Wilson* alleges the conditions of confinement include residing in a dorm-style living quarters of 150 bunks, in a cube of 8x9 feet that houses two or three prisoners. *Wilson*, No. 4:20-CV-794, Dkt. 1, PageID 4. Another plaintiff, Bellamy, is housed a 6x8 foot cell with two other inmates and is "constantly and unavoidably" within two feet of other prisoners. *Id.* The two other plaintiffs share the same conditions. *Id.* at PageID 5.

Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissues in other vital organs including

the heart and liver.[30] People like, Mr. Wheeler, who suffer from pre-existing health issues – being 77 years old, a heart condition, high blood pressure, emphysema, and diabetes,– are at a heightened risk. Even if a person survives COVID-19, the virus can permanently damage lungs, heart, and other organs.[31] Approximately 1 out of 5 people who are infected with COVID-19 will need to be hospitalized, and many of those will need intensive care.[32] Such intensive care often requires highly specialized equipment like ventilators that are in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians.[33]

Dr. Novisky, an expert on prisons and prisoner health, notes in her declaration, "prisons, by their very nature, are high risk sites for the spread of infectious disease." Ex. C, p. 1. Dr. Goldenson, a physician with decades of experience in correctional health, agrees: "The risk of exposure to and transmission of infectious diseases, as well as the risk of harm from developing

---

[30] Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, *https://cutt.ly/etRPVRl*.

[31] Melissa Healy, *Coronavirus infection may cause lasting damage throughout the body, doctors fear*, LA TIMES (Apr. 10, 2020), available at *https://cutt.ly/htNrJ77*; *see also* Di Wu et al., *Plasma Metabolomic and Lipidomic Alterations Associated with COVID-19*, MEDRXIV 2020.04.05.20053819 (2020). For high-risk patients who survive, the effect of contracting this virus can be permanent and debilitating, and can include "profound deconditioning, loss of  digits, neurologic damage, and loss of respiratory capacity." Declaration of Dr. Jonathan Golob,  *Dawson v. Asher*, No. 2:20-cv-00409-JLR-MAT at ¶ 4 (W.D. Wash., Mar. 16, 2020), available at *https://cutt.ly/AtNrFOl*.

[32] Letter from Faculty at Johns Hopkins School of Medicine,  School of Nursing, and Bloomberg School of Public Health to Hon. James Hogan, Gov. of  Maryland (Mar. 25, 2020) available at *https://cutt.ly/stERiXk*

[33] Kevin McCoy and Katie Wedell, *'On-the-job emergency training': Hospitals may run low on staff to run ventilators for coronavirus patients*, USA TODAY (Mar. 27, 2020), available at *https://bit.ly/2V7rLsS*.

severe complications or death if infected, is significantly higher in jails, prisons, and detention centers than in the community." Ex. D, p. 5.

Because inmates are forced to exist in close, shared spaces for eating, sleeping, and bathing, it is impossible for people who are confined in prisons, jails, and detention centers to engage in the necessary social distancing required to mitigate the risk of transmission. Ex. C, ¶ 10; Ex. D, ¶ 20 ("it is "extremely difficult, if not impossible" to implement recommended social distancing and hygiene procedures in detention settings). Bureau of Prisons facilities contain high numbers of shared contact surfaces, limited access to medical care, and high numbers of people with chronic – often untreated – illnesses living in close proximity with each other exacerbate the dangers in detention settings. Ex. C, ¶ 4; Ex. D, ¶ 24.

Other public health experts have publicly warned that people held in correctional facilities are likely to face serious, even grave, harm due to the outbreak of COVID-19, including:

- Dr. Gregg Gonsalves, a professor at Yale School of Public Health;
- Dr. Ross MacDonald, Chief Medical Officer for Correctional Health Services;
- Dr. Marc Stern, an affiliate faculty member at the University of Washington School of Public Health and a correctional health care consultant,
- Dr. Oluwadamilola T. Oladeru, a resident physician in the Harvard Radiation Oncology Program at Massachusetts General Hospital, and Adam Beckman, a student at Harvard Medical School,
- Dr. Homer Venters, former chief medical officer of the New York;
- the faculty at Johns Hopkins schools of nursing, medicine, and public health; and
- Dr. Josiah Rich, a Professor of Medicine and Epidemiology at Brown University.

*See Wilson*, Case No. 4:20-CV-794, Dkt. 1, PageID 12-13 (footnotes include full citations and hyperlinks).

As detailed above, nationwide there are 1,376 total cases of COVID-19 in BOP facilities (1,046 inmates and 330 staff members) and a total of 28 inmate deaths. *See supra* footnote 1. These figures will grow every day and will threaten the health and lives of prisoners, staff, and the surrounding community. Dr. Novisky writes: "Given the structure, operations, and current

conditions at Elkton, there is no realistic set of internal conditions or practices that FBOP can use that will prevent additional infection of prisoners and staff given the current number of prisoners living at Elkton." Ex. C, ¶ 16. As detailed in the complaint in *Wilson*, inmates at Elkton live in crowded quarters; sleep in beds within a few feet of each other; the entire prison is "overcrowded, and every bed is taken up." *Wilson*, Case No. 4:20-CV-794, Dkt. 1, PageID 16. Each unit contains only a few sinks and showers, shared by more than a hundred people, and these showers and sinks are close together; also the limited televisions, phones, and computers are shared, in constant use, and close to each other, all of which greatly increase the risk of transmission. *Id.* Residents eat together, and do not have adequate hygiene products. *Id.* at PageID 17.

The growing numbers of ill and dead at Elkton "make it clear that current measures being taken by the Bureau of Prisons are not sufficient in strength nor impact to adequately protect its staff, its prisoners, or the public." Ex. C, ¶ 6. "The death rate [at Elkton] will increase substantially before it starts to diminish without major interventions." Ex. D, ¶ 32. 59. Due to the severity of the threat posed by COVID-19, and its potential to rapidly spread throughout a correctional setting, public health experts recommend the rapid release from custody of people most vulnerable to COVID-19. Ex. C, ¶¶ 18-19; Ex. D, ¶ 33. 60. Release protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for people held or working in a prison and the broader community. Ex. C, ¶ 13. Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time. Ex. C, ¶ 14. While Mr. Wheeler is medically-vulnerable simply due to his age, his history of heart issues, emphysema, diabetes, and high blood pressure provides an even greater cause for concern.

As to said pending lawsuit for relief, the Honorable James S. Gwin found the circumstances at FCI Elkton were so deplorable and dangerous that he ordered all medically-vulnerable inmates at FCI Elkton to be transferred out of the institution within two weeks. *Wilson v. Williams*, Case No. 4:20-CV-794, Dkt. 22 (N.D. Ohio April 22, 2020). Judge Gwin found based on the spread of COVID-19 at FCI Elkton, and the Bureau of Prisons's inability to properly stop the spread, preliminary injunctive relief was required for a class of individuals. Judge Gwin found the Bureau of Prisons had "been deliberately indifferent" to the risks of COVID-19 and in their efforts to reduce those risks. *Id.*, Dkt. 22, PageID 367.

While the situation FCI Terre Haute are clearly less dire than at FCI Elkton, the conditions within the Bureau of Prisons are concerning throughout all facilities. While FCI Elkton is the most obvious example of how prison conditions are encouraging the spread of the virus, these conditions are found in all facilities. It is really only a matter of time before FCI Terre Haute suffers from the same issues that currently face FCI Elkton. Mr. Wheeler's medical conditions place him at risk for fatal complications if he contracts COVID-19, and the prison is not properly equipped to address any health complications he develops. Therefore, he asks this Court to consider such conditions, in conjunction with his personal medical issues, in determining whether a sentence reduction is warranted under 18 U.S.C. § 3582(c)(1)(A).

## VI.     Changes to Mr. Wheeler's statutory and guideline range since his original sentence

In the sixteen years since Mr. Wheeler was sentenced, a number of changes to the law have occurred, both the statutory range and sentencing guidelines range to which he was subjected. Through these changes to the law, it cannot be denied that if Mr. Wheeler was convicted of the same charges today, under current law, he would not be facing the same statutory penalties or same guideline range. More specifically, Mr. Wheeler's statutory range was 20 years to life under 21

U.S.C. §§ 841(b)(1)(A), 846 and 851. He was also found to be a career offender, which placed his total offense level at 41, Criminal History Category VI, and a sentencing guideline range of 360 months to life. Ex. A, p. 19. Mr. Wheeler would be subject to lesser penalties if convicted today, and he asks this Court to consider this fact for the instant motion for relief.

The fact that Mr. Wheeler's statutory and guideline ranges have been lowered is an appropriate consideration for this Court in determining whether a compassionate release is warranted under 18 U.S.C. § 3582(c)(1)(A). *See e.g., United States v. Maumau*, 2020 WL 806121, *4 (D. Utah Feb. 18, 2020) (granting a compassionate release, and reducing defendant's 55-year sentence to time served as defendant would not receive the same sentence due to recent changes in law under 18 U.S.C. § 924(c)); *United States v. Young*. 2020 WL 1047815 (M.D.Tenn. March 4, 2020) (finding extraordinary and compelling circumstances in defendant's health issues and the disparity between his sentence and the sentence he would receive under current law); *United States v. O'Bryan*, 2020 WL 869475, *1 (D.Kan. February 21, 2020) (granting reduction because of the § 924(c) sentence stacking, as defendant's 25-year sentence would now be ten); *United States v. Urkevich*, 2019 WL 6037391, *2 (D.Neb. November 14, 2019) (granting reduction because of the § 924(c) sentence stacking, as defendant's 848-month sentence would be 368 months today); *United States v. Brown*, 411 F. Supp. 3d 446, 453 (S.D. Iowa 2019) ("a district court assessing a compassionate release motion may [ ] consider the resulting sentencing disparity when assessing if there are "extraordinary and compelling reasons" supporting release.").

While Mr. Wheeler was subject to a statutory range of 20 years to life at the time of his offense, today his offense would instead carry a statutory term of ten years to life. Both then, and now, his offense was under 21 U.S.C. § 841(b)(1)(A), but the statutory ranges have been altered by the First Step Act, passed in December of 2018. Section 401(a)(2) of the First Step Act, 132

24

Stat. 5194, 5220, altered the mandatory minimum penalties set forth in 21 U.S.C. § 841(b)(1)(A). One thing the statute did was change the twenty-year mandatory minimum to fifteen years for a conviction under § 841(b)(1)(A) with one qualifying prior conviction under § 851.

Secondly, the First Step Act changed what qualifies as a conviction that can enhance the statutory range. Prior to the First Step Act, under § 841(b)(1)(A) a sentence of ten years to life could be escalated to twenty years to life if the defendant had a previous conviction for a "felony drug offense." 21 U.S.C. 841(b)(1)(A). This is how Mr. Wheeler's statutory range was escalated from 10-to-life to 20-to-life – due to his 1972 Indiana conviction for possession of drugs. PSR at ¶ 92. Section 401(a) of the First Step Act removed the term "felony drug offense" and replaced it with "serious drug felony" 132 Stat. at 5220. The term "serious drug felony," as defined by 18 U.S.C. § 924(e)(2)(A)(ii) is limited to drug offenses involving the "manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance." In other words, under the First Step Act, only drug trafficking convictions can enhance a defendant's statutory range beyond the 10 years to life term under the current version of 21 U.S.C. § 841(b)(1)(A). Mr. Wheeler's statutory range was enhanced to 20 years to life because of his Indiana drug possession offense. PSR at ¶ 92. Because this offense if for drug possession, not trafficking, it would not qualify under today's laws as a "serious drug felony" and thus could not enhance Mr. Wheeler's statutory range. Thus, under current law, he would only be subject to a ten-year mandatory minimum under today's law. Mr. Wheeler asks this Court to consider this fact in determining whether he should receive a sentence reduction.

Mr. Wheeler's sentencing guideline range would also be significantly reduced if today's guidelines were applied. The presentence report initially found that Mr. Wheeler's criminal history score placed in Criminal History Category II. Ex. A, p. 12; PSR at ¶ 111. At the sentencing hearing,

however, the government sought to impose the career offender enhancement on Mr. Wheeler. Ex. A, p. 6. The government claimed Mr. Wheeler's two predicate offenses to qualify him as a career offender were: 1) the 1972 Indiana drug possession conviction, PSR ¶ 92; and 2) the Florida federal RICO conviction, PSR ¶ 103. Ex. A, p. 6. The Court agreed, and in doing so, raised Mr. Wheeler's base offense level from 36 to 37, and also increased his Criminal History Category from II to VI, as required by U.S.S.G. § 4B1.1(b). Ex. A, pp. 19-20.

While the Court found his 1972 Indiana drug possession conviction was a qualifying career offender predicate, this conclusion was in error. A defendant is only a career offender if they have two prior convictions for a "controlled substance offense," as defined by U.S.S.G. § 4B1.2(b). *See* U.S.S.G. § 4B1.1. A "controlled substance offense" is limited to drug trafficking offenses, not drug possession offenses, as the Guidelines define the term as:

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

Therefore, the Court erred in finding Mr. Wheeler's 1972 Indiana drug possession offense qualified as a career offender predicate. If resentenced today, the career offender guideline would not be applied. As such, Mr. Wheeler's base offense would be determined by U.S.S.G. § 2D1.1. Mr. Wheeler's offense involving 87 kilograms of cocaine and the corresponding amounts of marijuana and valium as set forth in the presentence report, PSR ¶ 57, equates to a converted drug weight of 17,400 kilograms. Under the current sentencing guidelines, this equals a base offense level of 34. U.S.S.G. § 2D1.1(c)(3) (converted drug weight between 10,000 kg and 30,000). With his four-level enhancement for his role, his total offense level would be 38. Applying his Criminal

History Category II (since he would no longer be a career offender), the corresponding guideline range would be 262 to 327 months.

In total, under the current guidelines, Mr. Wheeler's range would no longer be 360 months to life, but be 262 to 327 months. Also keep in mind that he was sentenced in December of 2004, only a few months before *United States v. Booker*, 543 U.S. 220 (2005), was issued when the guidelines were mandatory; today sentencing courts consider varying downward from the now-discretionary guidelines. While the changes to the law, as set forth above, are significant, none of them provide independent grounds for relief in which Mr. Wheeler could obtain relief from his life sentence. These statutory and guidelines changes are not retroactive. This Court, however, has the power to consider these changes to the law in determining whether a sentence reduction is warranted under 18 U.S.C. § 3582(c)(1)(A). The compassionate release statute provides this Court with significant discretion to consider whatever may be relevant to Mr. Wheeler's continued incarceration.

The fact that he would likely not receive the same sentence today is a valid consideration, especially in conjunction with Mr. Wheeler's personal health issues and the COVID-19 pandemic that is greatly affecting our nation's prisons. In looking at the totality of these issues, there exists extraordinary and compelling reason to grant a compassionate release and permit the 77-year-old James Wheeler to serve the remainder of his sentence on home confinement.

## VII.    Mr. Wheeler's Letters of Support and Release Plan

If this Court granted Mr. Wheeler the requested relief, he would go to live with his sister in East Blufton, Indiana, as a condition of his home confinement. If released, his primary objective would be to obtain the necessary medical care he needs to ensure his health and safety. Once he

was stable, he would seek to find his own independent living arrangement where he could maintain his home confinement status.

To further demonstrate Mr. Wheeler's release plan efforts, he attaches to this motion Exhibit E, which consists of 32 pages of letters of support for Mr. Wheeler. Each of these letter demonstrate that Mr. Wheeler has significant contacts in the community, who are dedicated to assisting him with his transition back to the community. The first letter is by Matt Frank, the regional spokesman for the Outlaws Motorcycle Club. Ex. E, p. 1. Mr. Frank explains that Mr. Wheeler will not have any contact with his co-defendants or members of the Outlaws Motorcycle Club. He further that makes clear that all 36 of Mr. Wheeler's co-defendants have been released from prison and that none of them have violated their supervised release terms. Ex. E, p. 1. The remaining letters are all from friends of Mr. Wheeler who detail that he is no longer a threat to the community, that he has significant health issues, and a fear that COVID-19 will have serious consequences on Mr. Wheeler's health condition if he contracts the virus. All these letters request leniency and that this Court reduce his life sentence. Ex. E, pp. 1-32. Mr. Wheeler asks this Court to consider these letters in evaluating his motion for compassionate release.

## VIII.   Conclusion

For the foregoing reasons, James Wheeler requests this Court grant him a compassionate release as permitted by 18 U.S.C. § 3582(c)(1)(A). These circumstances demonstrate extraordinary and compelling circumstances to justify a reduction in his custodial sentence. He asks this Court to reduce his sentence to time served and that he immediately be placed on supervised release, with the condition he be placed on home confinement through the remainder of his custodial term.

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

*/s/ Jeffrey B. Lazarus*
JEFFREY B. LAZARUS
Assistant Federal Public Defender
Ohio Bar: 0079525
1660 West Second Street, Suite #750
Cleveland, OH 44113
(216)522-4856   Fax:(216)522-4321
E-mail: jeffrey_lazarus@fd.org

Attorney for James Wheeler