IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 3:03-CR-00739 |
| | ) | |
| Plaintiff, | ) | Judge James G. Carr |
| | ) | |
| v. | ) | Government's Second Supplemental |
| | ) | Response in Opposition to Defendant's First |
| JAMES LEE "FRANK" WHEELER, | ) | Step Act Motion Raising Medical Issues/ |
| | ) | COVID-19 to Support  a Compassionate |
| Defendant. | ) | <u>Release or Reduction in Sentence</u> |
| | ) | |

Wheeler filed a *pro se* motion for compassionate release based on extraordinary and
compelling grounds on March 26, 2020, raising the amended definition of a prior "serious"
felony drug conviction under 21 U.S.C § 841(b)(l)(a), citing Section 401 of the First Step Act of
2018. (R. 2278: Mot., PageID 7301-38).  On May 5, 2020, appointed counsel supplemented
Wheeler's *pro se* motion, adding a claim that the COVID-19 supported Wheeler's alleged
medical claims for compassionate release under 18 U.S.C. § 3582(c)(1)(A).  (R. 2281: Suppl.,
PageID 7349-7377).

After each filing, the government responded that both motions failed on procedural
grounds.  As to Wheeler's *pro se* motion, the government responded to the claim his sentence
was unjust because his prior felony drug conviction no longer qualifies under 21 U.S.C. § 851(a),
should be dismissed because: (1) Section 401 of the First Step Act amending the definition of
prior felony drug conviction to "serious" felony drug conviction was not retroactive to sentences
imposed before December 21, 2018; and (2) the District Court had already held that the life
sentence it imposed was *not* the result of the 21 U.S.C. § 851 information the government filed.

(R. 2279: Govt's Resp. in Opp., PageID 7346).  As to Wheeler's COVID-19 supplemental motion, the government responded that Wheeler had not presented that issue to the Bureau of Prisons ("BOP") in his original December 2019 application for compassionate relief, nor had he submitted a follow-up application allowing the BOP to consider the coronavirus issue.  Because he had neither exhausted his administrative remedies nor waited 30 days with no action from the BOP, the COVID-19 issue was not properly before this Court.  (R. 2282: Govt's Suppl. Resp. in Opp., PageID 7471-74).

Wheeler replied to the government's response.  He wrote that his *pro se* petition requested a reduction based, at least in part, on his medical condition. Defense counsel asserted that his supplemental motion only provided further support for his medical claim by providing additional relevant information that his health is at risk by his continued incarceration, due to the COVID-19 virus.  But, counsel added, if the Court believed that Wheeler's supplemental motion was not fully exhausted, then he asked the Court to waive the exhaustion requirement given the current circumstances, contending that exhaustion is not absolutely mandatory.  (R. 2283: Reply to Response, PageID 7482).

The government continues to maintain that Wheeler's First Step Act motion and supplemental motion should be denied based on procedural law.  However, should the Court not accept the government's position, it should have the benefit of a discussion on the merits from both parties before making a decision.  To that end, the government filed a Motion for Leave to File Surreply on Merits.  (R. 2284: Mot. For Leave, PageID 7488-93).

Argument

I.  <u>The Sixth Circuit held 18 U.S.C. § 3582(c)(1)(A)'s Administrative Exhaustion Requirement is Mandatory</u>

The Sixth Circuit recently upheld a dismissal without prejudice for an inmate who filed

2

an 18 U.S.C. § 3582(c)(1)(A) motion for compassionate release with the district court before the
BOP had 30 days to respond to his COVID-19 application.  In United States v. Alam, ---F.3d ---,
2020 WL 2845694, No. 20-1298 (6th Cir. June 2, 2020), the inmate was 64 years old and
suffered from obesity, diabetes, coronary artery disease, and had kidney stones and bladder
issues.  He had served about half of a 101-month sentence for health care and wire fraud for his
role in an $8 million Medicare kickback scheme.  Alam sent a letter to the prison warden
requesting compassionate release, fearing the health risks created by the COVID-19 pandemic.
Id. at *1.  But he didn't wait for a response.  Ten days later, he moved for emergency relief in
federal court.  The government pointed out that Alam had not complied with the compassionate-
release statute's administrative exhaustion requirement, 18 U.S.C. § 3582(c)(1)(A).  The district
court found that the requirement was obligatory and dismissed Alam's claims without prejudice.
Alam appealed.  Id.

On appeal, the Sixth Circuit first held that failure to satisfy the exhaustion requirement
did not deprive it of subject matter jurisdiction.  Nevertheless, it held that the exhaustion
requirement "remains a mandatory condition."  Id. at *2.  The Court wrote that the government
timely objected to Alam's failure to exhaust at every available opportunity, and for good reason.
"It wants to implement an orderly system for reviewing compassionate release applications, not
one that incentives line jumping."  Id. at *3.  The Court added, "Preventing prisoners from
charging straight to federal court serves important purposes.  It ensures that the prison
administrators can prioritize the most urgent claims.  And it ensures that they can investigate the
gravity of the conditions supporting compassionate release and the likelihood that the conditions
will persist.  These are not interests we should lightly dismiss or re-prioritize."  Id. at *4.  The
Court agreed with the one published decision of a federal court of appeals faced with a

circumstance in which the prisoner failed to comply with the § 3582(c)(1)(A) administrative exhaustion requirement.  In United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020), that court found the omission a "glaring roadblock foreclosing compassionate release."  Id. at *4.

Finally, the Sixth Circuit explained that the seriousness of COVID-19 and its spread in many prisons makes it all the more imperative that the prisons have authority to process these applications fairly and with due regard for the seriousness of each inmate's risk.  "Free-floating exceptions to the rule, available to anyone willing to go to federal court first, will not help that cause.  Recall that inmates can identify the ongoing public health crisis in their initial petition to their wardens.  If that doesn't work, prisoners can pursue administrative review.  If that also comes up short (or if 30 days pass), prisoners have the option to go to federal court."  Id.

The Alam court said the proper course of action in such cases is dismissal without prejudice.  "This approach comports with the general rule that we must strictly enforce statutory limits on the timing of a claim's filing."  Id. at *5.  The Sixth Circuit concluded, "If (rather than dismissing) we sat on untimely compassionate release motions until the 30-day window ran its course, we could end up reviewing stale motions.  Better to have Alam refile with the benefit of whatever additional insight he may have gleaned."  Id.

Similar to Alam, Wheeler did not exhaust his BOP administrative requirements under § 3582(c)(1)(A) based on a claim of health risk related to the COVID-19 virus.  In fact, he never raised medical issues in his original BOP application for compassionate release.  The nature of Wheeler's application for compassionate release was specifically premised on "extraordinary and compelling" grounds in the nature of the "Statutory Sentence Structure for my offense(s) of conviction."  Wheeler refers to the amended definition of prior felony drug conviction under 21 U.S.C. § 841(b)(1)(A).  (R. 2278-7: Mot. for Comp. Rel. under First Step Act, PageID 7333-34).

4

In his own exhibit, Wheeler declared in his proposed release plan:

> I am age eligible for Social Security, as well as have assets to cover any and all financial needs, costs, transportation, etc.  As well, I have medical coverage, and will be provided treatment through my attending physician in Blufton, OH.
>
> *This application is not based on medical needs*, although my medical condition is deteriorating, *primary owing to age related matters*, for which there is no treatment.

(R. 2278-7: Ex.: BOP App. For Compassionate Rel., PageID 7334) (emphasis added).  Although Wheeler attached medical records to his *pro se* judicial motion, clearly, his application was not based on medical issues.  He acknowledged only that his health was deteriorating primarily due to age, for which he recognized there is no treatment.  Nevertheless, defense counsel countered that Wheeler did raise medical issues, and that his supplemental motion raising COVID-19 concerns is not a new claim, but merely additional support for Wheeler's medical claims, describing another way in which his health is in jeopardy.  (R. 2283: Reply, PageID 7482).

Counsel also urges this Court to waive the exhaustion requirement because a "delay of a month carries the risk of catastrophic health consequences."  (Id., PageID 7486).  However, the Sixth Circuit specifically held that the exhaustion requirement is mandatory.  Congress's language says a "court may not" grant relief without complying with the exhaustion requirement, 18 U.S.C. § 3582(c), and thus operates as an "unyielding procedural requirement[ ]." Alam, 2020 WL 2845694, *3, quoting United States v. Dowl, 956 F.3d 904, 908 (6th Cir. 2020).  Moreover, the Alam opinion cautioned against courts attempting to divine whether the BOP may wish to act on any given petition.  "Speed matters, yes.  But accuracy matters too."  Id. at *4.

Here, there is no evidence that Wheeler presented medical claims to the BOP in his December 2019 application.  Nor has Wheeler presented another application to the BOP raising COVID-19 concerns.  Following the Sixth Circuit guidance in Alam, Wheeler should present his

medical claims, including any health risks due to COVID-19, in an administrative request to the BOP.  The seriousness of COVID-19 and its spread in many prisons make it all the more imperative that the prisons have authority to process these applications fairly and with due regard for the seriousness of each inmate's risk.  Alam, 2020 WL 2845694, *4.  Wheeler has not given the BOP the opportunity to review his risk, and he should not be allowed to line jump other inmates.  Accordingly, Wheeler should follow the First Step Act procedure by applying to and waiting for the BOP to respond, or if it does not respond in 30 days, only then file a judicial motion with the District Court.  Otherwise, this Court "could end up reviewing stale motions . . . without the benefit of whatever additional insight he may have gleaned."  Alam, 2020 WL 2845694, *5.

For these reasons, this Court should dismiss Wheeler's pending First Step Act motion without prejudice based on procedural law.

II.    Wheeler's Medical Records Do No Indicate He is Eligible for Compassionate Release.

In his supplemental motion, Wheeler states that he suffers from heart issues, a heart murmur and is being treated for an aortic aneurysm.  He also is being treated for diabetes, high blood pressure and emphysema.  (R. 2281: Supple. Mot., PageID 7357-58).  Wheeler says that he has developed tremendous anxiety and depression over the fear of contracting COVID-19.  (Id., PageID 7358).  Wheeler was 62 years old at his initial sentencing, and 66 years old when the Court amended his sentence on June 19, 2009.  He is now 77 years old.

U.S. Sentencing Guideline ("U.S.S.G.") § 1B1.13 concerns reductions in a term of imprisonment under 18 U.S.C. § 3582(c)(1)(a).  It states:

Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the

original term of imprisonment) if, after considering the factors set forth in 18 U.S.C.
§ 3553(a), to the extent that they are applicable, the court determines that—

(1) (A) extraordinary and compelling reasons warrant the reduction; or

  (B)  the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in
prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense
or offenses for which the defendant is imprisoned;

(2)  the defendant is not a danger to the safety of any other person or to the community,
as provided in 18 U.S.C. § 3142(g); and

(3)  the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.  Wheeler is more than 70 years old.  However, he has not served at least 30

years in prison for the offense of conviction.  Accordingly, to allow a reduction of sentence for

medical condition, he must meet the "extraordinary and compelling reasons" requirement of

§ 1B1.13(1)(A).

Application Note 1 to U.S.S.G. § 1B1.13 sets forth the "extraordinary and compelling

reasons" that may justify compassionate release for medical conditions.  The note provides:

1.  Extraordinary and Compelling Reasons.—Provided the defendant meets the
requirements of subdivision (2) [i.e., not a danger to the safety of any other
person or to the community], extraordinary and compelling reasons exist under
any of the circumstances set forth below:

(A) Medical Condition of the Defendant.—

(i)  The defendant is suffering from a terminal illness (i.e., a serious and
advanced illness with an end of life trajectory). A specific prognosis of life
expectancy (i.e., a probability of death within a specific time period) is not
required. Examples include metastatic solid-tumor cancer, amyotrophic
lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)  The defendant is—

(I)  suffering from a serious physical or medical condition,

(II)  suffering from a serious functional or cognitive impairment, or

(III)  experiencing deteriorating physical or mental health because of the

7

aging process,

> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, app. n. 1.

The Bureau of Prisons has supplied the government with Wheeler's medical records for 2020. They will be filed as an exhibit under seal, and a copy supplied to the Federal Public Defender's Office.

These medical records do not indicate, nor does Wheeler allege, that he suffers from an terminal illness. The report of April 7, 2020, shows that his hypertension was in the good range. He was unaware he had emphysema, and in regard to pulmonary issues, stated he gets around well. He had some irritation in his ears from hearing aids, but antibiotic ointment healed his right side. A chest x-ray from June 2017 showed a calcified nodule in his left lung, but Wheeler denied any chest pain or shortness of breath on exertion. (Govt. Ex. A, Pages 4-6). The assessment of April 7, 2020 shows that Wheeler's diabetes and his A1C test was in the good range. His cholesterol level was high, so his prescription was increased. (Id., Page 9). Regarding the abdominal aortic aneurysm, his blood pressure was under control on April 7, 2020, and a repeat ultrasound was performed on May 26, 2020.[1] (Id., Pages 1, 9). Wheeler's prescription for Vitamin D was increased and a DEXA scan for bone density was scheduled for the summer. (Id., Page 9). In late March, he was sweating heavily but had no fever, and complained that the other inmates were worried that they would catch something from him. (Id., Page14). Three days later after having fluids following dehydration, Wheeler seemed to be

---

[1] Wheeler previously had a routine ultrasound in June 2019 of the unruptured abdominal aortic aneurysm, to be repeated yearly. (Id., Page 38).

doing well, with no medical complaint.  (Id., Page 13).  On March 19, 2020, he was evaluated for some skin lesions or rash on his legs, and was prescribed medicine and topical cream.  (Id., Page 17).

As the Court can see, none of these medical conditions support an extraordinary and compelling reason why Wheeler should be granted compassionate release.  He does not allege that he is non-ambulatory, nor that he cannot self-perform the activities of daily living.  His various ailments are, as Wheeler himself stated in his BOP proposed release plan, physical deteriorations "primarily owing  to age related matters, for which there is no treatment."  (R. 2278-7: Mot. for Compassionate Release, PageID 7334).

Turning to the COVID-19 pandemic issue, Wheeler cites statistics and graphs from all BOP facilities combined, and singles out FCI Elkton in particular.  (R. 2281: Suppl. Motion, PageID  7353-57).  FCI Elkton is one of the three initial "hotspots" of the coronavirus in federal detention facilities.  Wheeler conceded that at the time of his filing on May 5, 2020, there were no reported positive cases of COVID-19 at FCI Terre Haute.  As of June 3, 2020, there were three positive cases out of 1,319 inmates.  This equates to 0.22 % of inmates testing positive in FCI Terre Haute.  In contrast, the number of positive cases at FCI Elkton is presently 461 inmates out of a total 2,295, for 20.0 % testing positive.  The facility where Wheeler is housed has nearly *one hundred percent fewer* inmates testing positive for COVID-19.  Wheeler's exhibits, including doctors' declarations discussing the public health recommendations focusing on FCI Elkton (R. 2281: Ex. C and D), are not relevant to Wheeler's institution.

Moreover, the BOP has recognized that the COVID-19 pandemic is dangerous.  It has taken significant measures in an effort to protect the health of the inmates in its charge.  In BOP's words, "maintaining safety and security of [BOP] institutions is [BOP's] highest

9

priority."  See Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020),

available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.  Consequently,

Wheeler's speculative COVID-19 exposure is mitigated as a result of the BOP's ongoing

program.

      For all of these reasons, Wheeler has failed to demonstrate that his medical condition is

so grave that, even considering the COVID-19 pandemic, he qualifies for early release.

  III.   Wheeler's Life Sentence Reflects the 18 U.S.C. § 3553(a) Sentencing Factors, Including
        his Danger to Society.

      Alternatively, Wheeler's request for a sentence reduction should be denied because his

release would pose a danger to the safety of the community and does not otherwise merit release

under the 18 U.S.C. § 3553(a) sentencing factors.  Under the applicable policy statement, this

Court must deny a sentence reduction unless it determines the defendant "is not a danger to the

safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).  Additionally, this court

must consider the § 3553(a) factors, as "applicable," as part of its analysis.  See § 3582(c)(1)(A);

United States v. Chambliss, 948 F.3d 691, 694 (5th Cir. 2020).  These factors include, but are not

limited to, the nature and circumstances of the offense; the history and characteristics of the

defendant; the need for the sentence to reflect the seriousness of the offense; to promote respect

for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal

conduct both specific and in general; and to protect the public from further crimes of the

defendant.  See § 3553(a).

      On January 5, 2005, Wheeler was sentenced to life imprisonment on Counts 1 and 3, the

substantive RICO and drug conspiracy counts, to run concurrently, and to 20 years imprisonment

on Count 2, the RICO conspiracy count, to run consecutively.  (R. 1684: Jmt. of 1/5/2005).  On

appeal, however, the Sixth Circuit found that the two Ohio RICO counts overlapped the time

period of a previously-prosecuted Florida indictment.  Because the same criminal enterprise was implicated in both jurisdictions, it reversed Wheeler's convictions on Counts 1 and 2, the Ohio substantive RICO and RICO conspiracy, on double jeopardy grounds, and upheld Count 3, the drug trafficking conspiracy.  Following remand, the District Court dismissed Counts 1 and 2, but left intact Wheeler's life sentence on Count 3.  (R. 2070: Amended Jmt. of 6/19/2009).  The dismissal  of Counts 1 and 2 did not mean that the conduct did not occur.  Those criminal acts remain relevant conduct for the purposes of sentencing.  Relevant conduct is "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."  U.S.S.G. § 1B1.3(a)(1)(A).

Wheeler's Second Revised Presentence Report ("PSR") of December 8, 2004, sets forth relevant conduct this Court should consider under the § 3553(a) sentencing factors.  The government will file the PSR under seal (Govt. Ex. B), and provide a copy to defense counsel.

Wheeler's criminal history paints a portrait of a dangerous man who regularly used violence and guns to control drug trafficking, and to intimidate rival biker gangs.  In 1981, Wheeler was stopped near the Outlaw Motorcycle Club ("OMC" or the "Outlaws") clubhouse by Indianapolis plainclothes officers carrying a fully loaded .357 magnum revolver with six other rounds in his pocket.  Wheeler said he armed himself because a fellow Outlaw member was killed by a rival gang, the Sons of Silence, and he was worried that he would be next.  (R. N/A: PSR ¶ 98).   In 1983, Wheeler was arrested for carrying a .38 Smith and Western revolver while strategically positioning himself in a Gary, Indiana bar, in anticipation of an encounter with a rival gang member.  (PSR ¶ 100-01).

The PSR shows the offense conduct supporting Wheeler's convictions in Florida for RICO, RICO conspiracy, and obstruction of justice.  In his capacity as a National Vice President

11

of the OMC, Wheeler sanctioned the bombing of a rival gang's Chicago clubhouse.  (PSR ¶ 108).  On November 7, 1994, the Outlaws placed an explosive device in a stolen car and detonated it in front of the Chicago, Illinois, clubhouse of the Hell's Henchmen.  The explosive force shredded the stolen vehicle into fragments and disbursed the fragmentation throughout a one block radius.  Several cars passing by the clubhouse at the time of the explosion were severely damaged.  A residence located across the street from the clubhouse suffered severe damage from pieces of the automobile the bomb had been placed in; pieces of steel actually penetrated the interior of the residence.  The blast ripped the Hell's Henchmen clubhouse's steel plate entrance door from its hinges and propelled it into the building, punching a hole in a brick wall 25 feet away.  Also, the side entrance doors were ripped from their jambs.  Fragmentation and blast pressure shattered glass block windows of the clubhouse and damaged furnishings within the clubhouse.  The incendiary effect of the explosion created a fireball and subsequent related fires.  Although the bomb failed to completely destroy the clubhouse, Outlaws members returned later and doused it with gasoline before burning it down.  The clubhouse was condemned and put up for sale. Outlaws members celebrated by returning to the site and giving the ruined structure the "one finger salute."  OMC leaders bragged that other Outlaws Motorcycle Club regions should be equally aggressive in targeting and destroying rival clubhouses.  (PSR ¶¶ 106-08).

An FBI investigation of the OMC beginning in or about 1997, developed numerous witnesses, some of whom were current and former OMC members, who testified to substantial stolen vehicle distribution, and other illegal acts controlled by and directed by Wheeler, through the OMC.  The investigation has also revealed several violent acts, including murder, committed by OMC members to further the affairs of the enterprise.  (PSR ¶ 46).

As the then-International President of the OMC, Wheeler and other OMC leaders were particularly concerned with deterring club members and associates, to include wives and girlfriends, from cooperation with law enforcement.  In fact, the OMC manufactured and distributed t-shirts bearing the logo "Snitches are a Dying Breed."   The OMC regularly informed its members that persons cooperating with law enforcement would be hurt or killed.  To further insulate and protect the OMC from penetration by government informants, OMC members and associates were administered voice stress analyzer tests designed to determine whether they were cooperating with law enforcement.  The witnesses testified that the purpose of the tests, along with determining who was cooperating, was to intimidate members and associates from approaching or cooperating with law enforcement.  (PSR ¶ 64).

Wheeler, as leader of the OMC, engaged or directed his club members to engage in, a variety of RICO predicate acts including the sale of controlled substances, the unlawful use of communications facilities to further controlled substances violations, interstate travel in aid of racketeering, the interstate transportation and sale of stolen motor vehicles and stolen property, conspiring to collect debts by extortionate means, murder, attempted murder, robbery and arson. (PSR ¶ 47).  The drugs included distribute cocaine, methamphetamine, LSD, marijuana, ecstasy and valium (diazepam), Schedule I, II and N controlled substances.  (PSR ¶ 4).

The jury returned a special verdict finding that amount of trafficked drugs attributed to Wheeler was 5 kilograms or more of cocaine, and 100 kilograms but less than 1,000 kilograms of marijuana.  (R. 1161: Special Verdict, pg. 2).  His PSR determined that Wheeler's conduct involved the equivalent of 17,512.77 kilograms of marijuana.  (PSR ¶ 78).

At the sentencing hearing, the government described how the OMC nearly killed an innocent man in Anderson, Indiana, tried to blow up a clubhouse in Indianapolis, Indiana, for

13

which Wheeler was directly involved.  (R. 1793: Sent. Trans. at TR 24; R. 2281-1: Ex. A, PageID 7401).  The government explained that the punishment was not about the Outlaws or any other group, but about the individual person—Wheeler.  (Id. at TR 27, PageID 7404).   Wheeler chose to use his particular club to intimidate and control others as a way to distribute hundreds of kilograms of cocaine, marijuana, and many other drugs.  (Id. at TR 24, PageID 7401).

District Judge David A. Katz, who presided over Wheeler's trial, described Wheeler as "an ironfisted leader."  (Id. at TR 11, PageID 7388).  In fashioning Wheeler's sentence, Judge Katz explained:

> And I have said often from this bench and other venues that most judges, this one included, take no pleasure in imposing sentences.  But the impact which this defendant had on the lives of so many others, both directly and indirectly, drives me to a conclusion from which I can't escape.  This case has given me significant opportunity to reflect on the law, vis-à-vis the influence for evil one person can have on so many others.

(Id. at TR 27-28, PageID 7404-05).  The Court found that Wheeler perpetuated and enlarged a culture within the OMC which venerated disdain for the rule of law, and replaced it with its antithesis, a rule of crime, fear, and violence.  (Id. at TR 28, PageID 7405).  The Court added that it seriously considered the nature and circumstances of the offenses, and looked at what was a just punishment for that "evil which was created by the atmosphere permeating the Outlaw Motorcycle Clubs under his control.  And that is the appropriate word, 'control.'"  (Id. at TR 29, PageID 7406).  The Court determined that a life sentence "reflects the seriousness of the crime; it affords protection to the public and prohibits this defendant from any further criminal activity."  (Id. at TR 30, PageID 7407).

The Court explained its sentence years later in its July 26, 2010, Order denying Wheeler's 28 U.S.C. § 2255 motion to amend, correct, or vacate its sentence.  It reiterated:

Instead of applying a statutory limit to determine Wheeler's sentence, this Court relied upon the U. S. Sentencing Guidelines and 18 U.S.C. § 3553(a) factors.  This Court stated:

> [I]t seems to me that *under the guidelines*, most of this *doesn't make any difference*.  It would appear to me, for instance, even if Mr. Wheeler were a criminal history category 36 – or a 2, and an offense level of 36, that the maximum under there is 262 months under Counts 1 and 3.  And if I followed that, I will tell you, *I would impose them consecutively*.  That's 524 months, or 43 years plus.
> We then come to Count 2, which is 20 years consecutive.
> So whether it's a 37 plus four [for leadership role], and a mandatory 360 years to life as a criminal history category six, or a 36 with a criminal history of category two, the sentence is going to be tantamount to life.  I want to make that very clear.

(R. 2155: Order, quoting R. 1793: Sentencing Transcript at TR 12). (emphasis added) (See also R. 2281-1: Ex. A, PageID 7389).  As the government explained above, Wheeler's sentence was not based upon the § 851(a) enhancement for prior felony drug convictions.  It was based upon the Sentencing Guidelines, which remain unaffected by the First Step Act of 2018.  The Court reiterated its reasoning in 2010.

Five years after Wheeler's original sentence, the Sixth Circuit remanded the case for resentencing, after reversing the convictions on Counts 1 and 2.  Judge Katz did not reduce the life sentence on Count 3.  He had a clear memory of the defendant, the trial and the evidence, and did not find that Wheeler deserved a lesser sentence by the mere passage of time.  Instead, Judge Katz re-imposed a life sentence for Count 3, the drug trafficking conspiracy.  (R. 2070: Amended Jmt. of 6/19/2009, PageID 4333-34)

The government maintains that Wheeler does not meet the § 3553(a) sentencing factors to support a compassionate release.  He was and remains a dangerous person, due to the influence and legacy he has over the Outlaws.  The letters in support he offers read alike: *Defendant is 77 years old, he has spent 17 years in prison, he is not a danger to society*.  (R.

15

2281-5:  Ex. E, PageID 7438-69).  Some writers contend that Wheeler does not deserve to die in prison, he is older and does not deserve to die in a cage, it is cruel to let him die in prison, with the world wide pandemic his sentence could turn into a death sentence, let him spend his final years with his loving sister.  (Id.).

Wheeler was not a youngster when he was sentenced to a life term of imprisonment—he was already 62 years old.  It could not have escaped Judge Katz's notice that a "life" sentence would necessarily mean just that—a life sentence.  This was the Court's Order.  This was the Court's intention.  Anything less would demean the seriousness of the offense.  The advent of the COVID-19 pandemic does not alter these facts, nor make Wheeler's sentence less deserved than it was when originally imposed.  Wheeler's sentence fit within the Sentencing Guideline's range then, and the First Step Act does not support a change.

This Court has the discretion whether or not to grant Wheeler compassionate release on the basis of medical issues.  See United States v. Brown, 411 F. Supp. 3d 446, 451 (S.D. Iowa Oct. 8, 2019) ("[T]he most natural reading of the amended § 3582(c) . . . is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it.").  However, in exercising discretion under § 3553(a) and the First Step Act, most courts treat compassionate release "due to medical conditions [a]s . . . a rare event."  White v. United States, 378 F.Supp.3d 784, 787 (W.D. Mo. May 9, 2019).   Wheeler's case and his medical conditions are not such a rare event that would justify the grant of a compassionate release, particularly after Judge Katz thoughtfully and deliberately imposed a life sentence for Wheeler's criminal conduct on two separate occasions.  Accordingly, this First Step Act motion should be denied on the merits.

<u>Conclusion</u>

For the foregoing reasons, the Court should deny Wheeler's First Step Motion for

Compassionate Release or Reduction in Sentence because it fails procedurally and on the merits.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:   /s/ Ava R. Dustin
Ava R. Dustin (OH: 0059765)
Assistant United States Attorney
Four Seagate, Suite 308
Toledo, OH 43604
(419) 259-6376
(419) 259-6360 (facsimile)
Ava.Rotell.Dustin@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this  5th  day of June, 2020, a copy of the foregoing document

was filed electronically.  Notice of this filing will be sent to all parties by operation of the

Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties

may access this filing through the Court's system.

Jeffrey B. Lazarus
Assistant Federal Public Defender
1660 West Second Street, Suite 750
Cleveland, OH 44113
    Attorney for Defendant James Lee "Frank" Wheeler

/s/  Ava R. Dustin
Ava R. Dustin
Assistant U.S. Attorney

17